[NOT YET SCHEDULED FOR ARGUMENT]
**25-5285**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

SHIRA PERLMUTTER, Register of Copyrights and Director of the U.S. Copyright Office,
Plaintiff-Appellant,

*v.*

TODD BLANCHE, in his capacity as the person claiming to have been acting Librarian of Congress, et al.,
Defendants-Appellees,

---

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-1659
Hon. Timothy J. Kelly, U.S. District Judge

---

# JOINT APPENDIX

---

Allyson R. Scher
Brian D. Netter
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ascher@democracyforward.org
bnetter@democracyforward.org

*Counsel for Plaintiff-Appellant*

Brett A. Shumate
*Assistant Attorney General*
Michael S. Raab
Ashley C. Honold
David L. Peters
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
202-598-6735
ashley.c.honold@usdoj.gov
david.l.peters@usdoj.gov

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

District Court Docket Sheet (No. 1:25-cv-01659-TJK) .................... JA001

Complaint, Dkt. 1 .................................................................... JA012

Declaration of Shira Perlmutter, Dkt. 24-3 .................................... JA026

Exhibit A to Preliminary Injunction, Dkt. 24-4 ............................... JA033

Exhibit B to Preliminary Injunction, Dkt. 24-5 ............................... JA035

Transcript of Preliminary Injunction Hearing, Dkt. 35 .................. JA038

Order (July 30, 2025), Dkt. 39 ........................................................ JA093

Memorandum Opinion, Dkt. 40 ....................................................... JA094

Plaintiff's Notice of Appeal, Dkt. 41 ................................................ JA109

Order (August 20, 2025), Dkt. 47 .................................................... JA111

Memorandum, Dkt. 48 ..................................................................... JA112

APPEAL,TYPE-D

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:25-cv-01659-TJK

PERLMUTTER v. BLANCHE et al
Assigned to: Judge Timothy J. Kelly
Case in other court: USCA, 25-05285
Cause: 05:0701 Judicial Review of Agency Decision

Date Filed: 05/22/2025
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: Federal Question

**Plaintiff**

**SHIRA PERLMUTTER**
*Register of Copyrights and Director of the U.S Copyright Office*

represented by **Donald Beaton Verrilli , Jr**
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
202-220-1101
Email: donald.verrilli@mto.com
*TERMINATED: 07/31/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miranda E. Rehaut**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071-3426
213-683-9100
Fax: 213-687-3702
Email: miranda.rehaut@mto.com
*TERMINATED: 07/31/2026*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adeel Mohammadi**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071-3426
213-683-9543
Email: adeel.mohammadi@mto.com
*TERMINATED: 07/31/2026*
*ATTORNEY TO BE NOTICED*

**Brian D. Netter**
DEMOCRACY FORWARD FOUNDATION
PO Box 34553

Washington, DC 20043
202-808-1846
Email: bnetter@democracyforward.org
*ATTORNEY TO BE NOTICED*

**James Salzmann**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071-3426
213-683-9577
Email: james.salzmann@mto.com
*TERMINATED: 07/31/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kuruvilla Joseph Olasa**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071
213-683-9530
Email: Kuruvilla.Olasa@mto.com
*TERMINATED: 07/31/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allyson R. Scher**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: ascher@democracyforward.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**TODD BLANCHE**
*in his capacity as the person claiming to be acting Librarian of Congress*

represented by **Christopher R. Hall**
U.S. DEPARTMENT OF JUSTICE
FEDERAL PROGRAMS BRANCH, CIVIL
DIVISION
20 Massachusetts Avenue, NW
Room 7224
Washington, DC 20530
(202) 514-4778
Fax: (202) 616-8202
Email: christopher.hall@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530
771-220-9755
Email: stanley.woodward@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Hayes**
Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-514-8214
Email: Benjamin.T.Hayes@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAUL PERKINS**
*in his capacity as the person claiming to be the Register of Copyrights*

represented by **Christopher R. Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Hayes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SERGIO GOR**
*in his official capacity as the Director of the White House Presidential Personnel Office*

represented by **Christopher R. Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Hayes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TRENT MORSE**
*in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office*

represented by **Christopher R. Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Hayes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EXECUTIVE OFFICE OF THE PRESIDENT** represented by **Christopher R. Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Hayes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the United States* represented by **Christopher R. Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Hayes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**ALVARO E. SIMAN** represented by **ALVARO E. SIMAN**
221 Donax Avenue
Unit 1
Imperial, CA 91932
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 05/22/2025 | 1 | COMPLAINT against TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP ( Filing fee $ 405 receipt number ADCDC-11709767) filed by SHIRA PERLMUTTER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons)(Scher, Allyson) (Entered: 05/22/2025) |

| | | |
|---|---|---|
| 05/22/2025 | 2 | MOTION for Temporary Restraining Order by SHIRA PERLMUTTER. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration, # 4 Exhibit, # 5 Exhibit)(Scher, Allyson) (Entered: 05/22/2025) |
| 05/22/2025 | 3 | NOTICE of Appearance by Allyson Scher on behalf of SHIRA PERLMUTTER (Scher, Allyson) (Entered: 05/22/2025) |
| 05/22/2025 | 4 | NOTICE of Appearance by Brian D. Netter on behalf of SHIRA PERLMUTTER (Netter, Brian) (Entered: 05/22/2025) |
| 05/22/2025 | | Case Assigned to Judge Timothy J. Kelly. (zjd) (Entered: 05/22/2025) |
| 05/23/2025 | 5 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 05/23/2025) |
| 05/23/2025 | 6 | STANDING ORDER. See Order for details. Signed by Judge Timothy J. Kelly on 5/23/2025. (lctjk2) (Entered: 05/23/2025) |
| 05/23/2025 | | MINUTE ORDER: In light of Plaintiff's 2 Motion for a Temporary Restraining Order, it is hereby ORDERED that Defendants shall file their opposition by May 26, 2025, at 5:00 p.m.; Plaintiff shall file her reply by May 27, 2025, at 2:00 p.m.; and the parties shall appear for a hearing on Plaintiff's 2 Motion on May 28, 2025, at 2:00 p.m. in Courtroom 11. Signed by Judge Timothy J. Kelly on 5/23/2025. (lctjk2) (Entered: 05/23/2025) |
| 05/26/2025 | 7 | Memorandum in opposition to re 2 MOTION for Temporary Restraining Order filed by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Attachments: # 1 Exhibit) (Hall, Christopher) (Entered: 05/26/2025) |
| 05/27/2025 | 8 | NOTICE of Appearance by Benjamin Hayes on behalf of All Defendants (Hayes, Benjamin) (Entered: 05/27/2025) |
| 05/27/2025 | 9 | REPLY to opposition to motion re 2 Motion for TRO filed by SHIRA PERLMUTTER. (Scher, Allyson) (Entered: 05/27/2025) |
| 05/27/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Adeel Mohammadi, Filing fee $ 100, receipt number ADCDC-11717117. Fee Status: Fee Paid. by SHIRA PERLMUTTER. (Attachments: # 1 Declaration of Adeel Mohammadi, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 05/27/2025) |
| 05/27/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- James R. Salzmann, Filing fee $ 100, receipt number ADCDC-11717134. Fee Status: Fee Paid. by SHIRA PERLMUTTER. (Attachments: # 1 Declaration James R. Salzmann, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 05/27/2025) |
| 05/27/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kuruvilla J. Olasa, Filing fee $ 100, receipt number ADCDC-11717136. Fee Status: Fee Paid. by SHIRA PERLMUTTER. (Attachments: # 1 Declaration of Kuruvilla J. Olasa, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 05/27/2025) |
| 05/27/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Miranda E. Rehaut, Filing fee $ 100, receipt number ADCDC-11717140. Fee Status: Fee Paid. by SHIRA PERLMUTTER. (Attachments: # 1 Declaration of Miranda E. Rehaut, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 05/27/2025) |
| 05/28/2025 | 14 | NOTICE of Appearance by Stanley Edmund Woodward, Jr on behalf of All Defendants (Woodward, Stanley) (Entered: 05/28/2025) |
| 05/28/2025 | | Minute Entry for proceedings held before Judge Timothy J. Kelly: TRO Motion Hearing held on 5/28/2025. For the reasons stated on the record, Plaintiff's 2 MOTION for |

| | | |
|---|---|---|
| | | Temporary Restraining Order heard, and DENIED. A Proposed Briefing Schedule for Preliminary Injunction, if warranted, due by 5/29/2025 at 5:00PM. (Court Reporter: Chandra Kean) (zkh) (Entered: 05/28/2025) |
| 05/28/2025 | | MINUTE ORDER: For the reasons explained on the record today, it is hereby ORDERED that Plaintiff's 2 Motion for a Temporary Restraining Order is DENIED. It is further ORDERED that, should Plaintiff intend to move for a preliminary injunction, the parties shall meet, confer, and submit a joint proposed briefing schedule for the motion by May 29, 2025, at 5:00 p.m. Signed by Judge Timothy J. Kelly on 5/28/2025. (lctjk2) (Entered: 05/28/2025) |
| 05/29/2025 | | MINUTE ORDER granting Plaintiff's 10 Motion for Admission Pro Hac Vice. Attorney Adeel Mohammadi is hereby admitted pro hac vice on behalf of Plaintiff. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Timothy J. Kelly on 5/29/2025. (lctjk2) (Entered: 05/29/2025) |
| 05/29/2025 | 15 | TRANSCRIPT OF PROCEEDINGS (TRO) before Judge Timothy J. Kelly held on May 29, 2025; Page Numbers: 1-63. Date of Issuance: May 29, 2025. Court Reporter/Transcriber Chandra Kean, RMR, Telephone number 202-354-3404. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/19/2025. Redacted Transcript Deadline set for 6/29/2025. Release of Transcript Restriction set for 8/27/2025.(Kean, Chandra) (Entered: 05/29/2025) |
| 05/29/2025 | | MINUTE ORDER granting Plaintiff's 11 Motion for Admission Pro Hac Vice. Attorney James R. Salzmann is hereby admitted pro hac vice on behalf of Plaintiff. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Timothy J. Kelly on 5/29/2025. (lctjk2) (Entered: 05/29/2025) |
| 05/29/2025 | | MINUTE ORDER granting Plaintiff's 12 Motion for Admission Pro Hac Vice. Attorney Kuruvilla J. Olasa is hereby admitted pro hac vice on behalf of Plaintiff. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Timothy J. Kelly on 5/29/2025. (lctjk2) (Entered: 05/29/2025) |
| 05/29/2025 | | MINUTE ORDER granting Plaintiff's 13 Motion for Admission Pro Hac Vice. Attorney Miranda E. Rehaut is hereby admitted pro hac vice on behalf of Plaintiff. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Timothy J. Kelly on 5/29/2025. (lctjk2) (Entered: 05/29/2025) |
| 05/29/2025 | 16 | MOTION for Briefing Schedule by SHIRA PERLMUTTER. (Attachments: # 1 Text of Proposed Order)(Scher, Allyson) (Entered: 05/29/2025) |

| | | |
|---|---|---|
| 05/29/2025 | 17 | ENTERED IN ERROR.....NOTICE of Appearance by Miranda E. Rehaut on behalf of SHIRA PERLMUTTER (Rehaut, Miranda) Modified on 5/30/2025; refiled as docket entry 19 (znmw). (Entered: 05/29/2025) |
| 05/29/2025 | 18 | NOTICE of Appearance by Kuruvilla Joseph Olasa on behalf of SHIRA PERLMUTTER (Olasa, Kuruvilla) (Entered: 05/29/2025) |
| 05/29/2025 | 19 | NOTICE of Appearance by Miranda E. Rehaut on behalf of SHIRA PERLMUTTER (Rehaut, Miranda) Modified event title on 5/30/2025 (znmw). (Entered: 05/29/2025) |
| 05/30/2025 | 20 | RESPONSE re 16 MOTION for Briefing Schedule *Opposition* filed by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Hayes, Benjamin) (Entered: 05/30/2025) |
| 05/30/2025 | 21 | NOTICE of Appearance by James Salzmann on behalf of SHIRA PERLMUTTER (Salzmann, James) (Main Document 21 replaced on 6/2/2025) (znmw). (Entered: 05/30/2025) |
| 05/30/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's 16 Motion to Enter a Briefing Schedule and Defendants' 20 Opposition, it is hereby ORDERED that the parties shall appear for a status conference on June 3, 2025, at 10:30 a.m. to be held via videoconference. The parties shall contact the Courtroom Deputy at (202) 354-3495 at least one business day before the hearing to make arrangements to participate. Signed by Judge Timothy J. Kelly on 5/30/2025. (lctjk2) (Entered: 05/30/2025) |
| 06/03/2025 | | Minute Entry for proceedings held before Judge Timothy J. Kelly: Status Conference held on 6/3/2025. Joint Proposed Briefing Schedule due by 6/4/2025. (Court Reporter: Chandra Kean) (zkh) (Entered: 06/03/2025) |
| 06/03/2025 | 22 | NOTICE of Appearance by Adeel Mohammadi on behalf of SHIRA PERLMUTTER (Mohammadi, Adeel) (Entered: 06/03/2025) |
| 06/04/2025 | 23 | Joint STATUS REPORT by SHIRA PERLMUTTER. (Scher, Allyson) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: Upon consideration of the parties' 23 Joint Status Report, it is hereby ORDERED that the following schedule shall govern preliminary-injunction briefing in this case: Plaintiff shall file her motion for preliminary injunction by June 10, 2025; Defendants shall file their opposition by June 24, 2025; and Plaintiff shall file her reply by July 1, 2025. The Court will determine whether a hearing is necessary at a later time. Signed by Judge Timothy J. Kelly on 6/4/2025. (lctjk2) (Entered: 06/04/2025) |
| 06/10/2025 | 24 | MOTION for Preliminary Injunction by SHIRA PERLMUTTER. (Attachments: # 1 Proposed Order, # 2 Memorandum, # 3 Declaration, # 4 Ex. A, # 5 Ex. B)(Scher, Allyson) (Entered: 06/10/2025) |
| 06/20/2025 | 25 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. EXECUTIVE OFFICE OF THE PRESIDENT served on 6/18/2025 (Scher, Allyson) (Entered: 06/20/2025) |
| 06/20/2025 | 26 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TODD BLANCHE served on 6/13/2025 (Scher, Allyson) (Entered: 06/20/2025) |
| 06/20/2025 | 27 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SERGIO GOR served on 6/18/2025 (Scher, Allyson) (Entered: 06/20/2025) |
| 06/20/2025 | 28 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TRENT MORSE served on 6/18/2025 (Scher, Allyson) (Entered: 06/20/2025) |

| | | |
|---|---|---|
| 06/20/2025 | 29 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PAUL PERKINS served on 6/18/2025 (Scher, Allyson) (Entered: 06/20/2025) |
| 06/20/2025 | 30 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 6/18/2025 (Scher, Allyson) (Entered: 06/20/2025) |
| 06/20/2025 | 31 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/18/2025. Answer due for ALL FEDERAL DEFENDANTS by 8/17/2025. (Scher, Allyson) (Entered: 06/20/2025) |
| 06/20/2025 | 32 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 6/13/2025. (Scher, Allyson) (Entered: 06/20/2025) |
| 06/24/2025 | 33 | Memorandum in opposition to re 24 MOTION for Preliminary Injunction filed by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Attachments: # 1 Exhibit Exhibit A) (Hayes, Benjamin) (Entered: 06/24/2025) |
| 07/01/2025 | 34 | REPLY to opposition to motion re 24 Motion for Preliminary Injunction filed by SHIRA PERLMUTTER. (Scher, Allyson) (Entered: 07/01/2025) |
| 07/17/2025 | | MINUTE ORDER: The parties requested that the Court hold a hearing on Plaintiff's 24 Motion for a Preliminary Injunction either the week of July 7 or July 14-16. ECF No. 23 at 2. Because the Court could not accommodate those times, it is hereby ORDERED that the parties shall appear for a hearing on Plaintiff's 24 Motion on July 23, 2025, at 3:00 p.m. via videoconference. The Court finds that this hearing date, a week after the parties' last requested window, will not prejudice them. *See* LCvR 65.1(d). The parties shall contact the Courtroom Deputy at (202) 354-3495 at least one business day before the hearing to make arrangements to participate. If the parties are unavailable at that time, they shall jointly contact the Courtroom Deputy to determine a mutually agreeable date and time for the parties and the Court. Interested members of the public and/or media may dial the Court's Public access line: Toll free number 833-990-9400; Meeting ID: 433360750. Signed by Judge Timothy J. Kelly on 7/17/2025. (lctjk2) (Entered: 07/17/2025) |
| 07/23/2025 | | Minute Entry for proceedings held before Judge Timothy J. Kelly: Preliminary Injunction Hearing held on 7/23/2025. Oral argument on Plaintiff's 24 MOTION for Preliminary Injunction, heard and taken under advisement. (Court Reporter: Chandra Kean) (zkh) (Entered: 07/23/2025) |
| 07/24/2025 | 35 | TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS before Judge Timothy J. Kelly held on July 23, 2025; Page Numbers: 1-55. Date of Issuance: July 24, 2025. Court Reporter/Transcriber Chandra Kean, RMR, Telephone number 202-354-3404. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

USCA Case #25-5285 Document #2190729 Filed: 08/31/2026 Page 11 of 117

| | | |
|---|---|---|
| | | Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/24/2025. Release of Transcript Restriction set for 10/22/2025.(Kean, Chandra) (Entered: 07/24/2025) |
| 07/25/2025 | 36 | NOTICE OF SUPPLEMENTAL AUTHORITY by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP (Hayes, Benjamin) (Entered: 07/25/2025) |
| 07/29/2025 | 37 | Unopposed MOTION to Stay *Deadline to Respond to Complaint* by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Hayes, Benjamin) (Entered: 07/29/2025) |
| 07/29/2025 | 38 | RESPONSE re 36 NOTICE OF SUPPLEMENTAL AUTHORITY *to Defendants' Notice of Supplemental Authority* filed by SHIRA PERLMUTTER. (Scher, Allyson) Modified to add link on 7/30/2025 (znmw). (Entered: 07/29/2025) |
| 07/30/2025 | 39 | ORDER denying Plaintiff's 24 Motion for a Preliminary Injunction. See Order for details. Signed by Judge Timothy J. Kelly on 7/30/2025. (lctjk2) (Entered: 07/30/2025) |
| 07/30/2025 | 40 | MEMORANDUM OPINION in support of the Court's 39 Order denying Plaintiff's 24 Motion for a Preliminary Injunction. Signed by Judge Timothy J. Kelly on 7/30/2025. (lctjk2) (Main Document 40 replaced on 7/31/2025) (zcam). (Entered: 07/30/2025) |
| 07/30/2025 | | MINUTE ORDER: Before the Court is Defendants' 37 Unopposed Motion to Stay Defendants' Deadline to Respond to Complaint. Given that the Court has resolved Plaintiff's 24 Motion for a Preliminary Injunction, it is hereby ORDERED that the 37 Unopposed Motion is DENIED as moot. It is further ORDERED that, by August 6, 2025, the parties shall each submit a proposed schedule to govern what the Court anticipates will be cross-motions for summary judgment, including a proposed hearing date on the motions. Signed by Judge Timothy J. Kelly on 7/30/2025. (lctjk2) (Entered: 07/30/2025) |
| 07/31/2025 | 41 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 40 Memorandum & Opinion, 39 Order on Motion for Preliminary Injunction by SHIRA PERLMUTTER. Filing fee $ 605, receipt number ADCDC-11857602. Fee Status: Fee Paid. Parties have been notified. (Scher, Allyson) (Entered: 07/31/2025) |
| 08/01/2025 | 42 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 41 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 08/01/2025) |
| 08/04/2025 | 43 | Emergency MOTION for Injunction *Pending Appeal* by SHIRA PERLMUTTER. (Scher, Allyson) (Entered: 08/04/2025) |
| 08/05/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's 43 Emergency Motion for Injunction Pending Appeal, it is hereby ORDERED that Defendants shall file their opposition to Plaintiff's 43 Emergency Motion by August 12, 2025, and Plaintiff shall file her reply by August 15, 2025. Signed by Judge Timothy J. Kelly on 8/5/2025. (lctjk2) (Entered: 08/05/2025) |
| 08/05/2025 | | USCA Case Number 25-5285 for 41 Notice of Appeal to DC Circuit Court, filed by SHIRA PERLMUTTER. (zdp) (Entered: 08/06/2025) |
| 08/06/2025 | 44 | Joint STATUS REPORT by SHIRA PERLMUTTER. (Scher, Allyson) (Entered: 08/06/2025) |
| 08/08/2025 | | MINUTE ORDER: Upon consideration of the parties' 44 Joint Status Report, it is hereby ORDERED that the following schedule shall govern further proceedings in this case: Plaintiff shall file her motion for summary judgment by September 8, 2025; Defendants shall file their combined opposition to Plaintiff's motion and cross-motion for summary |

JA009

| | | |
|---|---|---|
| | | judgment by September 22, 2025; Plaintiff shall file her combined reply in support of her motion and opposition to Defendants' cross-motion by October 6, 2025; Defendants shall file their reply in support of their cross-motion by October 14, 2025; and the parties shall appear for a hearing on the motions on November 4, 2025, at 10:00 a.m. in Courtroom 11. It is further ORDERED that Defendants' obligation to answer or otherwise respond to Plaintiff's 1 Complaint is STAYED until 14 days after the cross-motions for summary judgment are resolved, if necessary. Signed by Judge Timothy J. Kelly on 8/8/2025. (lctjk2) (Entered: 08/08/2025) |
| 08/12/2025 | 45 | Memorandum in opposition to re 43 Emergency MOTION for Injunction *Pending Appeal* filed by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Hayes, Benjamin) (Entered: 08/12/2025) |
| 08/15/2025 | 46 | REPLY re 43 Emergency MOTION for Injunction *Pending Appeal* filed by SHIRA PERLMUTTER. (Scher, Allyson) Modified event title on 8/18/2025 (znmw). (Entered: 08/15/2025) |
| 08/20/2025 | 47 | ORDER denying Plaintiff's 43 Emergency Motion for Injunction Pending Appeal. See Order for details. Signed by Judge Timothy J. Kelly on 8/20/2025. (lctjk2) (Entered: 08/20/2025) |
| 08/20/2025 | 48 | MEMORANDUM in support of the Court's 47 Order denying Plaintiff's 43 Emergency Motion for Injunction Pending Appeal. Signed by Judge Timothy J. Kelly on 8/20/2025. (lctjk2) (Entered: 08/20/2025) |
| 09/08/2025 | 49 | MOTION for Summary Judgment by SHIRA PERLMUTTER. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration Shira Perlmutter, # 4 Exhibit A, # 5 Exhibit B, # 6 Text of Proposed Order)(Scher, Allyson) (Entered: 09/08/2025) |
| 09/22/2025 | 50 | Cross MOTION for Summary Judgment by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Hayes, Benjamin) (Entered: 09/22/2025) |
| 09/22/2025 | 51 | Memorandum in opposition to re 49 MOTION for Summary Judgment filed by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Hayes, Benjamin) (Entered: 09/22/2025) |
| 10/06/2025 | 52 | RESPONSE re 50 Cross MOTION for Summary Judgment filed by SHIRA PERLMUTTER. (Attachments: # 1 Statement of Facts Plaintiff's Counter-Statement of Disputed Facts)(Scher, Allyson) (Entered: 10/06/2025) |
| 10/06/2025 | 53 | REPLY re 49 MOTION for Summary Judgment *Reply In Support* filed by SHIRA PERLMUTTER. (Scher, Allyson) Modified event on 10/7/2025 (znmw). (Entered: 10/06/2025) |
| 10/07/2025 | | MINUTE ORDER as to Plaintiff's 16 Motion for a Briefing Schedule. Upon consideration of recent developments, including the Court's Minute Order of August 8, 2025, setting a schedule for future proceedings, it is hereby ORDERED that Plaintiff's 16 Motion is DENIED AS MOOT. Signed by Judge Timothy J. Kelly on 10/07/2025. (lctjk2) (Entered: 10/07/2025) |
| 10/22/2025 | | MINUTE ORDER: Upon consideration of the ongoing lapse in federal appropriations, and the extension of civil case filing deadlines for federal agency parties set out in Chief Judge Boasberg's Standing Order No. 25-55, it is hereby ORDERED that the hearing on the |

| | | |
|---|---|---|
| | | motions currently set for November 4, 2025, is VACATED. Signed by Judge Timothy J. Kelly on 10/22/2025. (lctjk2) (Entered: 10/22/2025) |
| 12/08/2025 | 54 | REPLY to opposition to motion re 50 Motion for Summary Judgment, filed by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Attachments: # 1 Statement of Facts) (Hayes, Benjamin) (Entered: 12/08/2025) |
| 04/15/2026 | 55 | MOTION for Leave to File Amicus Brief by ALVARO E. SIMAN. (Attachments: # 1 Declaration in Support of Motion, # 2 Proposed Amicus Brief, # 3 Request for ADA Accommodations, # 4 Text of Proposed Order - ADA Request, # 5 Certificate of Service, # 6 Text of Proposed Order - Motion for Leave to File, # 7 Cover Letter)(znmw) (Entered: 04/22/2026) |
| 06/05/2026 | 56 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: ALVARO SIMON - Motion to Supplement, Letter, Motion for Accommodations. Reason(s): Filer is not a party to the case. Motion to file Amicus brief is pending. (Attachments: # 1 Supplemental Amicus Brief, # 2 Letter, # 3 Motion for Accommodations) (znmw) (Additional attachment(s) added on 6/25/2026: # 4 Certificate of Service) (znmw). (Entered: 06/09/2026) |
| 07/01/2026 | | MINUTE ORDER: It is hereby ORDERED that by July 31, 2026, each party shall file a supplemental brief, not to exceed 20 pages, on the effect of the Supreme Court's decision in Trump v. Slaughter, 609 U.S. __ (2026) on the parties' summary judgment motions. It is further ORDERED that by August 14, 2026, each party may file a response, not to exceed 15 pages. Signed by Judge Timothy J. Kelly on 7/1/26. (lctjk2) (Entered: 07/01/2026) |
| 07/31/2026 | 57 | NOTICE OF WITHDRAWAL OF APPEARANCE as to SHIRA PERLMUTTER. Attorney Miranda E. Rehaut; James Salzmann; Donald Beaton Verrilli, Jr; Adeel Mohammadi and Kuruvilla Joseph Olasa terminated. (Verrilli, Donald) (Entered: 07/31/2026) |
| 07/31/2026 | 58 | SUPPLEMENTAL MEMORANDUM to re 49 MOTION for Summary Judgment filed by SHIRA PERLMUTTER. (Scher, Allyson) (Entered: 07/31/2026) |
| 07/31/2026 | 59 | SUPPLEMENTAL MEMORANDUM re 50 Cross MOTION for Summary Judgment by TODD BLANCHE, EXECUTIVE OFFICE OF THE PRESIDENT, SERGIO GOR, TRENT MORSE, PAUL PERKINS, DONALD J. TRUMP. (Hayes, Benjamin) Modified event on 8/3/2026 (znmw). (Entered: 07/31/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/05/2026 16:43:14 | | | |
| **PACER Login:** | ascher31 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-01659-TJK |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

JA011

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHIRA PERLMUTTER, *Register of Copyrights and Director of the U.S. Copyright Office*,
U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20559

*Plaintiff*,

v.

TODD BLANCHE, *in his capacity as the person claiming to be acting Librarian of Congress*,
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

PAUL PERKINS, *in his capacity as the person claiming to be the Register of Copyrights*,
U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20559

SERGIO GOR, *in his official capacity as the Director of the White House Presidential Personnel Office*,
1600 Pennsylvania Avenue NW
Washington, DC 20500

TRENT MORSE, *in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office*,
1600 Pennsylvania Avenue NW
Washington, DC 20500

EXECUTIVE OFFICE OF THE PRESIDENT,
1600 Pennsylvania Avenue NW
Washington, DC 20500

Case No. 25-cv-1659

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**EMERGENCY TEMPORARY RESTRAINING ORDER SOUGHT**

and

DONALD J. TRUMP, *in his official capacity as President of the United States*,
1600 Pennsylvania Avenue NW
Washington, DC 20500

*Defendants*.

**INTRODUCTION**

The Library of Congress is a national treasure. It maintains the largest collection of any library in the world, performs confidential research for Members of Congress seeking to develop legislation, and houses the Nation's copyright system. This national treasure is, in name and function, Congress's library, and it exercises unique statutory functions in that role. *Cf.* 2 U.S.C. Ch. 5 ("Library of Congress," under the title "The Congress"). It is therefore unsurprising that Congress has not given up its right to have a say in the leadership of its Library.

But on May 8, 2025, President Donald J. Trump fired Dr. Carla D. Hayden, the Librarian of Congress. In the days that followed, President Trump attempted to bulldoze over Congress's role in selecting leadership within the Library of Congress. The President fired Dr. Carla D. Hayden, the Librarian of Congress, and purported to remove Plaintiff Shira Perlmutter from her post as Register of Copyrights and Director of the U.S. Copyright Office. The President then, without any authorization from Congress or advice and consent from the Senate, purported to appoint his close associate and the Deputy Attorney General at the U.S. Department of Justice, Todd Blanche, as acting Librarian of Congress. Mr. Blanche, in turn, sent two Justice Department officials to the Library of Congress to attempt to access the U.S. Copyright Office and assume the positions of acting Deputy Librarian of Congress and Register of Copyrights.

The Administration's attempts to remove Ms. Perlmutter as the Register of Copyrights are blatantly unlawful. Congress vested the Librarian of Congress—not the President—with the power to appoint, and therefore to remove, the Register of Copyrights. 17 U.S.C. § 701(a). Accordingly, the President's attempt to remove Ms. Perlmutter was unlawful and ineffective.

Nor can Ms. Perlmutter be removed by Mr. Blanche, whom the President purported to appoint as *acting* Librarian of Congress. The President has no authority to name a temporary replacement Librarian of Congress, much less name a high-ranking DOJ official whose presence offends the constitutional separation of powers. Although Congress has authorized the President through the Federal Vacancies Reform Act to temporarily fill vacant, high-level positions in an "Executive agency," 5 U.S.C. § 3345(a), it has not authorized the President to fill temporary vacancies elsewhere, including, as relevant here, the Library of Congress. Instead, Congress chose to authorize the Librarian of Congress to "make rules and regulations for the government of the Library," 2 U.S.C. § 136, and, pursuant to those rules, interim Principal Deputy Librarian Robert R. Newlen now exercises the powers of the acting Librarian of Congress.

In short, the President's attempt to name Mr. Blanche as acting Librarian of Congress was unlawful and ineffective, and therefore Mr. Blanche cannot remove or replace Ms. Perlmutter.

Plaintiff Shira Perlmutter brings this action against Todd Blanche, in his capacity as the person unlawfully appointed as and now claiming to be acting Librarian of Congress; Paul Perkins, in his capacity as the person claiming to be the Register of Copyrights; Sergio Gor, in his official capacity as the Director of the White House Presidential Personnel Office; Trent Morse, in his official capacity as the Deputy Director of the White House Presidential Personnel Office; the Executive Office of the President; and Donald J. Trump, in his official capacity as President of the

United States, to prevent Defendants from interfering with her lawful appointment as Register of Copyrights and Director of the U.S. Copyright Office.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action for declaratory and injunctive relief under 28 U.S.C. §§ 1331, 1361, 1651, 2201, and 2202.

2. Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

3. Plaintiff Shira Perlmutter is the Register of Copyrights and Director of the U.S. Copyright Office of the Library of Congress. Librarian of Congress Carla D. Hayden appointed Ms. Perlmutter to the position in October 2020.

4. Defendant Todd Blanche is the Deputy Attorney General at the U.S. Department of Justice and claims to have been designated as the acting Librarian of Congress. He is responsible for the purported replacement of Ms. Perlmutter as Register of Copyrights and Director of the U.S. Copyright Office.

5. Defendant Paul Perkins is an Associate Deputy Attorney General in the Office of the Deputy Attorney General at the U.S. Department of Justice. Mr. Perkins claims to have been designated by Mr. Blanche as acting Register of Copyrights and Director of the U.S. Copyright Office of the Library of Congress.

6. Defendant Sergio Gor is the Director of the White House Presidential Personnel Office, and is responsible for the purported removal of Ms. Perlmutter from her position.

7. Defendant Trent Morse is Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, and is responsible for the purported removal of Ms. Perlmutter from her position.

8. Defendant Executive Office of the President is a federal agency, and is responsible for the purported removal of Ms. Perlmutter from her position and for the purported designation of Defendant Todd Blanche as acting Librarian of Congress.

9. Defendant Donald J. Trump is the President of the United States and is responsible for the purported removal of Ms. Perlmutter from her position and for the purported designation of Defendant Todd Blanche as acting Librarian of Congress.

## STATUTORY BACKGROUND

10. The Library of Congress is an agency that Congress has designated as a part of the legislative branch of the U.S. government. 2 U.S.C. § 171(1).[1] The Library "serves as the research arm of Congress and is recognized as the national library of the United States." *Frequently Asked Questions*, Libr. of Cong., https://perma.cc/6Z77-ZRE4 (archived May 17, 2025).

11. The Library of Congress is led by the Librarian of Congress, who is appointed by the President of the United States and confirmed by a vote of the Senate. *See* 2 U.S.C. § 136-1(a). The Librarian is appointed for a term of ten years. *Id.* § 136-1(b). Congress has delegated to the Librarian the authority to make regulations for the government of the Library. *Id.* § 136.

12. The Library of Congress is comprised of several divisions, including the U.S. Copyright Office, 17 U.S.C. § 701, which has been a department within the Library of Congress for more than 150 years. The U.S. Copyright Office "registers copyright claims, records information about copyright ownership, provides information to the public, and assists Congress and other parts of the government on a wide range of copyright issues." *Overview*, U.S. Copyright Off., https://perma.cc/6BQN-J5Z5 (archived May 22, 2025). It examines hundreds of thousands

[1] The Library of Congress was established in 1800, with the appropriation of $5,000 for books for the use of Congress. *See* Library of Congress Information Bulletin (1984).

of copyright claims per year and receives deposits of works of authorship submitted for registration. *Id.* These deposits contribute significantly to the Library of Congress's collections. *Id.*

13. The Register of Copyrights leads the Copyright Office, is appointed by the Librarian of Congress, and acts under the Librarian's general direction and supervision. 17 U.S.C. § 701(a). The Register is the principal advisor to Congress on national and international copyright matters, testifying upon request and providing ongoing leadership and impartial expertise on copyright law and policy. *Overview*, U.S. Copyright Off., https://perma.cc/6BQN-J5Z5 (archived May 22, 2025).

14. The Register of Copyrights is statutorily required to perform the following functions and duties, among others:

- "Advise Congress on national and international issues relating to copyright, other matters arising under this title, and related matters";
- "Provide information and assistance to Federal departments and agencies and the Judiciary on national and international issues relating to copyright, other matters arising under this title, and related matters";
- "Participate in meetings of international intergovernmental organizations and meetings with foreign government officials relating to copyright, other matters arising under this title, and related matters, including as a member of United States delegations as authorized by the appropriate Executive branch authority";
- "Conduct studies and programs regarding copyright, other matters arising under this title, and related matters, the administration of the Copyright Office, or any function vested in the Copyright Office by law, including educational programs conducted cooperatively with foreign intellectual property offices and international intergovernmental organizations"; and
- "Perform such other functions as Congress may direct, or as may be appropriate in furtherance of the functions and duties specifically set forth in this title."

17 U.S.C. § 701(b).

15. The Library of Congress also includes the Congressional Research Service (CRS), 2 U.S.C. § 166(a), which is required to confidentially "advise and assist" congressional committees, upon request, "in the analysis, appraisal, and evaluation of legislative proposals within that committee's jurisdiction, or of recommendations submitted to Congress, by the President or any executive agency." 2 U.S.C. § 166(d). Each year, CRS receives thousands of requests. These duties must be performed "without partisan bias." *Id.* The Library of Congress also maintains confidential congressional records.

16. The Director of CRS leads the division and is appointed by the Librarian of Congress, after consultation with Congress's Joint Committee on the Library. 2 U.S.C. § 166(c)(1).

**FACTUAL ALLEGATIONS**

17. President Trump fired the Librarian of Congress, Dr. Carla D. Hayden, via email on May 8, 2025. *See* Tim Balk, *Trump Administration Fires Librarian of Congress,* N.Y. Times (May 8, 2025), https://perma.cc/865K-GS9D. Dr. Hayden, who was appointed in 2016 and became the 14th Librarian of Congress, was the first African American and first woman to serve in the role. *Id.* White House Press Secretary Karoline Leavitt explained that Dr. Hayden's firing was due to "quite concerning things that [Dr. Hayden] had done at the Library of Congress in the pursuit of D.E.I. and putting inappropriate books in the library for children." Erica L. Green, *Trump Fired Librarian of Congress Over D.E.I.,* N.Y. Times (May 9, 2025), https://perma.cc/B434-H5QP. Neither Ms. Leavitt nor any other administration official provided any detail or support for these claims, which are at odds with the Library's status as a non-lending research library accessible only by those age 16 and older. *Frequently Asked Questions*, Libr. of Cong., https://perma.cc/6Z77-ZRE4.

18. Under the regulations promulgated pursuant to 2 U.S.C. § 136 and longstanding practice, interim Principal Deputy Librarian Robert R. Newlen replaced Dr. Hayden as acting Librarian of Congress. Mr. Newlen has been an employee of the Library of Congress for a total of more than 40 years.

19. On May 9, 2025, the U.S. Copyright Office issued a long-awaited report, in pre-publication format. Part 3 of its Report on Copyright and Artificial Intelligence (AI), issued pursuant to the Register of Copyrights' statutory responsibility to "[c]onduct studies" and "[a]dvise Congress on national and international issues relating to copyright," 17 U.S.C. § 701(b)(1), (b)(4), addressed the use of copyrighted works in the development of generative AI systems. *See* U.S. Copyright Off., *Copyright and Artificial Intelligence Part 3: Generative AI Training* (May 2025), https://perma.cc/3J9F-7SQN. The Report concluded that some uses of copyrighted works in generative AI training were likely to qualify as "fair use," but some uses were likely to require licensing. A fourth and final part of the report is in the process of being finalized, and will address the topic of potential liability for infringing AI outputs.

20. The following day, May 10, 2025, Trent Morse, Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel, sent an email to Ms. Perlmutter, which stated that, on behalf of the President, her "position as the Register of Copyrights and Director at the U.S. Copyright Office is terminated effective immediately."

21. President Trump later re-posted on his social media platform, Truth Social, the following post with a CBS article announcing that he had fired Ms. Perlmutter:




https://perma.cc/C7RF-HNJR.

22. On May 12, 2025, two Justice Department officials arrived at the Library of Congress and requested access to the U.S. Copyright Office. *See* Maya C. Miller & Devlin Barrett, *Trump Installs Top Justice Dept. Official at Library of Congress, Prompting a Standoff*, N.Y. Times (May 12, 2025), https://perma.cc/9L4G-8ZMU. The Justice Department officials—Brian Nieves, who serves as Deputy Attorney General Todd Blanche's Chief of Staff and Senior Policy Counsel, and Paul Perkins, Mr. Blanche's Associate Deputy Attorney General—showed Library staff a letter from the White House that purported to appoint Mr. Blanche to serve as the acting Librarian of Congress. *Id.* The letter references the Federal Vacancies Reform Act as the source of the President's authority to name Mr. Blanche to the post of acting Librarian of Congress.

23. The Justice Department officials also showed Library staff an email from Mr. Blanche that stated that he had selected them to serve in senior roles within the Library of Congress: Mr. Nieves as the acting Principal Deputy Librarian of Congress, and Mr. Perkins to replace Ms. Perlmutter as the acting Register of Copyrights and the Director of the U.S. Copyright

Office, which served as Mr. Blanche's ratification of the President's decision to remove Ms. Perlmutter from her position. *Id.*

24. Library of Congress staff contacted the U.S. Capitol Police, the federal law enforcement agency charged with protecting the United States Congress, which has jurisdiction within the Library of Congress's building and grounds, 2 U.S.C. § 167h. *See* Hillel Italie & Seung Min Kim, *Deputy Attorney General Who Defended Trump in Hush Money Trial is Named Acting Librarian of Congress*, AP News (May 12, 2025), https://perma.cc/KT26-92GZ. Subsequently, Mr. Nieves and Mr. Perkins left the grounds of the Library of Congress voluntarily. *Id.*

25. A Justice Department spokesperson later represented to news outlets that President Trump had appointed Mr. Blanche as the acting Librarian of Congress. *See id.* The Justice Department spokesperson also represented that Mr. Blanche had appointed Mr. Nieves and Mr. Perkins to their respective positions in the Library. *Id.*

## CLAIMS FOR RELIEF

### Count I
### *Ultra Vires* – Violation of Constitutional and Statutory Authority
### (Appointment of Todd Blanche as Acting Librarian of Congress)
### (Against All Defendants)

26. The foregoing paragraphs are incorporated herein by reference.

27. The President's purported appointment of Defendant Blanche as acting Librarian of Congress is *ultra vires* because it is not authorized by the Constitution or any statutory provision.

28. Through the Appointments Clause, the Constitution empowers the President to appoint "Officers of the United States," subject to "the Advice and Consent of the Senate." U.S. Const. Art. II, § 2, cl. 2. The Appointments Clause does not authorize the President to appoint an

individual to perform the duties of the Librarian of Congress without the advice and consent of the Senate.

29. The Federal Vacancies Reform Act permits the President, in certain circumstances, to "temporarily authoriz[e] an acting official to perform the functions and duties of any office of an Executive agency" for which Senate confirmation is required. 5 U.S.C § 3347(a).

30. The Library of Congress is not an "Executive agency" within the meaning of the Federal Vacancies Reform Act. *See* 5 U.S.C. § 105. Therefore, the Federal Vacancies Reform Act does not authorize the President to appoint an acting Librarian of Congress. 5 U.S.C § 3347(a).

31. Mr. Blanche's unlawful position at the Library of Congress has caused and will continue to cause Ms. Perlmutter to sustain injuries, by threatening to deprive her of access to her lawful appointment as Register of Copyrights and Director of the U.S. Copyright Office, by preventing her from fulfilling her statutory responsibilities to Congress, and by causing the purported appointment of Mr. Perkins to Ms. Perlmutter's rightful position.

**Count II**
**U.S. Constitution – Separation of Powers and Appointments Clause**
**(Removal of Shira Perlmutter as Register of Copyrights)**
**(Against All Defendants)**

32. The foregoing paragraphs are incorporated herein by reference.

33. This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

34. Both President Trump's and Mr. Blanche's purported removal of Plaintiff is invalid because they violate Article II, section 2 of the U.S. Constitution. The Appointments Clause grants Congress the authority to vest the appointment of inferior officers, such as the Register of Copyrights, in the heads of Departments. Congress has exercised that authority to grant the

Librarian of Congress the exclusive authority to appoint the Register of Copyrights. 17 U.S.C. § 701(a).

35. When Congress enacts such a scheme, "it is ordinarily the department head"—here, the Librarian of Congress—"rather than the President, who enjoys the power of removal." *Free Enter. Fund*, 561 U.S. at 493. And "[a]bsent relevant legislation" stating otherwise, "the power to remove is held . . . only by the appointing authority." *Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239, 247 (D.C. Cir. 1981). Therefore, the Librarian of Congress retains the exclusive authority to hire and fire the Register of Copyrights. *Free Enter. Fund*, 561 U.S. at 509.

36. The purported termination of Plaintiff from her position as Register of Copyrights and Director of the Copyright Office by President Trump, Mr. Blanche, or any other Defendant is unlawful. No Defendant is lawfully the Librarian of Congress, and only the Librarian of Congress has the authority to remove Plaintiff from her position.

**REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(A) Enter a preliminary and permanent injunction ordering Mr. Blanche not to exercise the powers of acting Librarian of Congress, Defendants not to purport to appoint any other individual to be acting Librarian of Congress, Mr. Perkins not to exercise the powers of acting Register of Copyrights, and any actions taken or contemplated to be taken by Mr. Blanche or any other improperly appointed person as an officer of the Library of Congress to be void *ab initio* and without effect;

(B) Enter a preliminary and permanent injunction ordering that Plaintiff Shira Perlmutter may not be removed from her office as Register of Copyrights and Director of the U.S. Copyright Office, or in any way be treated as having been removed, denied, or obstructed

in accessing any of the benefits or resources of her office, or otherwise be obstructed from her ability to carry out her duties, absent a decision by a lawfully appointed Librarian of Congress to remove her from that office.

(C) Declare that the Federal Vacancies Reform Act does not authorize the appointment of a temporary acting Librarian of Congress.

(D) Declare that Plaintiff Shira Perlmutter remains the Register of Copyrights and Director of the U.S. Copyright Office, Mr. Blanche has not lawfully been appointed as the acting Librarian of Congress, and Mr. Newlen remains the acting Librarian of Congress; and

(E) Award all other appropriate relief.

Dated: May 22, 2025

Respectfully submitted,

*/s/ Allyson R. Scher*
Brian D. Netter (D.C. Bar No. 979362)
Allyson R. Scher (D.C. Bar No. 1616379)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bnetter@democracyforward.org
ascher@democracyforward.org

Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
donald.verrilli@mto.com
ginger.anders@mto.com

Kuruvilla J. Olasa (pro hac vice forthcoming)
James R. Salzmann (pro hac vice forthcoming)
Miranda E. Rehaut (pro hac vice forthcoming)
Adeel Mohammadi (pro hac vice forthcoming)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor

Los Angeles, California 90071
(213) 683-9100
kuruvilla.olasa@mto.com
james.salzmann@mto.com
miranda.rehaut@mto.com
adeel.mohammadi@mto.com

*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHIRA PERLMUTTER,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE *et al.*,<br>*Defendants*. | Case No. 1:25-cv-01659-TJK |

**DECLARATION OF SHIRA PERLMUTTER**

I, Shira Perlmutter, declare as follows:

1. I am the Register of Copyrights and Director of the U.S. Copyright Office in the Library of Congress. I was appointed to my position in October 2020 by then-Librarian of Congress, Carla D. Hayden.

2. From 2012 until my appointment as Register, I was the Chief Policy Officer and Director for International Affairs at the United States Patent and Trademark Office ("USPTO"), where I oversaw policy and international work in all areas of intellectual property including copyright, serving administrations of both parties. Earlier in my career, I served as the Associate Register for Policy and International Affairs at the U.S. Copyright Office; directed global legal policy for an international trade association; was a consultant on copyright and e-commerce at the World Intellectual Property Organization; headed intellectual property law and policy at AOL Time Warner; was a law professor at the Catholic University of America; and practiced at two private law firms. I have an AB from Harvard University and a JD from the University of Pennsylvania.

3. The Library of Congress performs critical legislative functions, such as conducting research and policy studies for members of Congress, advising them on draft legislation, and maintaining records that are confidential to the legislative branch.

4. Within the Library of Congress, the U.S. Copyright Office registers copyright claims, records information about copyright ownership, provides information to the public, and advises Congress and other parts of the government on copyright law and policy. The Office examines hundreds of thousands of copyright claims each year and receives deposits of works of authorship submitted for registration. These deposits contribute significantly to the Library of Congress's collections.

5. As Register of Copyrights, by statute, I act under the Librarian of Congress's supervision and direction. Since May 8, 2025, when President Trump fired Librarian of Congress Carla D. Hayden, I have acted under the supervision and direction of Robert R. Newlen, who replaced Dr. Hayden as acting Librarian in accordance with the Library of Congress's regulations.

6. In my role as Register of Copyrights and Director of the U.S. Copyright Office, I serve as the principal advisor to Congress on national and international copyright matters, testifying upon request, conducting studies and programs, providing impartial expertise on copyright law and policy, administering the U.S. Copyright Act, and leading a workforce of nearly 500 employees. I am statutorily required to perform the following responsibilities (among others):

a. examine applications for copyright registration and register or reject claims, 17 U.S.C. § 410;

b. advise courts on the impact of inaccurate information in a certificate of registration, *id.* § 411(b);

c. maintain records of copyright deposits and registrations, *id.* § 705;

d. record transfers of copyright ownership, *id.* § 205;

e. establish regulations for the administration of my functions and duties, subject to the approval of the Librarian of Congress, *id.* § 702;

f. designate a Mechanical Licensing Collective ("MLC") to administer the mechanical blanket license for musical works and distribute collected royalties to songwriters and music publishers, *id.* § 115(d)(3)(B), and a Digital Licensee Coordinator ("DLC") to represent digital music services in the administration of the license, *id.* § 115(d)(5)(B).

g. recommend Copyright Claims Officers to serve on the three-member tribunal Copyright Claims Board ("CCB"), the small claims court recently established by the Copyright Office at the direction of Congress; and review the CCB's decisions for abuse of discretion before they can be appealed in district court, *id.* § 1506(x); and

h. review for legal error decisions by Copyright Royalty Judges, which determine royalty rates, adjust terms, and ensure the distribution of royalties deposited by licensees, no later than 60 days after the date of their final determination, *id.* § 802(f)(1)(D); consult with the Copyright Royalty Judges on legal issues as requested, *id.* § 802(f)(1)(A)(ii); and resolve novel questions of law as requested, *id.* § 802(f)(1)(B).

7. On May 9, 2025, the U.S. Copyright Office issued in pre-publication format, the long-awaited Part 3 of Copyright and Artificial Intelligence, a report made pursuant to my statutory responsibility to "[c]onduct studies . . . regarding copyright" and "[a]dvise Congress on national and international issues relating to copyright." 17 U.S.C. § 701(b)(1), (b)(4). This Part, subtitled "Generative AI Training," addressed the use of copyrighted works in the development of generative AI systems. *See* U.S. Copyright Off., Copyright and Artificial Intelligence Part 3: Generative AI Training (May 2025), https://perma.cc/3J9F-7SQN. The Report concluded that

some uses of copyrighted works in generative AI training were likely to qualify as "fair use," but some uses were likely to require licensing. Part 4 of the Copyright and Artificial Intelligence report, which will be the final part, remains in progress.

8. On May 10, 2025, I received an email from Trent Morse stating that, at the direction of President Trump, I was terminated from my position effective immediately.

9. Specifically, the May 10, 2025 email, *see* Exhibit A, reads:

> Shira,
>
> On behalf of President Donald J. Trump, I am writing to inform you that your position as the Register of Copyrights and Director at [sic] the U.S. Copyright Office is terminated effective immediately.
>
> Thank you for your service.
>
> Trent Morse
> Deputy Director
> Presidential Personnel

10. I am informed and believe that on May 12, 2025, Brian Nieves and Paul Perkins arrived at the Library of Congress and requested access to the U.S. Copyright Office. Mr. Nieves and Mr. Perkins showed Library staff a letter from the White House that purported to appoint Todd Blanche to serve as the acting Librarian of Congress. *See* Exhibit B. Mr. Nieves and Mr. Perkins also showed Library staff printed versions of emails from Mr. Blanche, in which he purported to appoint Mr. Nieves as acting Principal Deputy Librarian of Congress and Mr. Perkins as acting Register of Copyrights and Director of the U.S. Copyright Office. *See* Exhibit B. Mr. Nieves and Mr. Perkins subsequently left the premises.

11. To my knowledge, no official at the Library of Congress has recognized Mr. Blanche as the acting Librarian of Congress. Still, the purported appointments of Mr. Blanche, Mr. Nieves, and Mr. Perkins have caused considerable confusion among Library staff, copyright stakeholders,

and the public. If the conflicting claims to the positions of acting Librarian of Congress and Register of Copyrights are not resolved, staff will not be able to ascertain who is in control of the Library and the Copyright Office, and therefore who supervises and directs their work.

12. Despite Mr. Perkins's claim that he is Acting Register of Copyrights, I remain Register of Copyrights and therefore am required by law to fulfill my above-described statutory obligations.

13. I have not received any communication from Library of Congress leadership that purports to terminate my employment as Register of Copyrights.

14. My statutory duties include many current and near-term responsibilities that Mr. Perkins's claim to serve as Acting Register of Copyrights impedes my ability to faithfully execute, including (among others), the following. Without an injunction, I will be unable to effectively:

a. register copyright claims if the works contain copyrightable subject matter—actions that have significant implications for private rights, including in copyright litigation. Copyright registration is generally a prerequisite to bringing an infringement lawsuit and to obtaining an award of statutory damages and attorneys' fees. Without an effective and timely registration system, copyright owners will face difficulties in enforcing their rights;

b. redesignate an MLC and DLC as required every five years. The current redesignation process began in January 2024 and remains incomplete;

c. appoint a new Copyright Claims Officer, in consultation with the Librarian of Congress, to replace an Officer whose term is ending. Without a new Officer, the Board will be unable to function effectively;

d. issue rulemakings that are currently underway, including a forthcoming rulemaking establishing a Group Registration option for Two-Dimensional Artwork, https://www.copyright.gov/rulemaking/gr2d/;

e. review determinations by the Copyright Royalty Judges for legal error within 60 days after the date on which their final determination is issued;

f. continue to advise courts on the impact of inaccurate information contained in a certificate of registration, 17 U.S.C. § 411(b); and

g. issue the final part of the Office's Copyright and Artificial Intelligence report, pursuant to my statutory responsibility to "[c]onduct studies" and "[a]dvise Congress on national and international issues relating to copyright," 17 U.S.C. § 701(b)(1), (b)(4).

15. For the above-described reasons, Mr. Perkins's claim that he is the acting Register of Copyrights will also impede the Copyright Office's ability to perform its work as authorized by Congress and critical to copyright owners and users.

16. If the U.S. Copyright Office loses its credibility as a reliable administrator of the copyright system and non-partisan advisor to Congress, my ability to fulfill the statutory duties of the Register of Copyrights will be severely compromised.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Alexandria, Virginia
June 10, 2025

Shira Perlmutter

# EXHIBIT A

**From**: "Morse, Trent M. EOP/WHO" [redacted]
**Date:** May 10, 2025 at 2:43:15 PM EDT
**To:** "Perlmutter, Shira" [redacted]
**Cc:** "Gor, Sergio N. EOP/WHO" [redacted]
**Subject: Message from PPO**

**CAUTION:** This email message has been received from an external source. Please use caution when opening attachments, or clicking on links.

Shira,

On behalf of President Donald J. Trump, I am writing to inform you that your position as the Register of Copyrights and Director at the U.S. Copyright Office is terminated effective immediately.

Thank you for your service.

Trent Morse
Deputy Director
Presidential Personnel

# EXHIBIT B

**Perkins, Paul (ODAG)**

| | |
|---|---|
| **From:** | Blanche40, Todd (ODAG) |
| **Sent:** | Sunday, May 11, 2025 5:55 PM |
| **To:** | Perkins, Paul (ODAG); Nieves, Brian (ODAG) |
| **Subject:** | Appointments. |
| **Attachments:** | Todd Blanche Acting Librarian of Congress_signed 5.9.25.pdf |

Paul and Brian,

Pursuant to the attached .pdf, in my capacity as the Acting Librarian of Congress, I designate Paul Perkins as the Acting Register of Copyrights and Acting Director of the U.S. Copyright Office. I designate Brian Nieves as the Acting Principal Deputy Librarian of the Library of Congress.

Formal paperwork will be forthcoming.

Thank you for agreeing to help in this important effort,

Todd

Todd Blanche
Deputy Attorney General

---

**From:** Gor, Sergio N. EOP/WHO [redacted]
**Sent:** Saturday, May 10, 2025 12:31:00 AM
**To:** Blanche40, Todd (ODAG) [redacted]
**Subject:** [EXTERNAL]

Sent from my iPhone

THE WHITE HOUSE

WASHINGTON

May 9, 2025

MEMORANDUM FOR TODD BLANCHE
Deputy Attorney General

Pursuant to the Constitution and the laws of the United States, including section 3345(a) of title 5, United States Code, you are directed to perform the duties of the office of the Librarian of Congress.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
---

| | |
|---|---|
| SHIRA PERLMUTTER,<br><br>Plaintiff,<br><br>v.<br><br>TODD BLANCHE, et al.,<br><br>Defendants. | CIVIL NO. 25-1659<br><br>Wednesday, July 23, 2025<br><br>3:08 p.m. - 4:09 p.m. |

TRANSCRIPT OF PRELIMINARY INJUNCTION

BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
---

APPEARANCES:

DEMOCRACY FORWARD FOUNDATION
BY: Brian D. Netter
Allyson R. Scher
Adeel Mohammadi
P.O. Box 34554
Washington, DC 20043
202-448-9090
Email: Ascher@democracyforward.org
Email: Bnetter@democracyforward.org

For the Plaintiff

U.S. DEPARTMENT OF JUSTICE
FPB CIVIL DIVISION
BY: Benjamin Hayes
20 Massachusetts Avenue, NW, Room 7224
Washington, DC 20530
202-514-4778
Email: Benjamin.T.Hayes@usdoj.gov

For the Defendants
---

COURT REPORTER:

CHANDRA R. KEAN, RMR
Official Court Reporter
333 Constitution Avenue, NW
Washington, DC 20001

**PROCEEDINGS**

(Court called to order at 3:08 p.m.)

DEPUTY COURTROOM CLERK: We're on the record in Civil Matter 25-1659, Shira Perlmutter v. Todd Blanche, et al.

Present for the plaintiff are Brian Netter, Adeel Mohammadi, and Allyson Scher. And present for the defendants is Benjamin Hayes.

THE COURT: All right. Good afternoon to everyone. So without further ado, let me recognize -- and we'll do it the same way we did it in connection with the TRO. I'll hear from the plaintiff; I'll hear from the defendant; and then I'll let the plaintiffs respond to anything the defendants said.

You know, I'll just -- you all -- let me put it this way. You all know where I was at the time of the TRO, so I would say take that into account when using your time. But other than that, any of the factors you want to hit, I'm happy to hear you on.

So I don't know who it will be for the plaintiff, whether it's Ms. Scher or someone else, but you may proceed.

MR. NETTER: Good afternoon, Your Honor. Brian Netter from Democracy Forward Foundation. I'll be handling this argument for the plaintiff, Ms.

Perlmutter.

THE COURT: All right. Very well.

MR. NETTER: Since the last hearing in this matter, nothing has cured the abject lawlessness of the attempted takeover of the Library of Congress by Todd Blanche and his subordinates, nor have any of the facts meaningfully changed.

Ms. Perlmutter remains unable to perform the functions assigned to her by law, and the Library of Congress and Copyright Office remain in a state of disarray.

What has changed since this Court's emergency TRO review is that there is new guidance from the D.C. Circuit on a series of critical issues. In *Aviel v. Gor*, a motions panel reviewing the government's motion to stay an order reinstating the president of the Inter-American Foundation pending appeal, denied the government's motion. And although some motions panel orders leave the parties guessing as to the reasons for the panel's order, the *Aviel* panel majority provided a full opinion by Judge Katsas and joined by Judge Pillard.

The *Aviel* opinion includes three critical findings:

First, for purposes of likelihood of success on the merits, the panel found that where the Federal Vacancies

Reform Act does not expressly authorize the President to appoint an acting principal officer, it is unlikely that the Take Care Clause gives the President freestanding authority to make a temporary appointment. And on this point, Judge Rao agreed as well.

Second, where the President does not have the authority to appoint an inferior officer, he does not have the authority to fire the inferior officer. And this determination by the D.C. Circuit follows the Supreme Court's holdings in *Free Enterprise Fund v. PCAOB* and the 1839 decision in *In Re Hennen*.

And, third, at least until the Supreme Court or a D.C. Circuit merits panel weighs in, the quote-unquote "last word" from the D.C. Circuit for purposes of preliminary relief is that reinstatement is an appropriate remedy if the removals at issue were likely unlawful.

In so reasoning, the panel adopted an interpretation of the Supreme Court's *Wilcox* stay order that differs from this Court's preliminary assessment.

So our fundamental submission to the Court at this moment of time, on full review of the preliminary injunction, is with the guidance of the D.C. Circuit under *Aviel*, the Court's assessment that Ms. Perlmutter could not demonstrate irreparable injury, at least for

purposes of the 14-day period of the TRO, should not guide the determination of whether she demonstrates irreparable injury for purposes of the duration of the case under the preliminary injunction standard.

THE COURT: Can you just go into the very last point you made of the three? I think -- and what you said was it conflicted with my reasoning, I think you said.

Explain to me what you mean by that.

MR. NETTER: So Judge Katsas's opinion in *Aviel* takes the position that what the Supreme Court was saying in *Wilcox* was that a party is unlikely to demonstrate irreparable harm -- the equities weigh against that party -- if it is likely on the merits that the President had the authority to terminate that individual. So the --

THE COURT: That is -- okay. So that's your argument, is that it conflicts with how I had interpreted *Wilcox*.

MR. NETTER: That's correct, Your Honor.

THE COURT: Okay. I understand the argument. I -- well, okay. I understand your argument. I'll wait to hear from the other side, but you can proceed. But I wanted to make sure I understood the point you were making.

MR. NETTER: And let me follow up. Not just with respect to -- and whether this Court should follow what we construe Judge Katsas to have been saying in the *Aviel* ruling but in the Supreme Court's decision in *Wilcox* itself. The one thing we would want to refer the Court to is the critical language, and I'll read this quotation, is, "The stay also reflects our judgment that the government faces greater risk of harm if an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."

And the citation that's attached to that quote is to *Trump v. International Refugee Assistance Project*, 2017 per curiam decision of the Supreme Court. And the --

THE COURT: I have it right here. No, go ahead.

MR. NETTER: Excellent. And the Supreme Court's -- a quotation from *Trump v. IRAP* is the purpose of interim equity relief is not to conclusively determine the rights of the party but to balance the equities as the litigation moves forward.

So what that's saying is, effectively, that given that a preliminary injunction is an exercise of a Court's equitable authority, the point of this practice

is to minimize the expected harm that results from having to establish what the rules are going to be while the case is being litigated. So, naturally, and as a mathematical matter, the way that one computes expected harm is by taking both what the harm would be if a circumstance were to be true and the likelihood that that circumstance would come to pass.

So, naturally, if it is true that the President is likely to prevail on his argument that he was entitled to fire an individual, then, if you multiply that by the harm to the President of not having his preferred person in office, that creates a very different dynamic than a situation where, as here, Ms. Perlmutter -- the arguments on the merits for Ms. Perlmutter having been fired are extraordinarily weak. And the harms that she will suffer, therefore, in the balancing of the equities, in terms of expected value, necessarily tilt the balance in a certain direction.

THE COURT: I understand your argument. And what you're saying is that it's just -- it's interesting -- look, you know, it's hard to -- all of these opinions, whether we're talking about Supreme Court in *Wilcox* or some of the other ones on the D.C. Circuit are hard to -- in some cases, are hard to divine exactly what is happening, obviously.

But your argument is that there is interplay -- what this is suggesting is interplay between what the Court is saying in the balance of the equities and its assessment of the merits.

MR. NETTER: Correct, Your Honor.

THE COURT: The likelihood of success.

MR. NETTER: And we would assert that it's not just us saying this, but that's what Footnote 2 in Judge Katsas' opinion in *Aviel* is suggesting.

THE COURT: Well, you use the word "suggesting," and I think that's fair. I mean, again, I think this is all very murky and somewhat difficult to nail down conclusively because of the posture these cases are in. That certainly -- I agree with you that's one way to read what he was saying -- what Judge Katsas was saying, that is -- but, okay. I understand your argument.

MR. NETTER: Thank you, Your Honor. And I think what's essential there is that Judge Katsas, who has not always been in the majority of the en banc court for these purposes, viewed himself effectively as bound by the most recent en banc decision of the D.C. Circuit in this stay posture for purposes of ruling on a panel stay.

And this, you know, leaves open the possibility

that he or District Court judges or that the D.C. Circuit en banc could reach a different decision after a merits determination. But what this Court is deciding right now is that necessarily probabilistic assessment of where things sit in terms of preliminary relief.

And for those purposes, our assessment is that a recent and reasoned panel by the D.C. Circuit that necessarily rejected the government's arguments in that case as to irreparable harm, which track the arguments that the government is making here in large part, that that should guide this Court's assessment of whether Ms. Perlmutter has established irreparable harm for purposes of her motion for preliminary injunction.

THE COURT: It's tough because there are -- you'd have to acknowledge, right, that there are plenty of times when courts don't seem to weigh -- they don't seem to do the sort of expected value calculation that you're offering. And they say -- and even -- and, again, you can interpret *Wilcox* as saying this, too -- but that basically say when they end up -- if a Court ends up denying -- I guess it only comes up in this scenario -- but denying preliminary relief on the basis of irreparable harm, and they go out of their way to say, well, even assuming the plaintiff is likely to end up -- is likely to win, and, in fact, they're

wrongfully -- which is different, I know, what you're saying is happening in *Wilcox*, and I get what you're arguing. But they say, even if they're likely to win, this is not the type of harm -- or however you want to put it. It's not the type of harm that could get you irreparable harm.

And so even though we assume -- we're assuming they're -- for example, they're wrongfully removed in this case, or whatever the case might be, they're going to end up winning on the merits, that because of the nature of the harm at stake they don't get over the hump.

How do you respond to that -- to that, which I think is put -- zooming out a little bit from the language of some of these cases over the last few months, is sort of like how courts do sometimes when they're going to decide on this basis, tend to come out? Or how they describe what they're doing is really what I mean to say.

MR. NETTER: So, Your Honor, whatever the points of disagreement may be at the D.C. Circuit on questions of the appropriateness of judicial relief in these employment disputes, I think our first-line argument would be that there's no reading of *Aviel* that is consistent with the conclusion that it is never

appropriate to grant preliminary relief to a federal employee who has supposedly been fired through a potentially unlawful process.

THE COURT: Okay. I mean, I -- to say -- well, it's never appropriate -- it's never appropriate or a plaintiff -- or it's not -- I'm sorry, repeat what you just said.

MR. NETTER: Well, instead of repeating it, let me state it differently.

THE COURT: Okay.

MR. NETTER: Which is, to the extent there is an argument out in the world that the theory of irreparable harm doesn't work, that there's no such thing as having irreparable harm from having lost your senior-level federal job, that argument is inconsistent with the outcome in *Aviel*. It's certainly inconsistent with the resolution as compared to the arguments the government made in that case.

So then the question has to be, and what is the standard --

THE COURT: Go ahead.

MR. NETTER: And if it is true that irreparable harm exists in only some circumstances, is this one of those circumstances? And on that point, we adamantly assert that this is a very strong case in which Ms.

Perlmutter is experiencing irreparable harm because of the facts surrounding the attempts to dismiss her.

So on May 9th, Ms. Perlmutter published, in her capacity as Register of Copyright, a pre-publication version of Part 3 of her report to Congress on artificial intelligence, discussing how -- whether AI companies -- discussing, excuse me, whether AI companies may use copyrighted materials to train their models.

The very next day, on May 10th, the President purported to remove her, setting into motion the chain of events that gave rise to this litigation.

So there's a strong evidentiary inference that the President sought to sideline her so as to prevent her from continuing the important work that she has been doing as an adviser to Congress.

Now, if it was important enough for the President unlawfully to prevent Ms. Perlmutter from finishing her report to Congress on the applicability of copyright law to artificial intelligence, then surely Ms. Perlmutter has an interest in resuming that work. And a Court exercising a fundamentally equitable authority should not be putting a thumb on the scale to favor the lawless actions of the executive branch, you know, vis-a-vis an act of performing fundamentally legislative functions in that regard.

So now the Supreme Court case that starts this line, the *Sampson* case and its progeny, those cases talk in terms of balancing the parochial interests of the fired employee against the, quote, "latitude traditionally afforded to the government in handling its own internal affairs."

And if we start with that second point here, the interest of the executive branch are diminished because at least some of the Register's functions, and potentially the functions that caused for the President to seek to intervene, are legislative in nature.

And it -- I think the Court should take judicial notice of the fact that just today the White House has issued a -- what it's calling America's AI Action Plan.

So the need for Ms. Perlmutter to be on the ground advising Congress as to how copyright intersects with artificial intelligence is more significant and more important than perhaps ever. And permitting the executive branch officials to sideline Ms. Perlmutter because they don't want her to be able to provide the advice to Congress that she has been providing as a lifelong expert on copyright matters is fundamentally inequitable and should not fall into the bucket of letting the executive branch manage its own internal affairs, because that's just not what's going on here.

And if any of these harms could be remedied for purposes of this being irreparable harm, the government hasn't offered any theories as to what that remedy would look like at the end of the case.

If legislation is considered and adopted while Ms. Perlmutter is on the sidelines, then there's not realistically going to be any pathway for Congress to reopen those bills and take account of the advice that she would have given had the executive branch not interfered.

Likewise, all of the appointments and the functions that are assigned to her by statute are assigned to the Register by statute because she is an important expert on copyright law and ought to be there performing those functions. So it is rare in these cases where you have a government official who has functions specifically assigned to her by statute.

She is not a line-level employee or somebody who is just performing tasks that are assigned by a supervisor that, you know, could be delegated to somebody else.

Here we have a circumstance in which Congress has said, this is what we want the Register to be doing, and she can't do those things.

THE COURT: I take your point. When you say they're assigned to her, they're assigned to the office,

and your position is she's the rightful person to be in that office. But the legislation doesn't say Ms. Perlmutter is assigned these things. They're assigned to an office. And she, in your view, is the rightful, lawful occupant of that office.

Fair?

MR. NETTER: That's correct, Your Honor. And we'll turn in a moment to the merits. But if we accept the proposition that she is the Register of Copyrights then -- Register of Copyright, excuse me -- then she has both the privilege of serving as its adviser and the responsibility of discharging these statutory tasks.

And the executive branch officials who are standing as the obstacle to her accomplishing those tasks are acting fundamentally inequitably and are preventing her from doing the things that she is entitled to and responsible for doing.

So it does invariably tie us back to the merits, and perhaps this is an opportunity, then, to walk through the points on the merits because this seems exceedingly straightforward.

Ms. Perlmutter is likely to prevail on the merits because her position as Register of Copyrights is an inferior officer for purposes of the Appointments Clause. This is undisputed as between the parties. And

for an inferior officer, the Constitution's Appointment Clause, it says that Congress may decide by statute whether the officer will be appointed by the President, by the courts of law, or by a head of department.

And here, through 17 U.S.C. 701, Congress decided to vest appointment authority in the Librarian of Congress. And as we discussed, as one of the issues handled by the *Aviel* panel, unless otherwise provided by statute, the power to remove an inferior officer belongs to whoever holds the appointment power.

So this is -- pursuant to binding Supreme Court precedent, Ms. Perlmutter can be removed only by the Librarian.

So that takes us to the question of whether Mr. Blanche, when he was purporting to act as the librarian, was lawfully exercising that role.

Pursuant to the Appointments Clause, the President lacks any inherent authority to appoint principal officers without the advice and consent of Congress unless Congress has expressly provided such authority by statute. And that's where the Federal Vacancies Reform Act comes in.

The FVRA doesn't help the executive branch here because Congress did not include the Library of Congress within the statute's scope. It very clearly, in 5

U.S.C. 3345(a), says that the FVRA applies to an executive agency. Executive agency is defined in Section 105 to include executive departments, which are enumerated and don't include the Library of Congress; government corporations, which are defined in 103 and plainly does not include the Library of Congress; or independently -- independent establishments as defined in Section 104.

In Section 104, "independent establishment" is defined to mean an establishment in the executive branch, which is not an executive department, military department, or government corporation, plus, the Government Accounting Office -- or Government Accountability Office these days.

So the question ultimately becomes whether, as a matter of statute -- and it's well established that Congress is not obligated to follow constitutional norms in using statutory terms. So the question is whether, as a matter of statute, the Library of Congress is an independent establishment and, therefore, an executive agency. And there is just not a whit of evidence to suggest that Congress treated the Library of Congress as an independent establishment and, therefore, as an executive agency.

Much to the contrary, there is again binding D.C.

Circuit precedent, the case of *Haddon v. Walters*, establishing that when Congress has used the term "independent establishment" in distinction to an agency, when it has identified a list that includes both independent establishment and the agency, that excludes the possibility that the agency or entity at issue is an independent establishment.

And that is precisely what happens in the U.S. Code, because in -- 5 U.S.C. 4101(a) uses "independent establishment" in distinction to the Library of Congress. It lists both an independent establishment or the Library of Congress.

Moreover, we identified in our briefs a dozen separate circumstances in which Congress used the term "executive agency" in distinction to the Library of Congress. There is simply no basis whatsoever to infer from this that Congress intended for the Library of Congress to be treated as an independent establishment.

Now, the defendants' only argument in response is that they say that this is just a belt and suspenders situation that apparently involves a whole lot of belts and a whole lot of suspenders because we have more than a dozen circumstances in which Congress has used the term -- the relevant statutory terms in a way that's inconsistent with including the Library of Congress.

And there's effectively no real argument here, no real argument as to why Congress would have done so. And if it was so important in those other 13-plus examples for Congress to emphasize that the Library of Congress, through its belt and suspenders obsession, that the Library of Congress would be included, why not here? Why, if it was so important for the Library of Congress to be included elsewhere, would Congress not have expressly included the Library here?

And the only proper inference is the inference that always follows from the canon against super fluidity, which is that Congress wasn't using the term "independent establishment" to include the Library of Congress.

Therefore, it follows that Mr. Blanche does not have any authority as acting Librarian of Congress because the President lacked the authority to appoint him to that role under the FVRA or under any other mechanism, and that he, therefore, had no authority to terminate or to remove Ms. Perlmutter from her role as Register of Copyright such that she properly continues to hold that position and ought to be restored during the pendency of this litigation.

THE COURT: All right. Thank you. I appreciate your argument.

Let me hear the defendant in response.

MR. HAYES: Good morning, Your Honor. Benjamin Hayes for the defendants.

I'm happy to start wherever you would like, but I guess I think it appropriate to start at irreparable harm since that's where the other side started as well. And so I'll start with the *Wilcox* and the *Dellinger* cases because I think I have a very different understanding of those cases. I think Your Honor's prior TRO decision got those cases exactly right.

So the *Wilcox* decision -- I think what's relevant here is the *Wilcox* decision and the *Dellinger* decision from the D.C. Circuit.

My read of *Wilcox* is exactly as Your Honor read it, that there are two independent bases identified in the Supreme Court's order that justify the stay. And the Court lays them out separately.

One is the merits question. And then it says, "The stay also reflects our judgment that the government faces greater risk," et cetera. And that's the language that the parties have quoted.

I don't know how to read that, frankly, without reading it for what it says. And at least, whether it's focused just on an irreparable harm question or the balance of harms in total, the bottom line is still that

when they are asserting a statutory right to function theory, when the plaintiff is, that is not enough given the relative harms that the government is suffering and they are.

I don't know how to read it other than that, and I don't think the *Aviel* decision undermines that at all. That decision says nothing whatsoever about irreparable harm.

The footnote is discussing a separate merits question, Footnote 2, a separate merits question about whether reinstatement was an available remedy. The Court doesn't go into irreparable harm.

Now, maybe there's a chain of inferences that one could draw that says, well, maybe that might be related, but that's not what that footnote is talking about, and I don't think that's enough, certainly, to rewrite what *Wilcox* was saying.

And I do think, on this point, the *Dellinger* stay is relevant too because, as I take my opponent's argument, I think it is that you have to have both likelihood of success on the merits as well as, you know, the other factors in order to get a stay.

And *Dellinger* says -- makes -- as Your Honor was suggesting courts do this -- assumes that the plaintiff is correct that his removal is statutory ultra vires

nonetheless found, no irreparable harm and granted a stay of the injunction.

So I think that's exactly how the courts have approached this: Irreparable harm is needed and an independent basis for obtaining a preliminary injunction or a TRO. And I don't think reading a footnote in *Aviel* can displace at least what the Supreme Court has told us and the D.C. Circuit in the *Dellinger* case, in terms of what is likely -- what is there not final say on the matter but their assessment of what statutory right to function is and whether it's enough to get emergency injunctive relief. So I think that's the appropriate way to read those decisions.

But I think that, you know, even if we're going to go further than that and say, well, maybe there is some form of this that there can be irreparable harm based on statutory right to function, this case doesn't fit into that. And this -- I think Your Honor's TRO decision made this point too.

I think most of the cases that have preceded this, this one, and in which statutory right to function has been held to be irreparable harm fall into one of two buckets.

The first are, where the principal officer, the vacancy, is someone who is appointed by the President

with the advice and consent of the Senate, to an independent agency or -- independent position or a multi-member independent board with for-cause removal protections.

And the cases that have done that highlight in multiple places of the opinions those features as would distinguish those cases from, say, your run-of-the-mill employment dispute. And they have emphasized that that is what -- if it's going to be a theory that is viable for irreparable harm, you need to have that.

Other cases that have not involved an individual who is confirmed by the Senate and nominated by the President, like the *Brehm* decision by Judge Leon -- I think it's true of the *English* decision as well -- highlighted those distinctions as to say those cases are different. We're not here talking about someone who is appointed by the President, confirmed by the Senate, and someone who isn't serving on an independent entity.

So I think that -- even if this theory is accepted, it clearly doesn't fall into the buckets of those cases that have accepted it. So I think that's a reason to reject it there.

The second bucket are cases like *Berry* and *Aviel*. And those are cases where irreparable harm was found because the entity, whether it was the -- I think a

civil rights board in *Berry* -- and I can't remember the other one -- and *Aviel*, were either going to terminate legislatively, be gone, so you can't reinstate someone to something that's no longer there, or was going to be fundamentally changed from what they were before.

And those are -- there's -- there's nothing like that here. There wasn't any evidence of that when this case was filed. There's no evidence of that when the PI briefing went through. There's nothing to suggest that in the declaration. And nothing like that has happened today.

So I think -- and I think that long history demonstrates why at this point, 75 days out, no -- there's no suggestion that the Library of Congress is in peril. I think that just underscores why those cases are totally different than what we're talking about even if you think the statutory right to function theory is one that can qualify for irreparable harm.

I'll address -- so they have several other theories of irreparable harm that I can walk through.

The other -- the second one is this inability to perform legislative functions. As I think Your Honor's stay decision -- not stay decision -- TRO decision references, it's a little bit hard to distinguish this theory from the statutory right to function theory. So

I think it could be dispensed with just on that ground. But I think, in addition to that, there are a couple other problems with it.

The first is -- and this is also relevant to the statutory right to function -- that at bottom, these are not harms to her. I think Your Honor's *English* decision makes this point, that the harm has to be harm to the individual. And this conflates harm to the plaintiff with harms to the Copyright Office or the Library of Congress or some other entity. And I don't think that's what the law allows. I think *Dellinger* is a good example of not allowing that, that it has to be harm to her and not to the entity. So I don't think that conflation is allowed under the law.

But even if you were to allow it, I don't think that she has substantiated the harms that she has identified. So we have before us a single declaration from the plaintiff, which I think is defective for all the reasons Your Honor signaled in your TRO decision.

One point Your Honor made was that there's very little -- very little by way of timing, like, when is this going to happen. Irreparable harm has to be imminent. So a lot of the functions that the Copyright Office -- copyright director or the plaintiff says need to be done, there's no timeline on them. So it's hard

to say that that satisfies irreparable harm. Others of them seem to be done.

So one of her examples in Paragraph 14 is it will be difficult to effectively register copyright claims. The Law 360 article that they submitted in their brief paints a very different picture, that the Copyright Office is doing all of these things and is open for business. There was a brief period of time in, I think, May, when there was a backlog as -- right around the time when the removals happened, but those have been cleared.

There's no indication that the Copyright Office isn't proceeding. The only thing they point out in their brief is that there is not a signature, but they acknowledge that that's not statutorily required anyway. So that's not a barrier to the Copyright Office functioning.

Another example she gives is the appointment of -- this is Paragraph 14, subparagraph C -- the appointment of a new copyright claims officer. I just looked on their website. That person has been reappointed in July 2025.

So the point of all of this is just to illustrate that, while you can read her declaration as being a parade of horribles of things that's going to happen,

you either don't have any clear guidance in terms of timing or you have lists of things that are actually moving forward as they seem to normally move forward.

And so, at bottom, it is her burden to put forth evidence to support irreparable harm. It has to be great. It has to be imminent, and so on. And I don't see how -- even if we put aside the theoretical problems with statutory right to function, ability to perform legislative functions, and so on, I don't see how she's satisfied the burden just of producing evidence to support a theory of irreparable harm.

And I guess the last harm -- I probably covered most of this already -- is the harms to institutions, which a lot of the same points can be made. It's not a harm to her; it's a harm to the institution.

Her declaration, by the way, says nothing about -- there are concerns, for example, in her brief about disclosure of confidential information, you know, Congress's correspondence, things like that. None of that is in the declaration. That's all attorney argument in the brief. It's pure speculation regardless, and there's no evidence that I'm aware of that anything like that has occurred now 75 days out from when this suit was initiated. So I think that fails for multiple reasons, too. And so --

THE COURT: It's also not -- as I understand it anyway, it's not part of her job. I mean, the issue of -- I know there's an argument that she has certain advisory duties to Congress, okay, but I think that's referring to like CRS, which is a separate animal. It doesn't mean there's nothing to this argument on her part. But the core things that I think I've seen folks express concern about is I make -- I'm a member of Congress. I make a confidential request to Congress for -- I mean, to the Library for some legislative research. I might even, you know -- that might even be -- and I don't want the executive to know what I'm doing. That wouldn't be within her job parameters anyway.

Is that fair to say?

MR. HAYES: I think that's fair so -- it's fair to say that the copyright director does not control CRS. So I think that's totally separate entirely from anything that she might be doing in terms of advising Congress, which, yeah, is another reason why anything related to that is not harm to the Copyright Office and certainly not a harm that would be attributable at all to these removals since they have no effect on them at all.

I think I've covered the things I wanted to say

about irreparable harm. If I remember something I'll come back to it. So I'm happy to turn to the merits.

So our position is that the -- of course, the plaintiff's removal was lawful, both based on the FVRA and then two alternative constitutional arguments.

Under the federal -- our primary argument is that Mr. Blanche's designation as acting librarian was authorized by the Federal Vacancies Act. We're talking -- so we're dealing with a statutory text. There's a definition of "executive agency," which includes an independent establishment, and that is defined to mean an establishment in the executive branch. That's the language we're dealing with.

And so I think the Library of Congress falls squarely within that language for two reasons -- at least two reasons. Number one, I think this was mentioned before, the Librarian who leads the Library is selected -- nominated by the President with the advice and consent by the Senate. There are no removal protections in the statute, and I don't think it's ever been suggested that there are any. Her removal has not been challenged. So that's number one.

Number two, and I think more importantly but they both go together, is the fact that the Library of Congress performs quintessential executive functions.

It issues regulations, promulgates regulations by the Copyright Office which are approved by and sometimes promulgated by the Librarian.

These are binding on parties. They adjudicate cases, set royalty rates, things that the D.C. Circuit in the *Intercollegiate* case and the *Medical Imaging* case repeatedly characterize as core executive functions.

I think the Fourth Circuit case does as well from a little further back in *Edgar*. And those quintessential executive functions are what led the *Intercollegiate* case to hold that it is a department within the executive branch.

Now, I take the point, it is true, that they were not interpreting this statute. But I think the problem with -- I don't think it can just be dismissed on that basis because I think at the end of the day you have to match up what did the Court hold in those cases and what statutory language are you dealing with. And the statutory language is an establishment in the executive branch. It has been held to be in the executive branch.

And I don't know why there's some -- I don't know what nuanced version of executive branch there would be that would mean it is within the executive branch for purposes of the Constitution and in addition to the fact that it performs all of these executive functions. So

it's not strange to view it in the executive branch and why that wouldn't fall within the plain text of the statute.

Now, my friend on the other side has mentioned some statutory provisions that they believe up the other way. So I'll say a few things about that.

First of all, most of them, those dozen that he refers to, are definitions of the word "agency." That's all. So it isn't as if we're comparing apples and oranges here in terms of the Library of Congress and where it falls. We're still dealing with unique text here that isn't the word "agency" but is an establishment in the executive branch. So I think we have to interpret that on its face.

I do think, as much as they disagree, that the best reading of those provisions -- it is a belt and suspenders approach. And the reason for that is because, despite the fact that Congress -- or the Library of Congress has -- performs all these executive functions and such, even in the *Med. Imaging* case, for example, the Court recognizes that it is historically associated with Congress. It has Congress in its name, after all. That's not determinative, but I think that is a very -- that's -- it's impossible to avoid that as a background understanding when Congress is legislating.

I think it's perfectly reasonable for Congress, when writing the definition of a word "agency," which is not normally associated with the Library of Congress, to specifically list it.

And those are the exact same concerns, by the way, which led D.C. Circuit to hold that the Library of Congress is not within the definition of the term "agency" for purposes of the APA and FOIA. So it isn't like I'm saying, well, these must be the reasons. These are the kind of reasons that have led courts to exclude the Library of Congress from the definition of agency. And so I don't know why that wouldn't apply to those as well. And at the end of the day, despite like -- there is, to be sure, the rule against surplusage is a canon of interpretation, but it is not an inexorable command.

In statutory interpretation, context is key; and when we're talking about the clear language of this particular provision, which isn't just the term "agency," we're not even just interpreting the term "executive agency." We're talking about "and established in the executive branch." I don't think that a bunch of random definitions of the term "agency" scattered across Title 5 is enough to override the plain meaning of this text.

And they have some other arguments. I'm happy to

address them. One argument was Library of Congress is in Title 2. I don't think that's a good argument. You won't surprised here. I think the Fourth Circuit's *Eltra* decision effectively resolves that where it says, yes, we know that the Library has some legislative functions, for example, CRS. So it really tells us nothing whatsoever. That it's in Title 2 versus Title 5 or anywhere else, I think that's right. And so I don't find that particularly probative at all.

And their last point was that some statutes define the entity as an independent establishment in the organic statute. True, the Library of Congress is much older than that. They point to the fact that the post office, for example, is also very old, and that's true. But the difference is that the reason the post office statute has the label "independent establishment" in there is because Congress fundamentally reorganized it in 1970 so post the creation of Title 5. And that was in the midst -- in the midst of taking it from being a cabinet level department to being a completely independent agency, basically rewriting the operations, that they did that.

That's the same sort of thing that happened with the National Archives. It was part of GSA back in 1934. There was some reorganization legislation post-1966, and

they include -- and Congress includes that language there.

As far as I'm aware, nothing like that has happened to the Library of Congress. There's been amendments but there hasn't been a wholesale, you know, reorganization akin to that done by the Postal Service.

And I don't think Congress would be expected to go around just, you know, amending enabling statutes with no other reason to be amending the statutes. And so I think that that's the reason for the disparity there, but I don't think that's really probative of the statutory question.

THE COURT: Your other theories, though, beyond the statutory interpretation theories.

MR. HAYES: Yes. So we have two -- the constitutional points.

So our first is that even if you were to accept the argument that the FVRA does not apply to the Library that our view is that Article II empowers the President for a brief time to designate an acting official until some nominee can be -- excuse me -- someone can be nominated and confirmed by the Senate.

This was not held in the *Williams* case, so I'm not representing that the D.C. Circuit has held that, but the D.C. Circuit did -- I think it's fair to say,

recognized the plausibility of -- or the possibility that this power would exist but not as the *Aviel* decision -- stay decision that they cite said.

We're not suggesting that it's unfettered discretion, like the President can just ignore anything, you know, the Appointments Clause, the FVRA; it has just unbridled power. Our point is simply it is to enable the President to act as the President, namely, to exercise control over the executive branch and whatever department you're talking about for a period of time, because it always will take time once there's a vacancy, for the Senate to act. And if you don't have some ability for there to be someone to be put into that place in the interim, then that entity truly is cut off from executive leadership. And that's our -- and that's where it's a narrow argument.

We're not seeking -- you know, our position is not that the President gets -- you know, has unilateral power to do this but might, if he feels -- so feels and do it some other way according to statute or otherwise.

So that's our principal argument there. I understand that the *Aviel* stay decision did not view that favorably, but I think that -- at least the argument that they were addressing.

THE COURT: You got one of three.

MR. HAYES: I'm sorry?

THE COURT: You got one of three, right, on that one?

MR. HAYES: Yeah. Well, not on that one, actually. I think Judge --

THE COURT: Oh, no. It's your later argument, okay.

MR. HAYES: It's the later argument, which I'll turn to now because I -- although I do -- I guess I would say one more thing about this one, which is, that the argument made that the Recess Appointments Clause somehow forecloses our argument, I don't think that's right because I think it is correct that that clause is dealing with a very particular problem, right?

It's not -- I don't think it's surprising that Congress, back in 17- -- you know, the 1700s, would have thought, knowing that recesses were going to last a very long time, would write a clause directly focused on that, but I don't think that means that they, therefore, left no room for the President or Congress to have residual power to figure out how to deal with a vacancy that arises during a recess. So I think that's dealing with a specific problem and wasn't purporting to cover the entire ground when it comes to when -- how to fill acting positions.

So moving on to the third constitutional argument, yes, our position is that, if you don't agree with either of the first two, then the President has the authority to remove, in this case the plaintiff, an inferior officer, directly. And the reason for that is we recognize that the normal rule is that the head of -- the person who appoints has the power to remove. That's just normally how it goes. We recognize that our argument, again, is narrow.

It is not that the President can remove an inferior officer who has been appointed by a principal officer whenever he so chooses. It is simply that -- and this is the point that Judge Rao did agree with -- that where there's a breakdown in the chain of command, in that context, he needs to be able to exercise power over the inferior officer until the principal officer position is filled; otherwise, you're left in more or less the same position that he can't exercise power, the Take Care Clause and the power to oversee the executive branch, if there is that break in the chain of command.

THE COURT: All right. Very well.

Let me turn to you, Mr. Netter, for any response. But can I also just -- you don't have to begin with it but if you could include a response to this, something Mr. Hayes raised, that I thought it made sense to flesh

out.

I still struggle to understand the difference conceptually -- and I was just looking to see how you described it in your briefing, between -- I mean, I guess, more or less between your first and second theories of harm.

So I -- forgive me if this is not sort of -- you wouldn't characterize it this way, but sort of -- I thought -- the first one is sort of statutory right to function. That's sort of kind of what we've been talking about, what the cases tend to call it. And then the second one -- I'm just looking at your header -- "plaintiff remains the Register of Copyrights and is, therefore, required to fulfill her statutory duties."

Tell me, at a high level, what is the difference between those two things? Anyway, I don't want to sidetrack you on any other points you want to make in response, but that is one thing I'd love to hear you address.

MR. NETTER: Of course, Your Honor. I'm happy to start there.

So the difference that we had intended is that the first category refers to Ms. Perlmutter's right to discharge these functions under the statute.

And the second category is her obligation to do the

things that she is told to do by statute. And so one of them is receiving the commands, and one of them is discharging the commands.

THE COURT: Okay. Okay. Understood.

MR. NETTER: And I had wanted to begin by correcting one misstatement by Mr. Hayes, or perhaps an unintentional mischaracterization, as if the appointment of the copyright claims board officer had been successfully accomplished.

The website that he identified says that the former officer, quote, "will serve as an officer until the ongoing hiring process for his replacement is completed and a new appointment is made," close quote. It was the "new appointment" that we had argued could not be made without the recommendation of the Register such as that is an example of a function that cannot be performed during this period of uncertainty.

And to Mr. Hayes's broader point that some parade of horribles hasn't taken place, I think it does bear mentioning that his client, Mr. Perkins, hasn't returned to the Library of Congress. None of these executive branch officials have returned since the one day that they attempted to go there.

So the situation on the ground is one of treading water of the Library as a venerated American institution

awaiting this Court's guidance, which is yet another reason why an expeditious determination on the merits either by this Court or by the appellate courts is essential to create a functioning institution.

Now turning to Mr. Hayes' argument more broadly, what I think is striking with respect to this -- this -- I'll call it a power play by the President and by the Justice Department, what's striking is the utter lack of principle, a lack of principle with respect to the application of the law and a lack of principle with respect to the construction of this Court's equitable authority.

Now, with respect to the interpretation of the law, you know, Mr. Hayes said that, there's just a, quote, "bunch of random definitions" in the U.S. Code that this Court should ignore in deciding that the Library of Congress is an executive agency and, more specifically, that Congress thought it was an executive agency when it passed the FVRA.

Now, this is a nation of laws, and this is how the rule of law works. We look at the statutes; we look at how Congress has used terms to figure out what Congress wanted to do in terms of assigning authorities and assigning functions. The only way for the government to get to its desired position is to assume that it's true

and then to collect various data points that don't have any principled basis.

So this suggestion that these 12 statutes don't matter because they were using independent establishment as part of the definition of agency so it was necessary to reference the Library of Congress, but here, Congress was using the term "independent establishment" as part of the definition of executive agency and, therefore, it didn't need to mention the Library of Congress.

You know, just to state that argument is to refute it. And the backdrop of this entire case is just an incredible power grab, not just as to the executive functions that are performed within the Library, whatever those may be, but as to an agency that surely has non-executive functions as well.

So treating this case as just something about the President being able to control his executive officers because there are some executive tasks that take place there, that misses the mark entirely.

This is a case about the President trying to jump over his line, to exceed his authority under the Constitution, to take powers that have not been allocated to him by Congress and asking the Court to look the other way while that happens.

With respect to the Court's equitable authority, I

hear the arguments that the government is making. What I don't hear is a principled theory for when an individual is going to be allowed to come to court to ask -- to have the obstacles to his or her continued performance in government service removed.

So we've mentioned a couple times now that, okay, as a hypothetical, what if the President purported to remove the Senate parliamentarian? Or what if the President purported to remove you, Your Honor, somebody who undisputedly is not under the control of the President.

THE COURT: Finish your point because I do -- I mean, I thought that was -- I want to respond to this point but finish your point.

MR. NETTER: Thank you, Your Honor.

So the only response that the government has offered to this point is, I believe, in their opposition brief, Docket 33. They say the President's power to appoint and remove the Librarian, a power he does not have over true congressional entities like the House Sergeant At Arms or the Senate parliamentarian, confirms the Library of Congress's placement in the executive branch.

But that doesn't answer the question of how this would play out if the President did assert the authority

to remove the Senate parliamentarian.

THE COURT: How do you think it would play out?

MR. NETTER: Well, I think that the arguments would be precisely the same, that this was unlawful --

THE COURT: I don't think that's true at all. You would have -- I would have the -- whether -- if the President purported to remove or purported to exercise his authority in a way that was plainly intrusive on the other branches, number one, I don't actually know what the practical effect of that would even really be, but let's say that were the case, some future President, you would have institutionally that branch. You would have more than just a person, a high-level person concededly, but you would have more than just a person vindicating -- attempting to vindicate their rights. You would have institutionally that branch trying to vindicate its rights.

And I -- you know, you would have action by -- in the case of the Senate parliamentarian, I would have before me Senate counsel. I would have before me representatives of that branch attempting to vindicate their institutional prerogatives, the prerogatives of their independent branch. And I don't have that here.

So that doesn't -- to be clear, I don't really think that answers the question, you know. I take your

point that -- I'm not -- I don't think this points directly to the merits answer here. But my point is just that I do think -- in the scenarios you laid out, I do think things would play out differently because we'd have a clash of branches, not merely what -- I say "merely," but not the clash between the executive and an individual. What say you to that?

MR. NETTER: So, Your Honor, with respect, I think that that's changing the hypothetical, right? That assumes that another branch of government is going to decide that it's in its broader political interests to stage a fight and that the power -- that there would be some sort of a power struggle that would result in another institution filing a lawsuit. And, you know, that may work for the Senate. Maybe they would; maybe they wouldn't. I don't know who would be filing suit on this Court's behalf, if the Court were -- if the President were to purport to start firing judges.

But that doesn't answer the fundamental question, which is, what if the individual who has been fired -- what if the Senate parliamentarian shows up in court and says this is obviously unlawful, and it's not just unlawful because the President doesn't have the authority, it is unlawful because it is disruptive to the separation of powers. It is an effort by the

President or by the executive branch to claim power that does not belong to the President.

And if the answer to that is, well, Senate parliamentarian, you're entitled to your paycheck at the end of the day, then that is not a recipe for continued success in having the rule of law govern what authorities belong to each of the branches.

Here today, we have an official who was lawfully appointed to a position, who has worked over the course of her entire career to develop the expertise to discharge the responsibilities of Register of Copyright, who has responsibilities and privileges under the law, and who is due to exercise those privileges during this time frame, at a critical point in time when Congress is waiting to hear from her about the application of copyright law to artificial intelligence, something that is under active consideration.

And if the answer is that the President can take this action or direct his subordinates to take this action, and that there's nothing that the courts can or will do because maybe, if she can get a paycheck at the end of the day, then that is entirely disruptive of fundamental principles of the rule of law, and suggests that -- it gives the executive branch the incentive to act inequitably and creates mischief that will not

easily be corrected by the courts at the end of the day.

So this remains the emergency that it was when we filed this lawsuit. Ms. Perlmutter remains entitled to continue her service as Register of Copyright as much as was the case the day we filed this lawsuit. Just as we urge this Court to reach the merits and to rule in her favor at the TRO stage, we believe strongly that the D.C. Circuit's further guidance in *Aviel* requires that outcome today, in any event, and we would urge the Court to permit this case to advance to the extent there are questions about how the D.C. Circuit should be resolving this issue. This is a circumstance that we should let the D.C. Circuit decide for itself, which, of course, can happen once this Court enters an appealable order.

We appreciate the Court's consideration of the issues in this case and ask that our motion be granted.

THE COURT: All right. Very well.

Look, I will just say, I mean, I think -- I do think that it's a tricky case. And I appreciate all the work all of you have put into it, and I will endeavor to get you an answer as soon as I can.

With that, the parties are dismissed.

(Court in recess, 4:09 p.m.)

- - -

CERTIFICATE

I, Chandra Kean, RMR, hereby certify that the foregoing transcript is a true and correct transcription of the proceedings held in the above-titled matter.

C. Kean
Chandra Kean, RMR

July 24, 2025
DATE

**1**

103 [1] - 17:5
104 [2] - 17:8, 17:9
105 [1] - 17:3
10th [1] - 12:9
12 [1] - 41:3
13-plus [1] - 19:3
14 [2] - 26:3, 26:19
14-day [1] - 5:1
17 [2] - 16:5, 36:16
1700s [1] - 36:16
1839 [1] - 4:11
1934 [1] - 33:24
1970 [1] - 33:18

**2**

2 [4] - 8:8, 21:10, 33:2, 33:7
2017 [1] - 6:14
2025 [1] - 26:22
25-1659 [1] - 2:4

**3**

3 [1] - 12:5
33 [1] - 42:18
3345(a [1] - 17:1
360 [1] - 26:5
3:08 [1] - 2:2

**4**

4101(a [1] - 18:9
4:09 [1] - 46:24

**5**

5 [5] - 16:25, 18:9, 32:23, 33:7, 33:18

**7**

701 [1] - 16:5
75 [2] - 24:13, 27:23

**9**

9th [1] - 12:3

**A**

ability [2] - 27:8, 35:13
abject [1] - 3:4
able [3] - 13:20, 37:15, 41:17
accept [2] - 15:8, 34:17
accepted [2] - 23:19, 23:21
accomplished [1] - 39:9
accomplishing [1] - 15:14
according [1] - 35:20
account [2] - 2:17, 14:8
Accountability [1] - 17:14
Accounting [1] - 17:13
acknowledge [2] - 9:15, 26:15
act [5] - 12:24, 16:15, 35:8, 35:12, 45:25
Act [3] - 4:1, 16:22, 29:8
acting [6] - 4:2, 15:15, 19:16, 29:7, 34:20, 36:25
action [3] - 43:18, 45:19, 45:20
Action [1] - 13:14
actions [1] - 12:23
active [1] - 45:17
adamantly [1] - 11:24
addition [2] - 25:2, 30:24
address [3] - 24:19, 33:1, 38:19
addressing [1] - 35:24
Adeel [1] - 2:6
adjudicate [1] - 30:4
ado [1] - 2:10
adopted [2] - 4:18, 14:5
advance [1] - 46:11
advice [5] - 13:21, 14:8, 16:19, 23:1, 29:18
adviser [2] - 12:15, 15:11
advising [2] - 13:16, 28:19
advisory [1] - 28:4
affairs [2] - 13:6, 13:25
afforded [1] - 13:5
afternoon [2] - 2:9, 2:23
agency [24] - 17:2, 17:21, 17:24, 18:3, 18:5, 18:6, 18:15, 23:2, 29:10, 31:8, 31:12, 32:2, 32:8, 32:11, 32:19, 32:20, 32:22, 33:21, 40:17, 40:18, 41:5, 41:8, 41:14
agree [3] - 8:14, 37:2, 37:13
agreed [1] - 4:5
ahead [2] - 6:17, 11:21
AI [3] - 12:6, 12:7, 13:14
akin [1] - 34:6
al [1] - 2:5
allocated [1] - 41:23
allow [1] - 25:15
allowed [2] - 25:14, 42:3
allowing [2] - 6:9, 25:12
allows [1] - 25:11
Allyson [1] - 2:7
alternative [1] - 29:5
amending [2] - 34:8, 34:9
amendments [1] - 34:4
America's [1] - 13:14
American [2] - 3:17, 39:25
animal [1] - 28:5
answer [6] - 42:24, 44:2, 44:19, 45:3, 45:18, 46:22
answers [1] - 43:25
anyway [4] - 26:15, 28:2, 28:14, 38:16
APA [1] - 32:8
appeal [1] - 3:17
appealable [1] - 46:15
appellate [1] - 40:3
apples [1] - 31:9
applicability [1] - 12:18
application [2] - 40:10, 45:15
applies [1] - 17:1
apply [2] - 32:12, 34:18
appoint [5] - 4:2, 4:7, 16:18, 19:17, 42:19
appointed [5] - 16:3, 22:25, 23:17, 37:11, 45:9
appointment [8] - 4:4, 16:6, 16:10, 26:18, 26:19, 39:7, 39:13, 39:14
Appointment [1] - 16:1
appointments [1] - 14:11
Appointments [4] - 15:24, 16:17, 35:6, 36:11
appoints [1] - 37:7
appreciate [3] - 19:25, 46:16, 46:20
approach [1] - 31:17
approached [1] - 22:4
appropriate [6] - 4:16, 11:1, 11:5, 20:5, 22:12
appropriateness [1] - 10:22
approved [1] - 30:2
Archives [1] - 33:24
argued [1] - 39:14
arguing [1] - 10:3
argument [34] - 2:25, 5:18, 5:21, 5:22, 7:9, 7:19, 8:1, 8:17, 10:24, 11:12, 11:15, 18:19, 19:1, 19:2, 19:25, 21:20, 27:21, 28:3, 28:6, 29:6, 33:1, 33:2, 34:18, 35:16, 35:21, 35:24, 36:6, 36:8, 36:11, 36:12, 37:1, 37:9, 40:5, 41:10
arguments [8] - 7:14, 9:8, 9:9, 11:17, 29:5, 32:25, 42:1, 43:3
arises [1] - 36:22
Arms [1] - 42:21
Article [1] - 34:19
article [1] - 26:5
artificial [4] - 12:6, 12:19, 13:17, 45:16
aside [1] - 27:7
assert [3] - 8:7, 11:25, 42:25
asserting [1] - 21:1
assessment [7] - 4:20, 4:24, 8:4, 9:4, 9:6, 9:11, 22:10
assigned [9] - 3:9, 14:12, 14:17, 14:19, 14:25, 15:3
assigning [2] - 40:23, 40:24
Assistance [1] - 6:13
associated [2] - 31:22, 32:3
assume [2] - 10:7, 40:25
assumes [2] - 21:24, 44:10
assuming [2] - 9:24, 10:7
attached [1] - 6:12
attempted [2] - 3:5, 39:23
attempting [2] - 43:15, 43:21
attempts [1] - 12:2
attorney [1] - 27:20
attributable [1] - 28:22
authorities [2] - 40:23, 45:7
authority [19] - 4:4, 4:7, 4:8, 5:15, 6:25, 12:21, 16:6, 16:18, 16:20, 19:16, 19:17, 19:19, 37:4, 40:12, 41:21, 41:25, 42:25, 43:8, 44:24
authorize [1] - 4:1
authorized [1] - 29:8
available [1] - 21:11
Aviel [17] - 3:14, 3:20, 3:23, 4:24, 5:10, 6:4, 8:9, 10:24, 11:16, 16:8, 21:6, 22:6, 23:23, 24:2, 35:2, 35:22, 46:9
avoid [1] - 31:24
awaiting [1] - 40:1
aware [2] - 27:22, 34:3

**B**

backdrop [1] - 41:11
background [1] - 31:25
backlog [1] - 26:9
balance [4] - 6:21, 7:18, 8:3, 20:25
balancing [2] - 7:16, 13:3
banc [3] - 8:20, 8:22, 9:2
barrier [1] - 26:16
based [2] - 22:16, 29:4
bases [1] - 20:15
basis [6] - 9:22, 10:17, 18:16, 22:5, 30:16, 41:2
bear [1] - 39:19
becomes [1] - 17:15
begin [2] - 37:23, 39:5
behalf [1] - 44:17
belong [2] - 45:2, 45:7
belongs [1] - 16:9
belt [3] - 18:20, 19:5, 31:16
belts [1] - 18:21
Benjamin [2] - 2:8, 20:2
Berry [2] - 23:23, 24:1
best [1] - 31:15
between [6] - 8:2, 15:25, 38:4, 38:5, 38:16, 44:6
beyond [1] - 34:13
bills [1] - 14:8
binding [3] - 16:11,

17:25, 30:4
**bit** [2] - 10:14, 24:24
**Blanche** [4] - 2:4, 3:6, 16:15, 19:15
**Blanche's** [1] - 29:7
**board** [3] - 23:3, 24:1, 39:8
**bottom** [3] - 20:25, 25:5, 27:4
**bound** [1] - 8:21
**branch** [28] - 12:23, 13:8, 13:19, 13:24, 14:9, 15:13, 16:23, 17:11, 29:13, 30:12, 30:20, 30:22, 30:23, 31:1, 31:13, 32:21, 35:9, 37:19, 39:22, 42:23, 43:12, 43:16, 43:21, 43:23, 44:10, 45:1, 45:24
**branches** [3] - 43:9, 44:5, 45:7
**break** [1] - 37:20
**breakdown** [1] - 37:14
**Brehm** [1] - 23:13
**Brian** [2] - 2:6, 2:23
**brief** [7] - 26:5, 26:8, 26:14, 27:17, 27:21, 34:20, 42:18
**briefing** [2] - 24:9, 38:4
**briefs** [1] - 18:13
**broader** [2] - 39:18, 44:11
**broadly** [1] - 40:5
**bucket** [2] - 13:23, 23:23
**buckets** [2] - 22:23, 23:20
**bunch** [2] - 32:22, 40:15
**burden** [2] - 27:4, 27:10
**business** [1] - 26:8

**C**

**cabinet** [1] - 33:20
**calculation** [1] - 9:17
**cannot** [1] - 39:16
**canon** [2] - 19:11, 32:14
**capacity** [1] - 12:4
**Care** [2] - 4:3, 37:18
**career** [1] - 45:10
**case** [30] - 5:4, 7:3, 9:9, 10:9, 11:18, 11:25, 13:1, 13:2, 14:4, 18:1, 22:8, 22:17, 24:8, 30:6, 30:8, 30:11, 31:20, 34:23, 37:4, 41:11, 41:16, 41:20, 43:11, 43:19, 46:6, 46:11, 46:17, 46:20
**cases** [20] - 7:24, 8:14, 10:15, 13:2, 14:15, 20:8, 20:9, 20:10, 22:20, 23:5, 23:7, 23:11, 23:15, 23:20, 23:23, 23:24, 24:15, 30:5, 30:17, 38:11
**category** [2] - 38:23, 38:25
**caused** [1] - 13:10
**certain** [2] - 7:18, 28:3
**certainly** [4] - 8:14, 11:16, 21:16, 28:22
**cetera** [1] - 20:20
**chain** [4] - 12:10, 21:13, 37:14, 37:20
**challenged** [1] - 29:22
**changed** [3] - 3:7, 3:12, 24:5
**changing** [1] - 44:9
**characterize** [2] - 30:7, 38:8
**chooses** [1] - 37:12
**Circuit** [20] - 3:14, 4:9, 4:13, 4:14, 4:23, 7:24, 8:22, 9:2, 9:7, 10:21, 18:1, 20:13, 22:8, 30:5, 30:8, 32:6, 34:24, 34:25, 46:12, 46:14
**Circuit's** [2] - 33:3, 46:9
**circumstance** [4] - 7:6, 7:7, 14:21, 46:13
**circumstances** [4] - 11:23, 11:24, 18:14, 18:23
**citation** [1] - 6:12
**cite** [1] - 35:3
**civil** [1] - 24:1
**Civil** [1] - 2:4
**claim** [1] - 45:1
**claims** [3] - 26:4, 26:20, 39:8
**clash** [2] - 44:5, 44:6
**Clause** [7] - 4:3, 15:25, 16:2, 16:17, 35:6, 36:11, 37:19
**clause** [2] - 36:13, 36:18
**clear** [3] - 27:1, 32:17, 43:24
**cleared** [1] - 26:11
**clearly** [2] - 16:25, 23:20
**CLERK** [1] - 2:3
**client** [1] - 39:20
**close** [1] - 39:13
**Code** [2] - 18:9, 40:15
**collect** [1] - 41:1
**command** [3] - 32:15, 37:14, 37:20
**commands** [2] - 39:2, 39:3
**companies** [2] - 12:7
**compared** [1] - 11:17
**comparing** [1] - 31:9
**completed** [1] - 39:12
**completely** [1] - 33:20
**computes** [1] - 7:4
**concededly** [1] - 43:13
**conceptually** [1] - 38:3
**concern** [1] - 28:8
**concerns** [2] - 27:17, 32:5
**conclusion** [1] - 10:25
**conclusively** [2] - 6:20, 8:13
**confidential** [2] - 27:18, 28:9
**confirmed** [3] - 23:12, 23:17, 34:22
**confirms** [1] - 42:21
**conflates** [1] - 25:8
**conflation** [1] - 25:14
**conflicted** [1] - 5:7
**conflicts** [1] - 5:18
**Congress** [76] - 3:5, 3:10, 12:5, 12:15, 12:18, 13:16, 13:21, 14:7, 14:21, 16:2, 16:5, 16:7, 16:19, 16:20, 16:24, 17:4, 17:6, 17:17, 17:19, 17:22, 18:2, 18:11, 18:12, 18:14, 18:16, 18:17, 18:18, 18:23, 18:25, 19:2, 19:4, 19:5, 19:6, 19:8, 19:12, 19:14, 19:16, 24:14, 25:10, 28:4, 28:9, 28:20, 29:14, 29:25, 31:10, 31:18, 31:19, 31:22, 31:25, 32:1, 32:3, 32:7, 32:11, 33:1, 33:12, 33:17, 34:1, 34:4, 34:7, 36:16, 36:20, 39:21, 40:17, 40:18, 40:22, 41:6, 41:9, 41:23, 45:14
**Congress's** [2] - 27:19, 42:22
**congressional** [1] - 42:20
**connection** [1] - 2:11
**consent** [3] - 16:19, 23:1, 29:19
**consideration** [2] - 45:17, 46:16
**considered** [1] - 14:5
**consistent** [1] - 10:25
**Constitution** [2] - 30:24, 41:22
**Constitution's** [1] - 16:1
**constitutional** [4] - 17:17, 29:5, 34:16, 37:1
**construction** [1] - 40:11
**construe** [1] - 6:3
**context** [2] - 32:16, 37:15
**continue** [2] - 6:9, 46:5
**continued** [2] - 42:4, 45:5
**continues** [1] - 19:21
**continuing** [1] - 12:14
**contrary** [1] - 17:25
**control** [4] - 28:17, 35:9, 41:17, 42:10
**Copyright** [13] - 3:10, 12:4, 15:10, 19:21, 25:9, 25:23, 26:6, 26:12, 26:16, 28:21, 30:2, 45:11, 46:5
**copyright** [10] - 12:18, 13:16, 13:22, 14:14, 25:24, 26:4, 26:20, 28:17, 39:8, 45:16
**copyrighted** [1] - 12:8
**Copyrights** [3] - 15:9, 15:23, 38:13
**core** [2] - 28:7, 30:7
**corporation** [1] - 17:12
**corporations** [1] - 17:5
**correct** [5] - 5:20, 8:5, 15:7, 21:25, 36:13
**corrected** [1] - 46:1
**correcting** [1] - 39:6
**correspondence** [1] - 27:19
**counsel** [1] - 43:20
**couple** [2] - 25:2, 42:6
**course** [4] - 29:3, 38:20, 45:9, 46:14
**Court** [29] - 2:2, 4:12, 4:21, 5:11, 6:2, 6:6, 6:14, 7:23, 8:3, 9:1, 9:3, 9:20, 12:20, 13:1, 13:12, 16:11, 20:17, 21:12, 22:7, 30:17, 31:21, 40:3, 40:16, 41:23, 44:17, 46:7, 46:10, 46:15, 46:24
**court** [3] - 8:20, 42:3, 44:21
**COURT** [26] - 2:9, 3:2, 5:5, 5:17, 5:21, 6:16, 7:19, 8:6, 8:10, 9:14, 11:4, 11:10, 11:21, 14:24, 19:24, 28:1, 34:13, 35:25, 36:2, 36:6, 37:21, 39:4, 42:12, 43:2, 43:5, 46:18
**Court's** [15] - 3:12, 4:10, 4:19, 4:20, 4:24, 6:4, 6:19, 6:25, 9:11, 20:16, 40:1, 40:11, 41:25, 44:17, 46:16
**COURTROOM** [1] - 2:3
**courts** [9] - 9:16, 10:16, 16:4, 21:24, 22:3, 32:10, 40:3, 45:20, 46:1
**cover** [1] - 36:23
**covered** [2] - 27:12, 28:25
**create** [1] - 40:4
**creates** [2] - 7:12, 45:25
**creation** [1] - 33:18
**critical** [4] - 3:14, 3:23, 6:6, 45:14
**CRS** [3] - 28:5, 28:17, 33:6
**cured** [1] - 3:4
**curiam** [1] - 6:14
**cut** [1] - 35:14

**D**

**D.C** [20] - 3:13, 4:9, 4:13, 4:14, 4:23, 7:23, 8:22, 9:1, 9:7, 10:21, 17:25, 20:13, 22:8, 30:5, 32:6, 34:24, 34:25, 46:9, 46:12, 46:14
**data** [1] - 41:1
**days** [3] - 17:14, 24:13, 27:23
**deal** [1] - 36:21
**dealing** [6] - 29:9, 29:13, 30:18, 31:11,

36:14, 36:22
**decide** [4] - 10:17, 16:2, 44:11, 46:14
**decided** [1] - 16:5
**deciding** [2] - 9:3, 40:16
**decision** [23] - 4:11, 6:4, 6:14, 8:22, 9:2, 20:10, 20:11, 20:12, 21:6, 21:7, 22:18, 23:13, 23:14, 24:23, 25:6, 25:19, 33:4, 35:3, 35:22
**decisions** [1] - 22:13
**declaration** [5] - 24:10, 25:17, 26:24, 27:16, 27:20
**defective** [1] - 25:18
**defendant** [2] - 2:13, 20:1
**defendants** [3] - 2:8, 2:14, 20:3
**defendants'** [1] - 18:19
**define** [1] - 33:10
**defined** [5] - 17:2, 17:5, 17:7, 17:10, 29:12
**definition** [6] - 29:10, 32:2, 32:7, 32:11, 41:5, 41:8
**definitions** [3] - 31:8, 32:22, 40:15
**delegated** [1] - 14:20
**Dellinger** [6] - 20:7, 20:12, 21:18, 21:23, 22:8, 25:11
**Democracy** [1] - 2:24
**demonstrate** [2] - 4:25, 5:13
**demonstrates** [2] - 5:2, 24:13
**denied** [1] - 3:17
**denying** [2] - 9:21, 9:22
**Department** [1] - 40:8
**department** [6] - 16:4, 17:11, 17:12, 30:11, 33:20, 35:10
**departments** [1] - 17:3
**DEPUTY** [1] - 2:3
**describe** [1] - 10:18
**described** [1] - 38:4
**designate** [1] - 34:20
**designation** [1] - 29:7
**desired** [1] - 40:25
**despite** [2] - 31:18, 32:13
**determination** [4] - 4:9, 5:2, 9:3, 40:2
**determinative** [1] - 31:23
**determine** [1] - 6:21
**develop** [1] - 45:10
**difference** [4] - 33:15, 38:2, 38:15, 38:22
**different** [7] - 7:12, 9:2, 10:1, 20:8, 23:16, 24:16, 26:6
**differently** [2] - 11:9, 44:4
**differs** [1] - 4:20
**difficult** [2] - 8:12, 26:4
**diminished** [1] - 13:8
**direct** [1] - 45:19
**direction** [1] - 7:18
**directly** [3] - 36:18, 37:5, 44:2
**director** [2] - 25:24, 28:17
**disagree** [1] - 31:15
**disagreement** [1] - 10:21
**disarray** [1] - 3:11
**discharge** [2] - 38:24, 45:11
**discharging** [2] - 15:12, 39:3
**disclosure** [1] - 27:18
**discretion** [1] - 35:5
**discussed** [1] - 16:7
**discussing** [3] - 12:6, 12:7, 21:9
**dismiss** [1] - 12:2
**dismissed** [2] - 30:15, 46:23
**disparity** [1] - 34:10
**dispensed** [1] - 25:1
**displace** [1] - 22:7
**dispute** [1] - 23:8
**disputes** [1] - 10:23
**disruptive** [2] - 44:24, 45:22
**distinction** [3] - 18:3, 18:10, 18:15
**distinctions** [1] - 23:15
**distinguish** [2] - 23:7, 24:24
**District** [1] - 9:1
**divine** [1] - 7:24
**Docket** [1] - 42:18
**done** [5] - 19:2, 23:5, 25:25, 26:2, 34:6
**down** [1] - 8:13
**dozen** [3] - 18:13, 18:23, 31:7
**draw** [1] - 21:14
**due** [1] - 45:13
**duration** [1] - 5:3
**during** [4] - 19:22, 36:22, 39:17, 45:13
**duties** [2] - 28:4, 38:14
**duty** [1] - 6:11
**dynamic** [1] - 7:12

## E

**easily** [1] - 46:1
**Edgar** [1] - 30:9
**effect** [2] - 28:23, 43:10
**effectively** [5] - 6:23, 8:21, 19:1, 26:4, 33:4
**effort** [1] - 44:25
**either** [4] - 24:2, 27:1, 37:3, 40:3
**elsewhere** [1] - 19:8
**Eltra** [1] - 33:4
**emergency** [3] - 3:12, 22:11, 46:3
**emphasize** [1] - 19:4
**emphasized** [1] - 23:8
**employee** [3] - 11:2, 13:4, 14:18
**employment** [2] - 10:23, 23:8
**empowers** [1] - 34:19
**en** [3] - 8:20, 8:22, 9:2
**enable** [1] - 35:7
**enabling** [1] - 34:8
**end** [9] - 9:20, 9:24, 10:10, 14:4, 30:16, 32:13, 45:5, 45:22, 46:1
**endeavor** [1] - 46:21
**ends** [1] - 9:21
**English** [2] - 23:14, 25:6
**Enterprise** [1] - 4:10
**enters** [1] - 46:15
**entire** [3] - 36:24, 41:11, 45:10
**entirely** [3] - 28:18, 41:19, 45:22
**entities** [1] - 42:20
**entitled** [4] - 7:9, 15:16, 45:4, 46:4
**entity** [7] - 18:6, 23:18, 23:25, 25:10, 25:13, 33:11, 35:14
**enumerated** [1] - 17:4
**equitable** [4] - 6:25, 12:21, 40:11, 41:25
**equities** [4] - 5:13, 6:22, 7:17, 8:3
**equity** [1] - 6:20
**essential** [2] - 8:19, 40:4
**establish** [1] - 7:2
**established** [3] - 9:12, 17:16, 32:21
**establishing** [1] - 18:2
**establishment** [19] - 17:9, 17:10, 17:20, 17:23, 18:3, 18:5, 18:7, 18:10, 18:11, 18:18, 19:13, 29:11, 29:12, 30:19, 31:13, 33:11, 33:16, 41:4, 41:7
**establishments** [1] - 17:7
**et** [2] - 2:5, 20:20
**event** [1] - 46:10
**events** [1] - 12:11
**evidence** [6] - 17:21, 24:7, 24:8, 27:5, 27:10, 27:22
**evidentiary** [1] - 12:12
**exact** [1] - 32:5
**exactly** [4] - 7:25, 20:10, 20:14, 22:3
**example** [8] - 10:8, 25:12, 26:18, 27:17, 31:21, 33:6, 33:14, 39:16
**examples** [2] - 19:4, 26:3
**exceed** [1] - 41:21
**exceedingly** [1] - 15:21
**excellent** [1] - 6:18
**exclude** [1] - 32:10
**excludes** [1] - 18:5
**excuse** [3] - 12:7, 15:10, 34:21
**executive** [48] - 6:10, 12:23, 13:8, 13:19, 13:24, 14:9, 15:13, 16:23, 17:2, 17:3, 17:10, 17:11, 17:20, 17:24, 18:15, 28:12, 29:10, 29:12, 29:25, 30:7, 30:10, 30:12, 30:19, 30:20, 30:22, 30:23, 30:25, 31:1, 31:13, 31:19, 32:20, 32:21, 35:9, 35:15, 37:19, 39:21, 40:17, 40:18, 41:8, 41:12, 41:15, 41:17, 41:18, 42:22, 44:6, 45:1, 45:24
**exercise** [6] - 6:24, 35:9, 37:15, 37:18, 43:7, 45:13
**exercising** [3] - 6:9, 12:21, 16:16
**exist** [1] - 35:2
**exists** [1] - 11:23
**expected** [5] - 7:1, 7:4, 7:17, 9:17, 34:7
**expeditious** [1] - 40:2
**experiencing** [1] - 12:1
**expert** [2] - 13:22, 14:13
**expertise** [1] - 45:10
**explain** [1] - 5:9
**express** [1] - 28:8
**expressly** [3] - 4:1, 16:20, 19:9
**extent** [2] - 11:11, 46:11
**extraordinarily** [1] - 7:15

## F

**face** [1] - 31:14
**faces** [3] - 6:8, 6:10, 20:20
**fact** [6] - 9:25, 13:13, 29:24, 30:24, 31:18, 33:13
**factors** [2] - 2:18, 21:22
**facts** [2] - 3:6, 12:2
**fails** [1] - 27:25
**fair** [6] - 8:11, 15:6, 28:15, 28:16, 34:25
**fall** [4] - 13:23, 22:22, 23:20, 31:2
**falls** [2] - 29:14, 31:11
**far** [1] - 34:3
**favor** [2] - 12:22, 46:8
**favorably** [1] - 35:23
**features** [1] - 23:6
**federal** [3] - 11:1, 11:15, 29:6
**Federal** [3] - 3:25, 16:21, 29:8
**few** [2] - 10:15, 31:6
**fight** [1] - 44:12
**figure** [2] - 36:21, 40:22
**filed** [3] - 24:8, 46:4, 46:6
**filing** [2] - 44:14, 44:16
**fill** [1] - 36:24
**filled** [1] - 37:17
**final** [1] - 22:9
**findings** [1] - 3:23
**finish** [2] - 42:12,

42:14
finishing [1] - 12:17
fire [2] - 4:8, 7:10
fired [4] - 7:15, 11:2, 13:4, 44:20
firing [1] - 44:18
first [10] - 3:24, 10:23, 22:24, 25:4, 31:7, 34:17, 37:3, 38:5, 38:9, 38:23
first-line [1] - 10:23
fit [1] - 22:17
flesh [1] - 37:25
fluidity [1] - 19:11
focused [2] - 20:24, 36:18
FOIA [1] - 32:8
folks [1] - 28:7
follow [3] - 6:1, 6:2, 17:17
follows [3] - 4:9, 19:11, 19:15
Footnote [2] - 8:8, 21:10
footnote [3] - 21:9, 21:15, 22:6
for-cause [1] - 23:3
forecloses [1] - 36:12
forgive [1] - 38:7
form [1] - 22:16
former [1] - 39:10
forth [1] - 27:4
forward [3] - 6:22, 27:3
Forward [1] - 2:24
Foundation [2] - 2:24, 3:17
Fourth [2] - 30:8, 33:3
frame [1] - 45:14
frankly [1] - 20:22
Free [1] - 4:10
freestanding [1] - 4:3
friend [1] - 31:4
fulfill [1] - 38:14
full [2] - 3:21, 4:22
function [10] - 21:1, 22:11, 22:17, 22:21, 24:17, 24:25, 25:5, 27:8, 38:10, 39:16
functioning [2] - 26:17, 40:4
functions [20] - 3:9, 12:24, 13:9, 13:10, 14:11, 14:15, 14:16, 24:22, 25:23, 27:9, 29:25, 30:7, 30:10, 30:25, 31:20, 33:6, 38:24, 40:24, 41:13, 41:15
Fund [1] - 4:10
fundamental [3] - 4:21, 44:19, 45:23
fundamentally [6] - 12:21, 12:24, 13:22, 15:15, 24:5, 33:17
future [1] - 43:11
FVRA [7] - 16:23, 17:1, 19:18, 29:4, 34:18, 35:6, 40:19

G

given [3] - 6:23, 14:9, 21:2
Gor [1] - 3:15
govern [1] - 45:6
Government [2] - 17:13
government [15] - 6:8, 9:10, 11:18, 13:5, 14:2, 14:16, 17:5, 17:12, 20:19, 21:3, 40:24, 42:1, 42:5, 42:16, 44:10
government's [3] - 3:15, 3:18, 9:8
grab [1] - 41:12
grant [1] - 11:1
granted [2] - 22:1, 46:17
great [1] - 27:6
greater [2] - 6:8, 20:20
ground [4] - 13:15, 25:1, 36:24, 39:24
GSA [1] - 33:24
guess [5] - 9:21, 20:5, 27:12, 36:9, 38:5
guessing [1] - 3:19
guidance [5] - 3:13, 4:23, 27:1, 40:1, 46:9
guide [2] - 5:2, 9:11

H

Haddon [1] - 18:1
handled [1] - 16:8
handling [2] - 2:25, 13:5
happy [5] - 2:19, 20:4, 29:2, 32:25, 38:20
hard [5] - 7:21, 7:24, 24:24, 25:25
harm [45] - 5:13, 6:8, 7:1, 7:5, 7:11, 9:9, 9:12, 9:23, 10:4, 10:5, 10:6, 10:11, 11:13, 11:14, 11:23, 12:1, 14:2, 20:6, 20:24, 21:8, 21:12, 22:1, 22:4, 22:16, 22:22, 23:10, 23:24, 24:18, 24:20, 25:7, 25:8, 25:12, 25:22, 26:1, 27:5, 27:11, 27:12, 27:15, 28:21, 28:22, 29:1, 38:6
harms [8] - 7:15, 14:1, 20:25, 21:3, 25:6, 25:9, 25:16, 27:13
HAYES [6] - 20:2, 28:16, 34:15, 36:1, 36:4, 36:8
Hayes [5] - 2:8, 20:3, 37:25, 39:6, 40:14
Hayes' [1] - 40:5
Hayes's [1] - 39:18
head [2] - 16:4, 37:6
header [1] - 38:12
hear [9] - 2:12, 2:19, 5:23, 20:1, 38:18, 42:1, 42:2, 45:15
hearing [1] - 3:3
held [4] - 22:22, 30:20, 34:23, 34:24
help [1] - 16:23
Hennen [1] - 4:11
high [2] - 38:15, 43:13
high-level [1] - 43:13
highlight [1] - 23:5
highlighted [1] - 23:15
himself [1] - 8:21
hiring [1] - 39:12
historically [1] - 31:21
history [1] - 24:12
hit [1] - 2:19
hold [4] - 19:22, 30:11, 30:17, 32:6
holdings [1] - 4:10
holds [1] - 16:10
Honor [15] - 2:23, 5:20, 8:5, 8:18, 10:20, 15:7, 20:2, 20:14, 21:23, 25:19, 25:20, 38:20, 42:9, 42:15, 44:8
Honor's [4] - 20:9, 22:18, 24:22, 25:6
horribles [2] - 26:25, 39:19
House [2] - 13:13, 42:20
hump [1] - 10:12
hypothetical [2] - 42:7, 44:9

I

identified [5] - 18:4, 18:13, 20:15, 25:17, 39:10
ignore [2] - 35:5, 40:16
II [1] - 34:19
illustrate [1] - 26:23
Imaging [2] - 30:6, 31:20
imminent [2] - 25:23, 27:6
important [6] - 12:14, 12:16, 13:18, 14:13, 19:3, 19:7
importantly [1] - 29:23
impossible [1] - 31:24
inability [1] - 24:21
incentive [1] - 45:24
include [7] - 16:24, 17:3, 17:4, 17:6, 19:13, 34:1, 37:24
included [3] - 19:6, 19:8, 19:9
includes [4] - 3:23, 18:4, 29:11, 34:1
including [1] - 18:25
inconsistent [3] - 11:15, 11:16, 18:25
incredible [1] - 41:12
independent [24] - 17:7, 17:9, 17:20, 17:23, 18:3, 18:5, 18:7, 18:9, 18:11, 18:18, 19:13, 20:15, 22:5, 23:2, 23:3, 23:18, 29:11, 33:11, 33:16, 33:21, 41:4, 41:7, 43:23
independently [1] - 17:7
indication [1] - 26:12
individual [7] - 5:16, 7:10, 23:11, 25:8, 42:3, 44:7, 44:20
inequitable [1] - 13:23
inequitably [2] - 15:15, 45:25
inexorable [1] - 32:15
infer [1] - 18:16
inference [3] - 12:12, 19:10
inferences [1] - 21:13
inferior [8] - 4:7, 4:8, 15:24, 16:1, 16:9, 37:5, 37:10, 37:16
information [1] - 27:18
inherent [1] - 16:18
initiated [1] - 27:24
injunction [6] - 4:23, 5:4, 6:24, 9:13, 22:2, 22:5
injunctive [1] - 22:12
injury [2] - 4:25, 5:3
instead [1] - 11:8
institution [4] - 27:15, 39:25, 40:4, 44:14
institutional [1] - 43:22
institutionally [2] - 43:12, 43:16
institutions [1] - 27:13
intelligence [4] - 12:6, 12:19, 13:17, 45:16
intended [2] - 18:17, 38:22
Inter [1] - 3:17
Inter-American [1] - 3:17
Intercollegiate [2] - 30:6, 30:10
interest [2] - 12:20, 13:8
interesting [1] - 7:21
interests [2] - 13:3, 44:11
interfered [1] - 14:10
interim [2] - 6:20, 35:14
internal [2] - 13:6, 13:24
International [1] - 6:13
interplay [2] - 8:1, 8:2
interpret [2] - 9:19, 31:14
interpretation [5] - 4:19, 32:15, 32:16, 34:14, 40:13
interpreted [1] - 5:19
interpreting [2] - 30:14, 32:19
intersects [1] - 13:16
intervene [1] - 13:11
intrusive [1] - 43:8
invariably [1] - 15:18
involved [1] - 23:11
involves [1] - 18:21
IRAP [1] - 6:19
irreparable [29] - 4:25, 5:3, 5:13, 9:9, 9:12, 9:23, 10:6, 11:13, 11:14, 11:22, 12:1, 14:2, 20:5, 20:24, 21:7, 21:12, 22:1, 22:4, 22:16, 22:22, 23:10, 23:24, 24:18, 24:20, 25:22, 26:1, 27:5, 27:11, 29:1
issue [4] - 4:16, 18:6, 28:2, 46:13
issued [1] - 13:14
issues [4] - 3:14, 16:7,

30:1, 46:17
**itself** [2] - 6:5, 46:14

**J**

**job** [3] - 11:15, 28:2, 28:13
**joined** [1] - 3:21
**Judge** [11] - 3:21, 4:5, 5:10, 6:3, 8:8, 8:15, 8:19, 23:13, 36:5, 37:13
**judges** [2] - 9:1, 44:18
**judgment** [2] - 6:7, 20:19
**judicial** [2] - 10:22, 13:12
**July** [1] - 26:22
**jump** [1] - 41:20
**Justice** [1] - 40:8
**justify** [1] - 20:16

**K**

**Katsas** [4] - 3:21, 6:3, 8:15, 8:19
**Katsas'** [1] - 8:9
**Katsas's** [1] - 5:10
**key** [1] - 32:16
**kind** [2] - 32:10, 38:10
**knowing** [1] - 36:17

**L**

**label** [1] - 33:16
**lack** [3] - 40:8, 40:9, 40:10
**lacked** [1] - 19:17
**lacks** [1] - 16:18
**laid** [1] - 44:3
**language** [9] - 6:6, 10:15, 20:20, 29:13, 29:15, 30:18, 30:19, 32:17, 34:1
**large** [1] - 9:10
**last** [7] - 3:3, 4:14, 5:5, 10:15, 27:12, 33:10, 36:17
**latitude** [1] - 13:4
**Law** [1] - 26:5
**law** [13] - 3:9, 12:18, 14:14, 16:4, 25:11, 25:14, 40:10, 40:13, 40:21, 45:6, 45:12, 45:16, 45:23
**lawful** [2] - 15:5, 29:4
**lawfully** [2] - 16:16, 45:8
**lawless** [1] - 12:22
**lawlessness** [1] - 3:4
**laws** [1] - 40:20
**lawsuit** [3] - 44:14, 46:4, 46:6
**lays** [1] - 20:17
**leadership** [1] - 35:15
**leads** [1] - 29:17
**least** [7] - 4:12, 4:25, 13:9, 20:23, 22:7, 29:16, 35:23
**leave** [1] - 3:19
**leaves** [1] - 8:25
**led** [3] - 30:10, 32:6, 32:10
**left** [2] - 36:20, 37:17
**legislating** [1] - 31:25
**legislation** [3] - 14:5, 15:2, 33:25
**legislative** [6] - 12:24, 13:11, 24:22, 27:9, 28:10, 33:5
**legislatively** [1] - 24:3
**Leon** [1] - 23:13
**less** [2] - 37:17, 38:5
**letting** [1] - 13:24
**level** [5] - 11:15, 14:18, 33:20, 38:15, 43:13
**Librarian** [6] - 16:6, 16:13, 19:16, 29:17, 30:3, 42:19
**librarian** [2] - 16:16, 29:7
**Library** [40] - 3:5, 3:9, 16:24, 17:4, 17:6, 17:19, 17:22, 18:10, 18:12, 18:15, 18:17, 18:25, 19:4, 19:6, 19:7, 19:9, 19:13, 24:14, 25:9, 28:10, 29:14, 29:17, 29:24, 31:10, 31:19, 32:3, 32:6, 32:11, 33:1, 33:5, 33:12, 34:4, 34:18, 39:21, 39:25, 40:16, 41:6, 41:9, 41:13, 42:22
**lifelong** [1] - 13:22
**likelihood** [4] - 3:24, 7:6, 8:6, 21:21
**likely** [8] - 4:16, 5:14, 7:9, 9:24, 9:25, 10:3, 15:22, 22:9
**likewise** [1] - 14:11
**line** [5] - 10:23, 13:2, 14:18, 20:25, 41:21
**line-level** [1] - 14:18
**list** [2] - 18:4, 32:4
**lists** [2] - 18:11, 27:2
**litigated** [1] - 7:3
**litigation** [3] - 6:22, 12:11, 19:23
**look** [6] - 7:21, 14:4, 40:21, 41:24, 46:19
**looked** [1] - 26:20
**looking** [2] - 38:3, 38:12
**lost** [1] - 11:14
**love** [1] - 38:18

**M**

**majority** [2] - 3:20, 8:20
**manage** [1] - 13:24
**mark** [1] - 41:19
**match** [1] - 30:17
**materials** [1] - 12:8
**mathematical** [1] - 7:4
**Matter** [1] - 2:4
**matter** [6] - 3:4, 7:4, 17:16, 17:19, 22:10, 41:4
**matters** [1] - 13:22
**mean** [13] - 5:9, 8:11, 10:19, 11:4, 17:10, 28:2, 28:6, 28:10, 29:12, 30:23, 38:4, 42:13, 46:19
**meaning** [1] - 32:24
**meaningfully** [1] - 3:7
**means** [1] - 36:19
**mechanism** [1] - 19:19
**Med** [1] - 31:20
**Medical** [1] - 30:6
**member** [2] - 23:3, 28:8
**mention** [1] - 41:9
**mentioned** [3] - 29:17, 31:4, 42:6
**mentioning** [1] - 39:20
**merely** [2] - 44:5, 44:6
**merits** [19] - 3:25, 4:13, 5:14, 7:14, 8:4, 9:3, 10:10, 15:8, 15:18, 15:20, 15:22, 20:18, 21:9, 21:10, 21:21, 29:2, 40:2, 44:2, 46:7
**midst** [2] - 33:19
**might** [6] - 10:9, 21:14, 28:11, 28:19, 35:19
**military** [1] - 17:11
**mill** [1] - 23:7
**minimize** [1] - 7:1
**mischaracterization** [1] - 39:7
**mischief** [1] - 45:25
**misses** [1] - 41:19
**misstatement** [1] - 39:6
**models** [1] - 12:8
**Mohammadi** [1] - 2:7
**moment** [2] - 4:22, 15:8
**months** [1] - 10:16
**moreover** [1] - 18:13
**morning** [1] - 20:2
**most** [4] - 8:22, 22:20, 27:13, 31:7
**motion** [5] - 3:15, 3:18, 9:13, 12:10, 46:17
**motions** [2] - 3:15, 3:18
**move** [1] - 27:3
**moves** [1] - 6:22
**moving** [2] - 27:3, 37:1
**MR** [25] - 2:23, 3:3, 5:10, 5:20, 6:1, 6:18, 8:5, 8:7, 8:18, 10:20, 11:8, 11:11, 11:22, 15:7, 20:2, 28:16, 34:15, 36:1, 36:4, 36:8, 38:20, 39:5, 42:15, 43:3, 44:8
**multi** [1] - 23:3
**multi-member** [1] - 23:3
**multiple** [2] - 23:6, 27:25
**multiply** [1] - 7:10
**murky** [1] - 8:12
**must** [1] - 32:9

**N**

**nail** [1] - 8:13
**name** [1] - 31:22
**namely** [1] - 35:8
**narrow** [2] - 35:16, 37:9
**nation** [1] - 40:20
**National** [1] - 33:24
**naturally** [2] - 7:3, 7:8
**nature** [2] - 10:11, 13:11
**necessarily** [3] - 7:17, 9:4, 9:8
**necessary** [1] - 41:5
**need** [4] - 13:15, 23:10, 25:24, 41:9
**needed** [1] - 22:4
**needs** [1] - 37:15
**Netter** [3] - 2:6, 2:24, 37:22
**NETTER** [19] - 2:23, 3:3, 5:10, 5:20, 6:1, 6:18, 8:5, 8:7, 8:18, 10:20, 11:8, 11:11, 11:22, 15:7, 38:20, 39:5, 42:15, 43:3, 44:8
**never** [3] - 10:25, 11:5
**new** [4] - 3:13, 26:20, 39:13, 39:14
**next** [1] - 12:9
**nominated** [3] - 23:12, 29:18, 34:22
**nominee** [1] - 34:21
**non** [1] - 41:15
**non-executive** [1] - 41:15
**none** [2] - 27:19, 39:21
**nonetheless** [1] - 22:1
**normal** [1] - 37:6
**normally** [3] - 27:3, 32:3, 37:8
**norms** [1] - 17:17
**nothing** [10] - 3:4, 21:7, 24:6, 24:9, 24:10, 27:16, 28:6, 33:7, 34:3, 45:20
**notice** [1] - 13:13
**nuanced** [1] - 30:22
**number** [4] - 29:16, 29:22, 29:23, 43:9

**O**

**obligated** [1] - 17:17
**obligation** [1] - 38:25
**obsession** [1] - 19:5
**obstacle** [1] - 15:14
**obstacles** [1] - 42:4
**obtaining** [1] - 22:5
**obviously** [2] - 7:25, 44:22
**occupant** [1] - 15:5
**occurred** [1] - 27:23
**offered** [2] - 14:3, 42:17
**offering** [1] - 9:18
**office** [7] - 7:12, 14:25, 15:2, 15:4, 15:5, 33:14, 33:15
**Office** [10] - 3:10, 17:13, 17:14, 25:9, 25:24, 26:7, 26:12, 26:16, 28:21, 30:2
**officer** [19] - 4:2, 4:7, 4:8, 6:9, 6:10, 15:24, 16:1, 16:3, 16:9, 22:24, 26:20, 37:5, 37:11, 37:16, 39:8, 39:11
**officers** [2] - 16:19, 41:17

**official** [3] - 14:16, 34:20, 45:8
**officials** [3] - 13:19, 15:13, 39:22
**old** [1] - 33:14
**older** [1] - 33:13
**once** [2] - 35:11, 46:15
**one** [32] - 6:5, 7:4, 8:15, 11:23, 16:7, 20:18, 21:13, 22:21, 22:22, 24:2, 24:18, 24:21, 25:20, 26:3, 29:16, 29:22, 33:1, 35:25, 36:2, 36:3, 36:4, 36:10, 38:9, 38:12, 38:18, 39:1, 39:2, 39:6, 39:22, 39:24, 43:9
**ones** [1] - 7:23
**ongoing** [1] - 39:12
**open** [2] - 8:25, 26:7
**operations** [1] - 33:21
**opinion** [4] - 3:21, 3:23, 5:10, 8:9
**opinions** [2] - 7:22, 23:6
**opponent's** [1] - 21:19
**opportunity** [1] - 15:19
**opposition** [1] - 42:17
**oranges** [1] - 31:10
**order** [8] - 2:2, 3:16, 3:20, 4:19, 6:8, 20:16, 21:22, 46:15
**orders** [1] - 3:19
**organic** [1] - 33:12
**otherwise** [3] - 16:8, 35:20, 37:17
**ought** [2] - 14:14, 19:22
**outcome** [2] - 11:16, 46:10
**override** [1] - 32:23
**oversee** [1] - 37:19
**own** [2] - 13:6, 13:24

**P**

**p.m** [2] - 2:2, 46:24
**paints** [1] - 26:6
**panel** [9] - 3:15, 3:18, 3:20, 3:25, 4:13, 4:18, 8:23, 9:7, 16:8
**panel's** [1] - 3:20
**parade** [2] - 26:25, 39:18
**Paragraph** [2] - 26:3, 26:19
**parameters** [1] - 28:13
**parliamentarian** [6] - 42:8, 42:21, 43:1, 43:19, 44:21, 45:4
**parochial** [1] - 13:3
**part** [6] - 9:10, 28:2, 28:7, 33:24, 41:5, 41:7
**Part** [1] - 12:5
**particular** [2] - 32:18, 36:14
**particularly** [1] - 33:9
**parties** [5] - 3:19, 15:25, 20:21, 30:4, 46:23
**party** [3] - 5:12, 5:14, 6:21
**pass** [1] - 7:7
**passed** [1] - 40:19
**pathway** [1] - 14:7
**paycheck** [2] - 45:4, 45:21
**PCAOB** [1] - 4:11
**pendency** [1] - 19:23
**pending** [1] - 3:17
**per** [1] - 6:14
**perfectly** [1] - 32:1
**perform** [4] - 3:8, 6:11, 24:22, 27:8
**performance** [1] - 42:5
**performed** [2] - 39:16, 41:13
**performing** [3] - 12:24, 14:14, 14:19
**performs** [3] - 29:25, 30:25, 31:19
**perhaps** [3] - 13:18, 15:19, 39:6
**peril** [1] - 24:15
**period** [4] - 5:1, 26:8, 35:10, 39:17
**Perkins** [1] - 39:20
**Perlmutter** [19] - 2:4, 3:1, 3:8, 4:24, 7:13, 7:14, 9:12, 12:1, 12:3, 12:17, 12:19, 13:15, 13:19, 14:6, 15:3, 15:22, 16:12, 19:20, 46:4
**Perlmutter's** [1] - 38:23
**permit** [1] - 46:11
**permitting** [1] - 13:18
**person** [7] - 7:11, 15:1, 26:21, 37:7, 43:13, 43:14
**Pl** [1] - 24:8
**picture** [1] - 26:6
**Pillard** [1] - 3:22
**place** [3] - 35:14, 39:19, 41:18
**placement** [1] - 42:22
**places** [1] - 23:6
**plain** [2] - 31:2, 32:23
**plainly** [2] - 17:6, 43:8
**plaintiff** [13] - 2:6, 2:12, 2:20, 2:25, 9:24, 11:6, 21:2, 21:24, 25:8, 25:18, 25:24, 37:4, 38:13
**plaintiff's** [1] - 29:4
**plaintiffs** [1] - 2:13
**Plan** [1] - 13:14
**plausibility** [1] - 35:1
**play** [4] - 40:7, 42:25, 43:2, 44:4
**plenty** [1] - 9:15
**plus** [1] - 17:12
**point** [27] - 4:5, 5:6, 5:24, 6:25, 11:24, 13:7, 14:24, 21:18, 22:19, 24:13, 25:7, 25:20, 26:13, 26:23, 30:13, 33:10, 33:13, 35:7, 37:13, 39:18, 42:12, 42:14, 42:17, 44:1, 44:2, 45:14
**points** [7] - 10:21, 15:20, 27:14, 34:16, 38:17, 41:1, 44:1
**political** [1] - 44:11
**position** [12] - 5:11, 15:1, 15:23, 19:22, 23:2, 29:3, 35:17, 37:2, 37:16, 37:18, 40:25, 45:9
**positions** [1] - 36:25
**possibility** [3] - 8:25, 18:6, 35:1
**post** [3] - 33:13, 33:15, 33:18
**post-1966** [1] - 33:25
**Postal** [1] - 34:6
**posture** [2] - 8:13, 8:23
**potentially** [2] - 11:3, 13:10
**power** [18] - 6:10, 16:9, 16:10, 35:2, 35:7, 35:19, 36:21, 37:7, 37:15, 37:18, 37:19, 40:7, 41:12, 42:18, 42:19, 44:12, 44:13, 45:1
**powers** [2] - 41:22, 44:25
**practical** [1] - 43:10
**practice** [1] - 6:25
**pre** [1] - 12:4
**pre-publication** [1] - 12:4
**preceded** [1] - 22:20
**precedent** [2] - 16:12, 18:1
**precisely** [2] - 18:8, 43:4
**preferred** [1] - 7:11
**preliminary** [10] - 4:15, 4:20, 4:22, 5:4, 6:24, 9:5, 9:13, 9:22, 11:1, 22:5
**prerogatives** [2] - 43:22
**present** [2] - 2:6, 2:7
**President** [39] - 4:1, 4:3, 4:6, 5:15, 7:8, 7:11, 12:9, 12:13, 12:16, 13:10, 16:3, 16:17, 19:17, 22:25, 23:13, 23:17, 29:18, 34:19, 35:5, 35:8, 35:18, 36:20, 37:3, 37:10, 40:7, 41:17, 41:20, 42:7, 42:9, 42:11, 42:25, 43:7, 43:11, 44:18, 44:23, 45:1, 45:2, 45:18
**president** [1] - 3:16
**President's** [1] - 42:18
**prevail** [2] - 7:9, 15:22
**prevent** [2] - 12:13, 12:17
**preventing** [1] - 15:15
**primary** [1] - 29:6
**principal** [6] - 4:2, 16:18, 22:24, 35:21, 37:11, 37:16
**principle** [3] - 40:9, 40:10
**principled** [2] - 41:2, 42:2
**principles** [1] - 45:23
**privilege** [1] - 15:11
**privileges** [2] - 45:12, 45:13
**probabilistic** [1] - 9:4
**probative** [2] - 33:9, 34:11
**problem** [3] - 30:14, 36:14, 36:23
**problems** [2] - 25:3, 27:7
**proceed** [2] - 2:22, 5:23
**proceeding** [1] - 26:13
**PROCEEDINGS** [1] - 2:1
**process** [2] - 11:3, 39:12
**producing** [1] - 27:10
**progeny** [1] - 13:2
**Project** [1] - 6:13
**promulgated** [1] - 30:3
**promulgates** [1] - 30:1
**proper** [1] - 19:10
**properly** [1] - 19:21
**proposition** [1] - 15:9
**protections** [2] - 23:4, 29:20
**provide** [1] - 13:20
**provided** [3] - 3:20, 16:8, 16:20
**providing** [1] - 13:21
**provision** [1] - 32:18
**provisions** [2] - 31:5, 31:16
**publication** [1] - 12:4
**published** [1] - 12:3
**pure** [1] - 27:21
**purport** [1] - 44:18
**purported** [5] - 12:10, 42:7, 42:9, 43:7
**purporting** [2] - 16:15, 36:23
**purpose** [1] - 6:19
**purposes** [12] - 3:24, 4:14, 5:1, 5:3, 8:21, 8:23, 9:6, 9:12, 14:2, 15:24, 30:24, 32:8
**pursuant** [2] - 16:11, 16:17
**put** [7] - 2:15, 10:5, 10:14, 27:4, 27:7, 35:13, 46:21
**putting** [1] - 12:22

**Q**

**qualify** [1] - 24:18
**questions** [2] - 10:22, 46:12
**quintessential** [2] - 29:25, 30:9
**quotation** [2] - 6:7, 6:19
**quote** [6] - 4:13, 6:12, 13:4, 39:11, 39:13, 40:14
**quote-unquote** [1] - 4:13
**quoted** [1] - 20:21

**R**

**raised** [1] - 37:25
**random** [2] - 32:22, 40:15
**Rao** [2] - 4:5, 37:13
**rare** [1] - 14:15
**rates** [1] - 30:5

Re [1] - 4:11
reach [2] - 9:2, 46:7
read [8] - 6:6, 8:15, 20:14, 20:22, 21:5, 22:13, 26:24
reading [4] - 10:24, 20:23, 22:6, 31:16
real [2] - 19:1, 19:2
realistically [1] - 14:7
really [5] - 10:18, 33:6, 34:11, 43:10, 43:24
reappointed [1] - 26:21
reason [8] - 23:21, 28:20, 31:17, 33:15, 34:9, 34:10, 37:5, 40:2
reasonable [1] - 32:1
reasoned [1] - 9:7
reasoning [2] - 4:18, 5:7
reasons [7] - 3:19, 25:19, 27:25, 29:15, 29:16, 32:9, 32:10
receiving [1] - 39:2
recent [2] - 8:22, 9:7
Recess [1] - 36:11
recess [2] - 36:22, 46:24
recesses [1] - 36:17
recipe [1] - 45:5
recognize [3] - 2:10, 37:6, 37:8
recognized [1] - 35:1
recognizes [1] - 31:21
recommendation [1] - 39:15
record [1] - 2:3
refer [1] - 6:5
reference [1] - 41:6
references [1] - 24:24
referring [1] - 28:5
refers [2] - 31:8, 38:23
reflects [2] - 6:7, 20:19
Reform [2] - 4:1, 16:21
Refugee [1] - 6:13
refute [1] - 41:10
regard [1] - 12:25
regardless [1] - 27:22
register [1] - 26:4
Register [11] - 12:4, 14:13, 14:22, 15:9, 15:10, 15:23, 19:21, 38:13, 39:15, 45:11, 46:5
Register's [1] - 13:9
regulations [2] - 30:1
reinstate [1] - 24:3
reinstatement [2] - 4:15, 21:11
reinstating [1] - 3:16
reject [1] - 23:22
rejected [1] - 9:8
related [2] - 21:14, 28:21
relative [1] - 21:3
relevant [4] - 18:24, 20:11, 21:19, 25:4
relief [7] - 4:15, 6:20, 9:5, 9:22, 10:22, 11:1, 22:12
remain [1] - 3:10
remains [4] - 3:8, 38:13, 46:3, 46:4
remedied [1] - 14:1
remedy [3] - 4:16, 14:3, 21:11
remember [2] - 24:1, 29:1
removal [5] - 21:25, 23:3, 29:4, 29:19, 29:21
removals [3] - 4:16, 26:10, 28:23
remove [11] - 12:10, 16:9, 19:20, 37:4, 37:7, 37:10, 42:8, 42:9, 42:19, 43:1, 43:7
removed [5] - 6:9, 6:10, 10:8, 16:12, 42:5
reopen [1] - 14:8
reorganization [2] - 33:25, 34:5
reorganized [1] - 33:17
repeat [1] - 11:6
repeatedly [1] - 30:7
repeating [1] - 11:8
replacement [1] - 39:12
report [2] - 12:5, 12:18
representatives [1] - 43:21
representing [1] - 34:24
request [1] - 28:9
required [2] - 26:15, 38:14
requires [1] - 46:9
research [1] - 28:11
residual [1] - 36:21
resolution [1] - 11:17
resolves [1] - 33:4
resolving [1] - 46:12
respect [7] - 6:2, 40:6, 40:9, 40:11, 40:13, 41:25, 44:8
respond [3] - 2:14, 10:13, 42:13
response [6] - 18:19, 20:1, 37:22, 37:24, 38:18, 42:16
responsibilities [2] - 45:11, 45:12
responsibility [1] - 15:12
responsible [1] - 15:17
restored [1] - 19:22
result [1] - 44:13
results [1] - 7:1
resuming [1] - 12:20
returned [2] - 39:20, 39:22
review [2] - 3:13, 4:22
reviewing [1] - 3:15
rewrite [1] - 21:16
rewriting [1] - 33:21
rightful [2] - 15:1, 15:4
rights [4] - 6:21, 24:1, 43:15, 43:17
rise [1] - 12:11
risk [2] - 6:8, 20:20
role [3] - 16:16, 19:18, 19:20
room [1] - 36:20
royalty [1] - 30:5
rule [6] - 32:14, 37:6, 40:21, 45:6, 45:23, 46:7
rules [1] - 7:2
ruling [2] - 6:4, 8:23
run [1] - 23:7
run-of-the-mill [1] - 23:7

S

Sampson [1] - 13:2
satisfied [1] - 27:10
satisfies [1] - 26:1
scale [1] - 12:22
scattered [1] - 32:23
scenario [1] - 9:22
scenarios [1] - 44:3
Scher [2] - 2:7, 2:21
scope [1] - 16:25
second [7] - 4:6, 13:7, 23:23, 24:21, 38:5, 38:12, 38:25
Section [3] - 17:3, 17:8, 17:9
see [3] - 27:7, 27:9, 38:3
seek [1] - 13:11
seeking [1] - 35:17
seem [4] - 9:16, 9:17, 26:2, 27:3
selected [1] - 29:18
Senate [14] - 23:1, 23:12, 23:17, 29:19, 34:22, 35:12, 42:8, 42:21, 43:1, 43:19, 43:20, 44:15, 44:21, 45:3
senior [1] - 11:15
senior-level [1] - 11:15
sense [1] - 37:25
separate [5] - 18:14, 21:9, 21:10, 28:5, 28:18
separately [1] - 20:17
separation [1] - 44:25
Sergeant [1] - 42:21
series [1] - 3:14
serve [1] - 39:11
Service [1] - 34:6
service [2] - 42:5, 46:5
serving [2] - 15:11, 23:18
set [1] - 30:5
setting [1] - 12:10
several [1] - 24:19
Shira [1] - 2:4
shows [1] - 44:21
side [3] - 5:23, 20:6, 31:4
sideline [2] - 12:13, 13:19
sidelines [1] - 14:6
sidetrack [1] - 38:17
signaled [1] - 25:19
signature [1] - 26:14
significant [1] - 13:17
simply [3] - 18:16, 35:7, 37:12
single [1] - 25:17
sit [1] - 9:5
situation [3] - 7:13, 18:21, 39:24
someone [7] - 2:21, 22:25, 23:16, 23:18, 24:3, 34:21, 35:13
sometimes [2] - 10:16, 30:2
somewhat [1] - 8:12
soon [1] - 46:22
sorry [2] - 11:6, 36:1
sort [8] - 9:17, 10:16, 33:23, 38:7, 38:8, 38:9, 38:10, 44:13
sought [1] - 12:13
specific [1] - 36:23
specifically [3] - 14:16, 32:4, 40:17
speculation [1] - 27:21
squarely [1] - 29:15
stage [2] - 44:12, 46:8
stake [1] - 10:11
standard [2] - 5:4, 11:20
standing [1] - 15:13
start [6] - 13:7, 20:4, 20:5, 20:7, 38:21, 44:18
started [1] - 20:6
starts [1] - 13:1
state [3] - 3:10, 11:9, 41:10
statute [16] - 14:12, 14:13, 14:17, 16:2, 16:9, 16:21, 17:16, 17:19, 29:20, 30:14, 31:3, 33:12, 33:16, 35:20, 38:24, 39:1
statute's [1] - 16:25
statutes [5] - 33:10, 34:8, 34:9, 40:21, 41:3
statutorily [1] - 26:15
statutory [22] - 6:11, 15:12, 17:18, 18:24, 21:1, 21:25, 22:10, 22:17, 22:21, 24:17, 24:25, 25:5, 27:8, 29:9, 30:18, 30:19, 31:5, 32:16, 34:12, 34:14, 38:9, 38:14
stay [14] - 3:16, 4:19, 6:7, 8:23, 8:24, 20:16, 20:19, 21:18, 21:22, 22:2, 24:23, 35:3, 35:22
still [3] - 20:25, 31:11, 38:2
straightforward [1] - 15:21
strange [1] - 31:1
striking [2] - 40:6, 40:8
strong [2] - 11:25, 12:12
strongly [1] - 46:8
struggle [2] - 38:2, 44:13
submission [1] - 4:21
submitted [1] - 26:5
subordinates [2] - 3:6, 45:19
subparagraph [1] - 26:19
substantiated [1] - 25:16
success [4] - 3:24,

55

8:6, 21:21, 45:6
successfully [1] - 39:9
suffer [1] - 7:16
suffering [1] - 21:3
suggest [2] - 17:22, 24:9
suggested [1] - 29:21
suggesting [5] - 8:2, 8:9, 8:11, 21:24, 35:4
suggestion [2] - 24:14, 41:3
suggests [1] - 45:23
suit [2] - 27:24, 44:16
super [1] - 19:11
supervisor [1] - 14:19
support [2] - 27:5, 27:11
supposedly [1] - 11:2
Supreme [12] - 4:10, 4:12, 4:19, 5:11, 6:4, 6:14, 6:18, 7:22, 13:1, 16:11, 20:16, 22:7
surely [2] - 12:19, 41:14
surplusage [1] - 32:14
surprised [1] - 33:3
surprising [1] - 36:15
surrounding [1] - 12:2
suspenders [4] - 18:20, 18:22, 19:5, 31:17

T

takeover [1] - 3:5
tasks [4] - 14:19, 15:12, 15:14, 41:18
temporary [1] - 4:4
tend [2] - 10:17, 38:11
term [9] - 18:2, 18:14, 18:24, 19:12, 32:7, 32:18, 32:19, 32:22, 41:7
terminate [3] - 5:15, 19:20, 24:2
terms [11] - 7:17, 9:5, 13:3, 17:18, 18:24, 22:8, 27:1, 28:19, 31:10, 40:22, 40:23
text [4] - 29:9, 31:2, 31:11, 32:24
THE [26] - 2:9, 3:2, 5:5, 5:17, 5:21, 6:16, 7:19, 8:6, 8:10, 9:14, 11:4, 11:10, 11:21, 14:24, 19:24, 28:1, 34:13, 35:25, 36:2, 36:6, 37:21, 39:4, 42:12, 43:2, 43:5, 46:18
theoretical [1] - 27:7
theories [5] - 14:3, 24:19, 34:13, 34:14, 38:6
theory [9] - 11:12, 21:2, 23:9, 23:19, 24:17, 24:25, 27:11, 42:2
therefore [8] - 7:16, 17:20, 17:23, 19:15, 19:19, 36:19, 38:14, 41:8
third [2] - 4:12, 37:1
three [4] - 3:23, 5:6, 35:25, 36:2
thumb [1] - 12:22
tie [1] - 15:18
tilt [1] - 7:17
timeline [1] - 25:25
timing [2] - 25:21, 27:2
Title [5] - 32:23, 33:2, 33:7, 33:18
today [4] - 13:13, 24:11, 45:8, 46:10
Todd [2] - 2:4, 3:5
together [1] - 29:24
total [1] - 20:25
totally [2] - 24:16, 28:18
tough [1] - 9:14
track [1] - 9:9
traditionally [1] - 13:5
train [1] - 12:8
treading [1] - 39:24
treated [2] - 17:22, 18:18
treating [1] - 41:16
tricky [1] - 46:20
TRO [10] - 2:12, 2:17, 3:12, 5:1, 20:10, 22:6, 22:18, 24:23, 25:19, 46:8
true [10] - 7:6, 7:8, 11:22, 23:14, 30:13, 33:12, 33:14, 40:25, 42:20, 43:5
truly [1] - 35:14
Trump [2] - 6:13, 6:19
trying [2] - 41:20, 43:16
turn [4] - 15:8, 29:2, 36:9, 37:22
turning [1] - 40:5
two [9] - 20:15, 22:22, 29:5, 29:15, 29:16, 29:23, 34:15, 37:3, 38:16
type [2] - 10:4, 10:5

U

U.S [2] - 18:8, 40:15
U.S.C [3] - 16:5, 17:1, 18:9
ultimately [1] - 17:15
ultra [1] - 21:25
unable [2] - 3:8, 6:11
unbridled [1] - 35:7
uncertainty [1] - 39:17
under [11] - 4:24, 5:4, 19:18, 25:14, 29:6, 38:24, 41:21, 42:10, 45:12, 45:17
undermines [1] - 21:6
underscores [1] - 24:15
understood [2] - 5:24, 39:4
undisputed [1] - 15:25
undisputedly [1] - 42:10
unfettered [1] - 35:4
unilateral [1] - 35:18
unintentional [1] - 39:7
unique [1] - 31:11
unlawful [6] - 4:17, 11:3, 43:4, 44:22, 44:23, 44:24
unlawfully [1] - 12:17
unless [2] - 16:8, 16:20
unlikely [2] - 4:2, 5:12
unquote [1] - 4:13
up [9] - 6:1, 9:20, 9:21, 9:25, 10:10, 30:17, 31:5, 44:21
urge [2] - 46:7, 46:10
uses [1] - 18:9
utter [1] - 40:8

V

Vacancies [3] - 3:25, 16:21, 29:8
vacancy [3] - 22:25, 35:11, 36:21
value [2] - 7:17, 9:17
various [1] - 41:1
venerated [1] - 39:25
version [2] - 12:5, 30:22
versus [1] - 33:7
vest [1] - 16:6
viable [1] - 23:9
view [4] - 15:4, 31:1, 34:19, 35:22
viewed [1] - 8:21
vindicate [3] - 43:15, 43:17, 43:21
vindicating [1] - 43:15
vires [1] - 21:25
vis [2] - 12:23
vis-a-vis [1] - 12:23

W

wait [1] - 5:22
waiting [1] - 45:15
walk [2] - 15:19, 24:20
Walters [1] - 18:1
water [1] - 39:25
weak [1] - 7:15
website [2] - 26:21, 39:10
weigh [2] - 5:13, 9:16
weighs [1] - 4:13
whatsoever [3] - 18:16, 21:7, 33:7
whit [1] - 17:21
White [1] - 13:13
whole [2] - 18:21, 18:22
wholesale [1] - 34:5
Wilcox [12] - 4:19, 5:12, 5:19, 6:5, 7:23, 9:19, 10:2, 20:7, 20:11, 20:12, 20:14, 21:17
Williams [1] - 34:23
win [2] - 9:25, 10:3
winning [1] - 10:10
word [5] - 4:14, 8:10, 31:8, 31:12, 32:2
works [1] - 40:21
world [1] - 11:12
write [1] - 36:18
writing [1] - 32:2
wrongfully [3] - 6:10, 10:1, 10:8

Z

zooming [1] - 10:14

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHIRA PERLMUTTER,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE et al.,<br>*Defendants*. | Civil Action No. 25-1659 (TJK) |

**ORDER**

For the reasons set forth in the Court's accompanying Memorandum Opinion, it is hereby **ORDERED** that Plaintiff Shira Perlmutter's Motion to Dismiss, ECF No. 24, is **DENIED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 30, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHIRA PERLMUTTER,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE et al.,<br>*Defendants*. | Civil Action No. 25-1659 (TJK) |

**MEMORANDUM OPINION**

On May 10, 2025, Shira Perlmutter was purportedly fired by President Trump from her position as Register of Copyrights and Director of the U.S. Copyright Office at the Library of Congress. Arguing that this attempt to terminate her was unlawful, she sued a few weeks later and then moved for a preliminary injunction, seeking to prevent her removal. The Court will deny her motion because she has not shown that she will be irreparably harmed without this relief.

## I. Background

### A. Factual Background

On May 8, 2025, President Trump removed Carla D. Hayden as Librarian of Congress. ECF No. 24-3 ¶ 5. Two days later, acting through another official, he similarly purported to remove Perlmutter as head of the Copyright Office via an email that terminated her "effective immediately." *Id.* ¶ 9. And the next day, Deputy Attorney General Todd Blanche—whom President Trump had "directed to perform the duties of the office of the Librarian of Congress" following the former Librarian's removal, ECF No. 24-5 at 3—"designate[d] Paul Perkins" to replace Perlmutter "as the Acting Register of Copyrights and Acting Director of the U.S. Copyright Office," *id.* at 2. For her part, Perlmutter maintains that she "remain[s] Register of Copyrights" and that

she has "not received any communication from Library of Congress leadership that purports to terminate [her] employment as Register of Copyrights." *Id.* ¶¶ 12–13.

### B. Procedural History

Perlmutter claims that "the purported appointments of" Blanche and Perkins "have caused considerable confusion among Library staff, copyright stakeholders, and the public" and will "impede the Copyright Office's ability to perform its work." ECF No. 24-3 ¶¶ 11, 15. So on May 22, 2025, she sued, bringing two counts challenging her purported removal and the President's appointment of Blanche as the Acting Librarian of Congress. ECF No. 1 ¶¶ 26–36. She also moved for a temporary restraining order. ECF No. 2. On May 28, the Court denied her motion, concluding that she had not shown that she would suffer irreparable harm without that relief. ECF No. 15 at 36–52. Then, on June 10, Perlmutter moved for a preliminary injunction, ECF No. 24, and the Court held a hearing on the motion on July 23.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). Thus, "failure to show a likelihood of irreparable harm" is, "standing alone, sufficient to defeat the motion." *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 96 (D.D.C. 2020) (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel*

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "The party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up). In other words, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* Furthermore, "the movant must show that the alleged harm will *directly result* from the action which the movant seeks to enjoin." *Id.* (emphasis added). Finally, the injury must be truly "irreparable"—i.e., "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

## III. Analysis

The Court's analysis begins and ends with irreparable harm. Perlmutter argues that her removal from office—even if only temporary—is irreparable harm that can only be prevented by a preliminary injunction. The Court is unconvinced, so it will deny her motion.

The Supreme Court has instructed that the loss of a job and the harms that go along with it generally "will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). "That is particularly true in cases involving government employment." *English v. Trump*, 279 F. Supp. 3d 307, 334 (D.D.C. 2018). Indeed, the *Sampson* Court emphasized "that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" 415 U.S. at 83 (quoting *Cafeteria & Restaurant Workers Union, Local 473, A.F.L.—C.I.O. v. McElroy*, 367 U.S. 886, 896 (1961)). And it noted that, even outside the government context, courts of equity are "traditional[ly] unwilling[]" "to enforce contracts for personal service either at the behest of the employer or of the employee." *Id.* The Court also relied on "the historical denial of all equitable

relief by the federal courts" when a plaintiff sought, "by injunction, [to] restrain an executive officer from making a wrongful removal of a subordinate appointee." *Id.* at 71, 83 (quoting *White v. Berry*, 171 U.S. 366, 377 (1898)). For these reasons, preliminary equitable intervention in government-personnel cases is disfavored, and the plaintiff must at least demonstrate that her case involves a "genuinely extraordinary situation" to obtain interim relief. *Id.* at 92 n.68. Such a showing must establish that "the circumstances surrounding [her] discharge, together with the resultant effect on [her], . . . so far depart from the normal situation that irreparable injury might be found." *Id.* Only then will she have shown "irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Id.* at 84.[1]

Perlmutter argues that this case presents a "genuinely extraordinary situation" for three reasons: (1) she has been deprived of her "'statutory right to function' as Register of Copyrights," ECF No. 24-2 at 34; (2) she "remains Register of Copyrights and is therefore required to fulfill her statutory duties," *id.* at 37; and (3) "[i]rreparable harm to the Library of Congress and Copyright Office will frustrate [her] ability to resume her duties," *id.* at 39. As explained below, each of these arguments fails.

### A. Perlmutter's Temporary Loss of Her "Statutory Right to Function" While the Court Resolves the Merits of Her Case Is Not an Irreparable Harm

Perlmutter first argues that this case warrants preliminary injunctive relief because her

[1] At times, Perlmutter appears to suggest that the importance of her position should play a role in the Court's analysis of whether this situation is "genuinely extraordinary." *E.g.*, ECF No. 24-2 at 32. Perhaps this is a response to the *Sampson* plaintiff's status as a "probationary employee." 415 U.S. at 62. The reasoning in *Sampson*, though, did not appear to turn on the seniority of the employee. Thus, the Court assigns little weight to this factor. To be sure, such a consideration is not irrelevant. But it does little to show that "the circumstances surrounding [her] discharge, together with the resultant effect on [her], . . . so far depart from the normal situation that irreparable injury might be found." *Sampson*, 415 U.S. at 92 n.68.

removal deprives her of her "statutory right to function" as the Register of Copyrights. ECF No. 24-2 at 32, 34 (quotation omitted). Not so. In the first case purporting to recognize such a right, the court found that the plaintiffs had shown irreparable harm because, without a preliminary injunction, the court could not reinstate them to their positions later on—because the positions would no longer exist. *See Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983). Nothing similarly irremediable is at stake here.

In *Berry*, President Carter had appointed the plaintiffs, with the advice and consent of the Senate, to the Commission on Civil Rights. *Id.* at *1. That body did not have a fixed term for members; by statute, it expired 60 days after the date established for submission of its final report, September 30, 1983. *Id.* at *1 n.1. The Commission apparently did not meet this deadline, leaving it racing to finish the report before it dissolved on November 29. *Id.* at *5. But President Reagan fired the plaintiffs before the Commission submitted its report, so they sued. *Id.* at *1. After concluding that the plaintiffs were likely to succeed on the merits, the court found that they had established irreparable injury to "their statutory right to function as Commissioners." *Id.* at *5. According to that court, "[t]he irreparable nature of this injury is evident by the obviously disruptive effect the *denial* of preliminary relief will likely have on the Commission's final activities." *Id.* Because the plaintiffs' removal deprived the Commission of a quorum, it lost its "ability to fulfill its mandate" to issue a final report before it expired. *Id.* These circumstances, the court held, satisfied the *Sampson* test. *Id.*

Even putting aside that *Berry* is not binding on this Court, it does not provide Perlmutter a winning argument that she will likely suffer irreparable harm here for several reasons. First, as noted above, the harm to the plaintiff Commissioners was irreparable because, without a preliminary injunction, the Commission itself would have expired and the Court could not have reinstated

them to their positions. Here, to the extent that Perlmutter argues that she suffers harm solely from not functioning as the Register of Copyrights, she provides no reason to think that any such harm cannot be remediated in the ordinary course by returning her to her position if she prevails on the merits. She argues that later reinstatement is insufficient because she is being sidelined *now* and can never reclaim this lost time. ECF No. 24-2 at 34–35. And to demonstrate, she notes that the Copyright Office is in the middle of producing a multi-volume report on copyright and artificial intelligence for Congress and other stakeholders and that her ability to "complete" that report "will be forfeited during the months-long pendency of this lawsuit." *Id.* at 35. The *Berry* court, however, did not rely on this type of reasoning. And more fundamentally, this "lost time" argument proves too much because it would establish irreparable harm in *every* wrongful-termination case.

Perlmutter also gestures at a related argument when she asserts that her removal and Perkins's appointment will have an irreparable effect on her because they will prevent her from "return[ing] to her position as it currently exists." ECF No. 24-2 at 39. But she does not show that Defendants' actions, if not enjoined, will likely irreparably alter her position. So those fears are vague and speculative, not "certain and great." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quotation omitted).

Second, although the court in *Berry* appears to have assumed that alleged injury to the Commission was identical to alleged injury to the plaintiff Commissioners—an assumption with which the Court disagrees for reasons explained later—the situation in *Berry* was very different than the one here. In *Berry*, denying the requested injunction would have shut down the Commission before it fulfilled its mandate. So the Commission itself could not have continued to function—and indeed, could never function again—absent preliminary relief. Here, on the other hand, while Perlmutter claims that Defendants' actions "impede[]" *her* from carrying out the

responsibilities of the Copyright Office, ECF No. 24-3 ¶ 14, she does not explain why the Copyright Office cannot continue to operate under Perkins's temporary leadership. *Cf. English*, 279 F. Supp. 3d at 355 (finding that a removed officer had not shown irreparable harm where the agency would "not be shuttered" because it could "continue[] to operate" under the leadership of the officer's purported replacement). For example, though Perlmutter claims that *she* will be temporarily unable to complete the report on copyright and artificial intelligence absent an injunction, she does not explain why the *Copyright Office* could not do so without her at the helm. *See* ECF No. 24-3 ¶ 14(g). So even if the Court could consider some harms to the agency in considering irreparable harm to Perlmutter, she has not shown that the type of harm the *Berry* court addressed is present here.

Still, moving past *Berry* itself, Perlmutter identifies six more recent decisions from this district in which judges have concluded, at least in part based on *Berry*, that even the "temporary" "deprivation of a senior government official's 'statutory right to function' . . . is both significant and irreparable." ECF No. 24-2 at 34; *id.* at 32–33 (collecting cases). These cases get her no further.

One of them—*Aviel v. Gor* (*Aviel I*), No. 25-cv-778, 2025 WL 1009035 (D.D.C. Apr. 4, 2025)—is inapposite for substantially the same reasons as *Berry*. In that case, the district court found irreparable harm because "the very survival of [the removed officer's] organization [was] at stake." *Id.* at *10. So without an injunction, there would be no agency for the officer to return to after the case was resolved. But to repeat, Perlmutter has not shown that the existence of the Copyright Office is at stake, or that her position will likely be irreparably changed without an injunction. In another—*LeBlanc v. United States Privacy & Civil Liberties Oversight Board*—the agency, like the Commission in *Berry*, would have been deprived of a quorum, preventing it from

carrying out many of its responsibilities. No. 25-cv-542, 2025 WL 1454010, at *31 (D.D.C. May 21, 2025). Yet again, Perlmutter has not shown that the Copyright Office will grind to a halt without her.[2] True, in the other four cases Perlmutter cites, judges found irreparable harm even though the plaintiff did not make a showing similar to *Berry*, *Aviel I*, or *LeBlanc*. But respectfully, for that reason, the Court does not find their reasoning persuasive. *See Brehm*, 2025 U.S. Dist. LEXIS 71326, at *7–10 (declining to follow some cases cited by Perlmutter since "the viability of a 'statutory right to function' claim is uncertain" and, "[t]o the extent courts have accepted such a claim, it has been on different facts").

On top of all that, what is striking about these four cases—and also about *LeBlanc*—is what happened next: either the D.C. Circuit or the Supreme Court stayed the injunctions entered by the district courts. In three, either the Circuit or the Supreme Court stayed a preliminary injunction directly.[3] In the other two, the decision cited by Perlmutter was an unappealable temporary restraining order, but a subsequent permanent injunction entered by the same court was stayed.[4] And while Perlmutter disputes the meaning of these developments in the appellate courts,

[2] Similarly, in *LeBlanc*, the court noted that the removed officer was "appointed by the President, with the advice and consent of the Senate, to a nonpartisan, multimember board of experts." 2025 WL 1454010, at *30. Here, by contrast, Perlmutter was appointed by the Librarian, not the President with the advice and consent of the Senate. 17 U.S.C. § 701(a). At least one court in this district has held that such a distinction minimizes the officer's injury. *Brehm v. Marocco*, No. 25-cv-660, 2025 U.S. Dist. LEXIS 71326, at *8 (D.D.C. Mar. 11, 2025) (finding no irreparable harm from an officer's removal in part because the officer "was not appointed by the U.S. President or confirmed by the Senate").

[3] *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-cv-542, 2025 WL 1454010 (D.D.C. May 21, 2025), *stayed*, No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025) (per curiam); *Grundmann v. Trump*, 770 F. Supp. 3d 166 (D.D.C. 2025), *stayed*, No. 25-5165, 2025 WL 1840641 (D.C. Cir. July 3, 2025) (per curiam); *Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. 2025), *stayed sub nom. Trump v. Wilcox*, 145 S. Ct. 1415 (2025).

[4] *Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025), *stayed sub nom. Wilcox*, 145 S. Ct. 1415; *Dellinger v. Bessent* (*Dellinger I*), 768 F. Supp. 3d 33 (D.D.C. 2025), *stayed by Dellinger*

this Court would have to blind itself to them to assign the weight to these cases that she urges. In the end, none of the injunctions stuck. And no precedent of the Supreme Court or the D.C. Circuit has recognized that an official's temporary loss of a "statutory right to function" is an irreparable harm in a situation like Perlmutter's.

The reasoning behind the orders staying the injunctions, even if not conclusive here, is instructive as to whether Perlmutter is suffering the kind of harm warranting preliminary injunctive relief, especially in light of the balance of the equities. For example, in considering the allegedly unlawful removal of members of the National Labor Relations Board and the Merit Systems Protection Board, the Supreme Court held "that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."[5] *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). In other words, the Court concluded that an officer's temporarily "being unable to perform her statutory duty" was not an irreparable harm—or at least, not a harm that outweighed the corresponding risk of harm to the Executive such that an injunction was warranted. *Id.* This makes sense in light of *Sampson*'s holding that a plaintiff "at the very least must make a showing of irreparable injury sufficient in kind and degree to override the[] factors cutting against the general availability of preliminary injunctions in Government personnel cases." 415 U.S. at 84. And the D.C. Circuit has taken this approach as well. In a recent case about the alleged unlawful removal of the Special Counsel, it held that "circumstances cut" against an injunction

---

*v. Bessent* (*Dellinger II*), No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) (per curiam), *vacated and remanded*, No. 25-5052, 2025 WL 935211 (D.C. Cir. Mar. 27, 2025) (per curiam).

[5] As discussed later in this opinion, the D.C. Circuit has held that, as a matter of constitutional interpretation, the Library, at least in its role related to copyright matters, is part of the Executive, not the Legislative, Branch. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012).

when, "[a]t worst," the officer "would remain out of office for a short period of time" yet "the potential injury to the government of both having its designated [officer] sidelined and unable to act while also having to try and unravel [the removed officer]'s actions is substantial." *Dellinger II*, 2025 WL 887518, at *4.

So even assuming Perlmutter is right that her removal was unlawful, this reasoning suggests that an injunction is not warranted here. "At worst, [she] would remain out of office for a short period of time" while the Court resolves the merits. *Dellinger II*, 2025 WL 887518, at *4. And as the Supreme Court suggested, even if Perlmutter has been "wrongfully removed," temporarily "being unable to perform her statutory duty," without more, is not a harm that justifies a preliminary injunction, given the similar balance of the equities here. *Wilcox*, 145 S. Ct. at 1415; *cf. Sampson*, 415 U.S. at 84.

Perlmutter disputes the application of these appellate decisions and argues that they are limited to circumstances where the Government is likely to succeed on the merits.[6] Not so. In *Wilcox*, for example, the Supreme Court addressed the harm that "a *wrongfully* removed officer faces from being unable to perform her statutory duty." 145 S. Ct. at 1415 (emphasis added).

---

[6] Perlmutter also argues that *Wilcox* is "non-precedential." ECF No. 34 at 26; *see also Aviel I*, 2025 WL 1009035, at *10 (describing *Dellinger II* as "non-precedential"). In their opposition, Defendants do not suggest otherwise. Still, since briefing on Perlmutter's motion and the hearing concluded, the Supreme Court has clarified that its stay decisions, though "not conclusive as to the merits . . . inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, No. 25A11, 2025 WL 2056889, slip op. at 1 (U.S. July 23, 2025). As noted above, the Court's decision here is informed by the reasoning in *Wilcox*. And *Boyle* itself only adds to the pile of similar authority. In *Boyle*, the Court granted a stay pending appeal of a district court's permanent injunction preventing the removal of members of the Consumer Product Safety Commission. *Id.* The Court explained that "[t]he application is squarely controlled by" *Wilcox* and concluded that a stay was warranted because, as there, "'the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty.'" *Id.* (quoting *Wilcox*, 145 S. Ct. at 1415).

Although the Court also suggested that the Government was likely to prevail on one aspect of the merits, nothing about its brief consideration of irreparable harm and the balance of the equities appeared to turn on its assessment of the merits. *See id.* But even if it did, *Dellinger II*'s discussion did not. There, in a more developed analysis, the Circuit explicitly "assume[d]" that the officer's "removal [was] statutorily ultra vires" and that such "removal constitute[d] a cognizable injury." 2025 WL 887518, at *4. But it still determined that "that does not mean such injury is irreparable and weighs in [the officer's] favor." *Id.* Instead, when the injury is "remain[ing] out of office for a short period of time," "circumstances cut" against an injunction, even if the officer's removal "deprive[s] [her] of the statutory right to function in office." *Id.* (quotation omitted).[7] So too here.

Perlmutter also argues that the D.C. Circuit's handling of *Aviel* "confirm[s]" that *Wilcox* does not apply here because *she*—rather than Defendants—is likely to succeed on the merits. ECF No. 24-2 at 35. More than that, she appears to read the Circuit to suggest that, as long as she shows such a likelihood, she is entitled to a preliminary injunction. *Id.* at 36. She points out that Judge Katsas, in a concurring statement joined by Judge Pillard, noted that the Supreme Court's "merits ruling" in *Wilcox* "rested on the proposition that the removals at issue . . . were likely lawful" and that the Court did not disturb a prior D.C. Circuit decision suggesting that "reinstatement" is "an appropriate remedy" when an officer is unlawfully removed. *Aviel v. Gor* (*Aviel II*), No. 25-5105, 2025 WL 1600446, at *2 n.2 (D.C. Cir. June 5, 2025) (Katsas, J., concurring). Based on these snippets, Perlmutter seems to argue that, for purposes of preliminary relief, "reinstatement is an appropriate remedy if the removals at issued were likely unlawful," full stop—somehow skipping over (or implicitly satisfying) her burden to show irreparable harm. ECF No. 35 at 4.

[7] Perlmutter suggests that *Dellinger II* is limited to cases in which an appeal has been expedited. ECF No. 24-2 at 36. But nothing in the opinion implies such a limitation.

Perlmutter reads far too much into *Aviel II*. First, Judge Katsas's point about the availability of reinstatement as a remedy in officer-removal cases generally says nothing about Perlmutter's entitlement to that specific remedy now, other than that it remains available if she satisfies the requirements for a preliminary injunction. Second, nothing about Judge Katsas's statement—which did not even address irreparable harm[8]—or *Aviel II* purports to upend those requirements or the longstanding precedent in this jurisdiction that "[a] movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Thus, even assuming Perlmutter's removal was unlawful, she must still separately show such harm to obtain a preliminary injunction. In fact, not long before *Aviel II*, the Circuit reaffirmed this commonsense conclusion in *Dellinger II*, when it assumed that the Special Counsel's removal was unlawful but still found that he did not show sufficient harm on a statutory-right-to-function theory to warrant a preliminary injunction reinstating him. 2025 WL 887518, at *4.

For these reasons, the Court concludes that Perlmutter's asserted loss of her "statutory right to function" is not a genuinely extraordinary situation such that her temporary removal is irreparable harm—or at least, harm that outweighs any corresponding risk of harm to the Government such that the balance of the equities tips in her favor.

### B. Perlmutter's Temporary Inability to Perform Her Statutory Duties Is Not an Irreparable Harm

Next, Perlmutter argues that this case presents a genuinely extraordinary situation because

[8] Indeed, the only judge to discuss irreparable harm was Judge Rao, who explicitly rejected Perlmutter's statutory-right-to-function theory of harm because, in her view, an officer "possesses no private right in the powers of her office or the policy direction of the agency." *Aviel II* at *6 (Rao, J., dissenting) (citing *Raines v. Byrd*, 521 U.S. 811, 821 (1997)).

she "remains Register of Copyrights and is therefore required to fulfill her statutory duties." ECF No. 24-2 at 37. There is little if any difference between this theory of harm and her first. Perlmutter distinguishes the two by arguing that the first addresses her right to function and the second addresses her obligation to do so. But at bottom, both are ways of claiming that she is suffering irreparable harm because she cannot perform the job of Register of Copyrights and Director of the Copyright Office. And as the Court has already explained, Perlmutter's asserted inability to do that job temporarily while this lawsuit proceeds is not enough to show irreparable harm.

### C. To Meet Her Burden of Showing Irreparable Harm, Perlmutter Cannot Rely on Harms to the Library of Congress or the Copyright Office

Finally, Perlmutter claims that her removal is genuinely extraordinary because Defendants' actions inflict "institutional harm to the Library of Congress and U.S. Copyright Office." ECF No. 24-2 at 39. But injuries to third parties are not a basis to find irreparable harm. *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012); *Winter*, 555 U.S. at 20 (noting that a party seeking preliminary injunctive relief must show "that *he* is likely to suffer irreparable harm in the absence of preliminary relief" (emphasis added)). Indeed, in *Sampson*, the Court emphasized that "irreparable injury" can be found only by considering "the circumstances surrounding an employee's discharge, together with the resultant effect *on the employee*." 415 U.S. at 92 n.68 (emphasis added). So institutional harms to the Library or the Copyright Office, divorced from how those harms impact Perlmutter personally, cannot help her meet her burden.

Perlmutter argues that institutional harms are relevant because, in cases like *Wilcox*, the Supreme Court considered harms to the office of the President, not just harms to President Trump individually. ECF No. 34 at 22. But in those cases, the defendant officials were sued in their official capacities. So when they moved to stay the injunctions issued by the lower courts, they had the burden to show that they would be irreparably harmed *in their official capacities* absent a

stay. In such circumstances, it makes sense to consider harm to their offices. Here, on the other, Perlmutter does not appear to dispute that she is suing in her personal capacity. ECF No. 15 at 48–49. Thus, unlike a defendant sued in his official capacity, Perlmutter cannot rely on purported institutional harms to the Library or Copyright Office to show irreparable harm to her.

Undeterred, Perlmutter points to cases in which courts have considered harms to agencies in addressing whether a removed officer has suffered irreparable harm. *See* ECF No. 24-2 at 39–40. But those cases do not stand for the general proposition that a removed officer can appropriate harm to an agency in asserting her own irreparable harm. Instead, many merely recognize, as discussed above, that an officer's removal may threaten irreparable harm to her when it is likely the agency or office will no longer exist when the case is resolved. *See, e.g.*, *Aviel I*, 2025 WL 1009035, at *10–11; *see also English*, 279 F. Supp. 3d at 334–35 (discussing this theory of irreparable harm). In those cases, courts concluded that such circumstances have an irreparable "resultant effect" on the removed officer because, without an injunction, there will be no position for the officer to return to should she win on the merits. *Sampson*, U.S. at 92 n.68; *Aviel I*, 2025 WL 1009035, at *10–11. But as discussed, nothing in the record suggests that the existence of the Copyright Office is threatened or that Perlmutter's position will irreparably change in some way if it is temporarily held by Perkins.[9]

Finally, even putting aside that these purported institutional harms are not Perlmutter's to invoke, they fail on their own terms. She claims that the Copyright Office will not be able to "perform its statutory role as a neutral advisor to Congress if an Executive Branch official controls the Library of Congress's operations." ECF No. 24-2 at 40. But this concern is based on

[9] To the extent that some courts may have permitted plaintiffs to establish irreparable harm by pointing to harms suffered solely by their agencies, the Court is not bound by those decisions and, for the reason explained above, respectfully disagrees with them.

speculation at this point, and no representative of Congress has sought to intervene in this case to protect these interests that Perlmutter says are in peril. Besides, for support, she mostly cites to provisions of the U.S. Code governing the Congressional Research Service. *See* ECF No. 24-2 at 40 (citing 2 U.S.C. § 166). But that Service is "a separate department in the Library of Congress" untethered to the Copyright Office. § 166(a). Furthermore, the D.C. Circuit has held that, as a matter of constitutional interpretation, the Library, at least in its role related to copyright matters, is part of the *Executive*, not the Legislative, Branch. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012). And the Librarian—who appoints the Register of Copyrights—is appointed by the President with the advice and consent of the Senate, and she is removable by the President at will. *Id.* at 1341. So Executive influence over the Copyright Office appears to be a feature, not a bug, of this atypical arrangement. *See Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2443 (2025) ("The prerogative of at-will removal of a subordinate, then, often carries with it the power to supervise and direct that subordinate.").

## IV. Conclusion

For all the above reasons, the Court will deny Perlmutter's Motion for a Preliminary Injunction, ECF No. 24. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 31, 2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHIRA PERLMUTTER,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE *et al.*,<br>*Defendants*. | Case No. 25-cv-01659-TJK |

**PLAINTIFF'S NOTICE OF APPEAL**

Plaintiff provides notice of her appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's July 30, 2025 order and opinion, docketed at ECF Nos. 39, 40.

Dated: July 31, 2025

Respectfully submitted,

*<u>/s/ Allyson R. Scher</u>*
Brian D. Netter (D.C. Bar No. 979362)
Allyson R. Scher (D.C. Bar No. 1616379)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bnetter@democracyforward.org
ascher@democracyforward.org

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
donald.verrilli@mto.com
ginger.anders@mto.com

Kuruvilla J. Olasa (admitted *pro hac vice*)
James R. Salzmann (admitted *pro hac vice*)
Miranda E. Rehaut (admitted *pro hac vice*)
Adeel Mohammadi (admitted *pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9100
kuruvilla.olasa@mto.com
james.salzmann@mto.com
miranda.rehaut@mto.com
adeel.mohammadi@mto.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHIRA PERLMUTTER,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE et al.,<br>*Defendants*. | Civil Action No. 25-1659 (TJK) |

**ORDER**

For the reasons set forth in the Court's accompanying Memorandum, it is hereby **ORDERED** that Plaintiff Shira Perlmutter's Emergency Motion for Injunction Pending Appeal, ECF No. 43, is **DENIED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 20, 2025

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHIRA PERLMUTTER,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE et al.,<br>*Defendants*. | Civil Action No. 25-1659 (TJK) |

**MEMORANDUM**

On May 10, 2025, President Trump purportedly fired Shira Perlmutter from her position as Register of Copyrights and Director of the U.S. Copyright Office at the Library of Congress. ECF No. 24-3 ¶¶ 1, 8–9. Perlmutter, believing her termination to be unlawful, sued a few weeks later and then moved for a temporary restraining order seeking to prevent her removal, which the Court denied. ECF Nos. 1, 2, 15. She then moved for a preliminary injunction. ECF No. 24. The Court denied that motion for substantially the same reasons it denied her request for a temporary restraining order, finding that she had failed to establish that she would be irreparably harmed absent the requested injunction. ECF Nos. 39, 40. Perlmutter has now appealed that denial and moves for an injunction pending appeal. ECF Nos. 41, 43. But because she has again failed to show that she will be irreparably harmed absent her requested relief, the Court will deny her motion.

Federal Rule of Civil Procedure 62(d) provides that "[w]hile an appeal is pending from an interlocutory order . . . that . . . refuses . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." An "injunction pending appeal is an extraordinary remedy." *Memphis Publ'g Co. v. FBI*, 195 F. Supp. 3d 1, 3 (D.D.C. 2012). "The standards for evaluating a motion for an injunction pending

appeal are 'substantially the same as those for issuing a preliminary injunction.'" *Amgen Inc. v. Azar*, No. 17-cv-1006, 2018 WL 1990521, at *1 (D.D.C. Feb. 22, 2018) (quoting *Al–Anazi v. Bush*, 370 F. Supp. 2d 188, 199 n.11 (D.D.C. 2005)). Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008)).

Rule 62(d) also contemplates situations in which a district court that has denied an injunction still grants an injunction pending appeal. *MediNatura, Inc. v. FDA*, No. 20-cv-2066, 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021). Thus, in "at least some circumstances," an injunction pending appeal "may be appropriate" even if the court that just denied injunctive relief "believe[s] its analysis" in denying relief "is correct" in that the movant cannot show a likelihood of success on the merits. *Id.* (quotation omitted); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844–45 (D.C. Cir. 1977). So "in rare cases, the threat of irreparable harm may be so grave and the balance of equities may favor" the movant "so decisively that an injunction pending appeal . . . may be proper," even without a likelihood of success on the merits, so long as the movant at least establishes a "serious legal question" on the merits and shows that "the other three factors tip sharply" in its favor. *MediNatura*, 2021 WL 1025835, at *6 (quotation omitted); *see also Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560–61 & n.4 (D.D.C. 2018).

The Court will deny Perlmutter's motion because she has not shown that she faces irreparable harm, "grave" or otherwise, absent an injunction pending appeal. She presents the same three irreparable-harm arguments the Court has already considered and rejected twice. According to Perlmutter, she will be irreparably harmed absent an injunction because (1) her removal, even if only temporary, "deprive[s] her of her 'statutory right to function' in the role that the Librarian of Congress lawfully appointed her to perform," ECF No. 43 at 2; (2) she cannot "discharge her

statutory duties" while temporarily removed, *id.* at 3; and (3) "the President's efforts to oust [her] directly threaten the Library's and Copyright Office's ability to perform their assigned functions as intended by Congress," *id.*

Perlmutter has given the Court no reason to reconsider its prior conclusions that she has not established that she will suffer irreparable harm absent preliminary injunctive relief. Such relief in government-personnel cases is permitted only in a "genuinely extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). That requires Perlmutter to show that "the circumstances surrounding [her] discharge, together with the resultant effect on [her], . . . so far depart from the normal situation that irreparable injury might be found." *Id.* But as the Court has already explained in detail, the temporary loss of a "statutory right to function"—assuming such a right exists, *see* ECF No. 40 at 12 n.8—does not meet this standard, *id.* at 4–12. The same is true for Perlmutter's temporary inability to discharge her statutory duties. *Id.* at 12–13. And Perlmutter cannot rely on alleged harms to the Library or Copyright Office because she must show that *she*—not third parties—will be irreparably harmed. *Id.* at 13–14. Finally, even if she could rely on harms to third parties, Perlmutter's asserted harms to the Library and Copyright Office flowing from her temporary removal are speculative at best. *Id.* at 14–15. So she has not shown that this case presents such a "genuinely extraordinary situation" that irreparable harm may be found. *Sampson*, 415 U.S. at 92 n.68. And because she has not shown that she will suffer irreparable harm absent an injunction pending appeal, the Court will deny her motion.

For all the above reasons, the Court will deny Perlmutter's Emergency Motion for Injunction Pending Appeal. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 20, 2025