[ORAL ARGUMENT NOT YET SCHEDULED]
No. 25-5285

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

SHIRA PERLMUTTER, Register of Copyrights
and Director of the U.S. Copyright Office,
*Plaintiff-Appellant*,

v.

TODD BLANCHE, in his capacity as the person claiming
to be acting Librarian of Congress, *et al.*,
*Defendants-Appellees*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

**BRIEF OF RANKING MEMBER OF THE COMMITTEE ON HOUSE ADMINISTRATION JOSEPH MORELLE AND RANKING MEMBER OF THE HOUSE COMMITTEE ON THE JUDICIARY JAMIE RASKIN AS *AMICI CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL**

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Smita Ghosh
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* Joseph Morelle and Jamie Raskin are Members of Congress and the Ranking Member of the Committee on House Administration and the Ranking Member of the House Committee on the Judiciary, respectively. They are therefore familiar with the Register of Copyrights and the critical work that she does on behalf of Congress and of the American people. As members of Congress, *amici* also have a strong interest in the congressional authority and separation of powers issues at the heart of this case.

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I. PARTIES AND *AMICI*

Except for *amici* Members of Congress and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellant's brief, all parties, intervenors, and *amici* appearing in this Court are listed in Appellant's brief.

II. RULINGS UNDER REVIEW

Reference to the ruling under review appears in Appellant's brief.

III. RELATED CASES

Reference to any related cases pending before this Court appears in Appellant's brief.

Dated: September 8, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | iv |
| GLOSSARY | x |
| INTEREST OF *AMICI CURIAE* | 1 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| ARGUMENT | 5 |
| I. Congress Exercised its Broad Authority over Federal Offices when Creating the Register of Copyrights as a Legislative Officer under the Control of the Librarian of Congress | 5 |
| II. Presidents Have No Inherent Authority to Remove the Register of Copyrights | 11 |
| III. Presidents Have No Inherent Authority to Install an Acting Librarian of Congress During Vacancies | 22 |
| CONCLUSION | 29 |

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Aviel v. Gor*,
No. 25-5015, 2025 WL 1600446 (D.C. Cir. June 5, 2025) .................... 22, 23

*Buckley v. Valeo*,
424 U.S. 1 (1976) .................... 19

*Burnap v. United States*,
252 U.S. 512 (1920) .................... 16

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) .................... 24

*Ex parte Hennen*,
38 U.S. 230 (1839) .................... 4, 12, 13

*Free Enter. Fund v. Pub. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .................... 20, 21

*George v. Ishimaru*,
849 F. Supp. 68 (D.D.C. 1994) .................... 28

*Holmes v. Jennison*,
39 U.S. 540 (1840) .................... 22

*Keim v. United States*,
177 U.S. 290 (1900) .................... 16

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) .................... 3, 7, 12

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985) .................... 10

*Morrison v. Olson*,
487 U.S. 654 (1988) .................... 18

*Myers v. United States*,
272 U.S. 52 (1926) .................... 18

## TABLE OF AUTHORITIES – cont'd

**Page(s)**


*Nat'l Treasury Emps. Union v. Reagan*,
663 F.2d 239 (D.C. Cir. 1981) .......... 11

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) .......... 4

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017) .......... 2, 3, 5, 20, 22-24

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... 2, 5, 12, 17-19

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) .......... 20

*United States v. Germaine*,
99 U.S. 508 (1879) .......... 22

*United States v. Perkins*,
116 U.S. 483 (1886) .......... 7

*Williams v. Phillips*,
360 F. Supp. 1363 (D.D.C. 1973) .......... 26

*Williams v. Phillips*,
482 F.2d 669 (D.C. Cir. 1973) .......... 23

<u>CONSTITUTIONAL PROVISIONS</u>

*The Declaration of Independence* (U.S. 1776) .......... 2

U.S. Const. art. I, § 8, cl. 8 .......... 1

U.S. Const. art. I, § 8, cl. 18 .......... 6

U.S. Const. art. II, § 2, cl. 1 .......... 6

U.S. Const. art. II, § 2, cl. 2 .......... 6

U.S. Const. art. II, § 2, cl. 3 .......... 5, 22

**Page(s)**

STATUTES AND LEGISLATIVE MATERIALS

An Act concerning the Library for the use of both Houses of Congress, ch. 2, 2 Stat. 128 (1802) ........ 7

An Act for the temporary establishment of the Post-Office, ch. 16, 1 Stat. 70 (1789) ........ 14

Act of July 2, 1836, ch. 270, 5 Stat. 80 ........ 15

Act of July 8, 1870, ch. 230, 16 Stat 198 ........ 8

Act of Feb. 19, 1897, ch. 265, 29 Stat. 538 ........ 8, 9

1 Annals of Cong. (1789) (Joseph Gales ed., 1834) ........ 20

Artificial Intelligence and Copyright, 88 Fed. Reg. 59942 (Aug. 30, 2023) ........ 3

11 Cong. Deb. (1835) ........ 17

28 Cong. Rec. (1896) ........ 9

29 Cong. Rec. (1897) ........ 9

112 Cong. Rec. (1966) ........ 10

Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998) ........ 10

H.R. 5976, 54th Cong. (1896) ........ 9

H.R. Rep. No. 94-1476 (1976) ........ 10

H.R. Rep. No. 105-796 (1998) (Conf. Rep.) ........ 10

Library of Congress, *Report of the Librarian of Congress* (1901) ........ 8, 9

S. Rep. No. 54-1573 (1896) ........ 8, 9

S. Rep. No. 101-268 (1990) ........ 10

**Page(s)**

S. Rep. No. 105-250 (1998) .................................................................... 24

17 U.S.C. § 701(b)(1).............................................................................. 1, 10

EXECUTIVE BRANCH MATERIALS

*Appointment of Acting Purser*,
6 Op. Att'y Gen. 357 (1854) ................................................................. 25

*Chief of Bur. of Steam Eng'g—Ret.—Appointment*,
27 Op. Att'y Gen. 337 (1909) ............................................................... 26

*The Claim of Surgeon DuBarry for Back Pay*,
4 Op. Att'y Gen. 603 (1847) ................................................................. 14

*The Const. Separation of Powers Between the President and Cong.*, 20
Op. O.L.C. 123 (1996) ........................................................................ 16, 25

*Dep't of Energy—Appointment of Interim Offs.—Dep't of Energy Org. Act*,
2 Op. O.L.C. 405 (1978) ...................................................................... 27

*Designating an Acting Att'y Gen.*,
42 Op. O.L.C. 182 (2018) .................................................................... 26

*Exec. Power of Appointment*,
4 Op. Att'y Gen. 248 (1843) ................................................................. 25

Memorandum for Neil Eggleston from Walter Dellinger, Assistant Attorney General, OLC, *Re: Appointment of an Acting Staff Director of the United States Commission on Civil Rights* (Jan. 13, 1994) .......... 27

*Off. and Duties of Att'y Gen.*,
6 Op. Att'y Gen. 326 (1854) ................................................................. 26

*Power of the President to Designate Acting Member of the Fed. Home Loan Bank Bd.*,
1 Op. O.L.C. 150 (1977) ...................................................................... 27, 28

*The President and Accounting Offs.*,
1 Op. Att'y Gen. 624 (1823) ................................................................. 16

**Page(s)**

*President-Temp. Recess Appointments*,
25 Op. Att'y Gen. 258 (1904) .......... 26

*Removal of Assistant Postmaster*,
17 Op. Att'y Gen. 475 (1882) .......... 16

*Status of the Acting Dir., Off. of Mgmt. and Budget*,
1 Op. O.L.C. 287 (1977) .......... 26

*Temp. Presidential Designation of Acting Bd. Members of the Inter-Am. Found. & the U.S. Afr. Dev. Found.*,
49 Op. O.L.C. ___(Mar. 14, 2025) .......... 28

BOOKS, ARTICLES, AND OTHER AUTHORITIES

John Quincy Adams, Diary Entry (Jan. 5, 1822), *reprinted in* 32 *The John Quincy Adams Digital Diary* .......... 15

John Y. Cole, *Ainsworth Spofford and the Copyright Law of 1870*,
6 J. Libr. Hist. (1971) .......... 7, 8

*Documentary History of the First Federal Congress 1789–1791*
(Charlene Bangs Bickford et al. eds., 2019) .......... 20

*The Federalist No. 76* (Clinton Rossiter ed., 1961) .......... 6

James Kent, *Commentaries on American Law* (1826) .......... 14, 17

Letter from James Madison to Thomas Jefferson (Feb. 13, 1814),
*reprinted by Nat'l Archives: Founders Online* .......... 15

John Marshall, *The Life of George Washington* (1807) .......... 14, 17

Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* (2020) .......... 2

*The Papers of George Washington, Presidential Series* (Dorothy Twohig ed., 1993) .......... 14

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) .................... 6

Joseph Story, *Commentaries on the Constitution of the United States* (1st ed. 1833).................... 14, 17

E. Garrett West, *Congressional Power over Office Creation*, 128 Yale L.J. 166 (2018) .................... 3, 5

# GLOSSARY

OLC Office of Legal Counsel

## INTEREST OF *AMICI CURIAE*

Representatives Joseph Morelle and Jamie Raskin are Members of Congress and the Ranking Members of the Committee on House Administration and Committee on the Judiciary, respectively. They are served by and oversee the management of the Library of Congress and the United States Copyright Office and are therefore familiar with the Register of Copyrights and the important responsibilities carried out by that officer. As Members, they also have a strong interest in the separation of powers and accordingly have an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

While defending the President's attempt to remove the Register of Copyrights—an officer that Congress tasked with "[a]dvis[ing] Congress on national and international issues relating to copyright," 17 U.S.C. § 701(b)(1)—Defendants have raised two deeply flawed arguments about presidential power. This Court should reject them.

The Constitution's Framers gave Congress—not the executive—the power to determine the structure of the federal government. They also committed certain functions to Congress, including, among other things, "securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Over a century ago, Congress exercised these authorities to create the Register of Copyrights. It also limited the

executive's power over the Register by giving the Librarian of Congress exclusive authority to appoint, supervise, and remove her. In doing so, lawmakers enhanced the Register's ability to advise Congress in exercising its authority over intellectual property. *See infra* Section I; *cf. Trump v. Slaughter*, 146 S. Ct. 2283, 2302 (2026) (recognizing that Congress can create officers to "assist it with its functions").

The Framers' decision to give Congress the power to create federal offices and determine the Federal government's structure was a well-considered one. It was a direct response to their experiences in the colonial era, when British kings used their power to create and fill offices to construct a "vast patronage network" that they used to "bribe, threaten, and cajole" lawmakers. Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 152 (2020); *see also The Declaration of Independence* para. 12 (U.S. 1776) ("He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people ...."). The Framers "made certain that the American executive would have no such power," including in the Constitution a "repudiation of any presidential prerogative power to create offices." McConnell, *supra*, at 153-54.

In addition to giving *Congress* the power to create offices, the Framers divided the power to fill principal offices between the President and the Senate, providing another "critical structural safeguard[]" against executive aggrandizement. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (internal

quotation marks omitted). They also gave Congress additional discretion over inferior officers, whose work would be subject to "review by a principal officer." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 765 (2025). By giving Congress authority over office-creation and "forbid[ding] the President to appoint principal officers without the advice and consent of the Senate," *SW Gen.*, 580 U.S. at 313 (Thomas, J., concurring), the Appointments Clause reflects the assumption that "*Congress* should be first among equals in the construction and definition of the federal government," E. Garrett West, *Congressional Power over Office Creation*, 128 Yale L.J. 166, 178 (2018) (emphasis in original).

Last Spring, Defendants sought to override Congress's decision to create the Register of Copyrights and place her under the Librarian's supervision. After removing Dr. Carla Hayden from her Senate-confirmed position as Librarian of Congress, the President purported to appoint an Acting Librarian rather than nominate a person to seek Senate confirmation. *See* JA 013. Two days later, Defendants attempted to remove Shira Perlmutter as Register, seemingly in response to the Copyright Office's publication of a report opining on the use of copyrighted material to train generative AI models. JA 019-20. This report responded to "growing Congressional … interest" in these issues and aimed to help Congress "assess whether legislative … steps in this area are warranted." Artificial Intelligence and Copyright, 88 Fed. Reg. 59942, 59942-44 (Aug. 30, 2023).

To justify these actions, Defendants have put forth two extraordinary—and meritless—constitutional arguments. First, Defendants have claimed that Article II empowers the President to remove the Register—at least when the Librarian position is vacant. *See* Stay App. 19, *Blanche v. Perlmutter*, No. 25A478, 2026 WL 1871314 (U.S. Oct. 27, 2025) (hereinafter "Stay App."). This claim is unsupported by history and runs headlong into Supreme Court precedent. The Court long ago confirmed that when the President is not responsible for appointing an officer, he "has certainly no power to remove" her. *Ex parte Hennen*, 38 U.S. 230, 260 (1839). Historical practice—including the history the Court relied upon when assessing the President's removal power in *Slaughter*—confirms this understanding. *See infra* Section II; *see generally NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (noting that the Supreme Court places "significant weight upon historical practice" when interpreting constitutional provisions allocating power among the branches). And this consensus makes sense. The Constitution supplies a process for a President who wants to remove an inferior officer when the principal office above that person is vacant: the President simply appoints a successor by the means Article II prescribes—nomination and Senate Confirmation. Then *that* officer may remove the inferior.

Second, Defendants have asserted that the President has "inherent authority" to appoint an acting Librarian. Appellees Opp'n Mot. Inj. 18. But there is no basis

in the Constitution for such a claim, and no court has ever endorsed it. Indeed, the very existence of the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, as well as a long history of legislation providing for acting officers, demonstrates that the President needs affirmative statutory authority to fill offices temporarily without Senate confirmation. *SW Gen.*, 580 U.S. at 293. Even the Department of Justice opinions that Defendants have cited do not support their sweeping claims. While the Department has taken the position that presidents enjoy some inherent authority to name acting officials, it has—at least until recently—always recognized that the exercise of that authority is only permissible under unique and exigent circumstances that are not present here. *See infra* Section III.

Defendants' arguments, if accepted, would jeopardize the significant "structural safeguard" of the Appointments Clause, *SW Gen., Inc.*, 580 U.S. at 293, and undermine Congress's "plenary control" over executive offices, West, *supra*, at 209. This Court should reject them.

## ARGUMENT

### I. Congress Exercised its Broad Authority over Federal Offices when Creating the Register of Copyrights as a Legislative Officer under the Control of the Librarian of Congress.

**A.** The Constitution gives Congress the authority to determine how to shape the federal government. Seeking an adviser to "assist it with its functions," *Slaughter*, 146 S. Ct. at 2302, Congress chose to place the Register of Copyrights

within the legislative branch, under the exclusive control of the Librarian of Congress.

While the Framers anticipated the creation of "Departments," *see* U.S. Const. art. II, § 2, cl. 1, they left unspecified what those departments would be and how they would be organized. Instead, they gave Congress the authority to make laws necessary and proper for carrying into execution "all" powers of "the Government of the United States," *id.* art. I, § 8, cl. 18, including the authority to "establish all offices," 2 *The Records of the Federal Convention of 1787*, at 345 (Max Farrand ed., 1911).

The Framers also gave Congress a role in the appointment and removal of officers. For principal officers, the Framers recognized that lodging the appointment power in the President alone posed a risk of corruption. 2 *Farrand's Records*, at 43. For this reason, they designed the Senate's advice-and-consent role as a "excellent check" against presidential abuses. *The Federalist No. 76*, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961). They also gave Congress discretion to bypass the advice-and-consent requirement with respect to "inferior Officers," whose appointment could be vested by statute "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Because these officers were subject to some amount of supervision by principals, the Framers concluded that allowing Congress additional flexibility in regulating

them would not disturb "the chain of political accountability that was central to the Framers' design of the Appointments Clause." *Kennedy*, 606 U.S. at 794; *id.* at 765 (inferior officers are "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate").

**B.** Since the Founding, Congress has exercised its authority, as it deemed "best for the public interest," to create offices and agencies within different branches of government, to vest department heads with the power of appointing inferior officers, and to "restrict the power of removal" of these inferior officers in various ways. *United States v. Perkins*, 116 U.S. 483, 485 (1886). Congress exercised these powers when creating the office of the Register of Copyrights in 1897.

The creation of the Register was the culmination of a decades-long effort to establish a "central agency for the registration and custody of copyright deposits." John Y. Cole, *Ainsworth Spofford and the Copyright Law of 1870*, 6 J. Libr. Hist. 34 (1971). In 1802, the Library of Congress was established "for the use of Congress in connection with the work of legislation." An Act concerning the Library for the use of both Houses of Congress, ch. 2, § 2, 2 Stat. 128, 129 (1802) (authorizing creation of the Library and empowering congressional leaders to make "regulations and restrictions in relation to the said library"). In 1870, Congress

required the Librarian of Congress to perform "all acts and duties required by the law touching copyrights." Cole, *supra,* at 35 (citing Act of July 8, 1870, ch. 230, § 85, 16 Stat. 198, 212). In 1897, Congress transferred these duties to the Register and housed her office within the Library. *See* Act of Feb. 19, 1897, ch. 265, 29 Stat. 538, 545.

There were good reasons to place the Register under the Librarian's supervision. First, copyright law was closely intertwined with the Library. *See, e.g.*, S. Rep. No. 54-1573, at 99 (1896) (describing how the Library's collections were built in part by the legally required deposits of volumes by copyright applicants); *id*. at 141, 252 (Rep. Quigg) (discussing the close relationship between copyright law and the Library's collections). Furthermore, placing responsibility for copyright duties within the Library would give Congress access to advice and statistics on copyright matters. *See* Cole, *supra*, at 39; Library of Congress, *Report of the Librarian of Congress* 202 (1901) (hereinafter "*Report*") (describing the Librarian's obligation to report annually to Congress on "the affairs of the library, including the copyright business").

Given the relationship between the Library and copyright matters, Congress gave the Librarian exclusive authority over the Register. *See* Act of Feb. 19, 1897, 29 Stat. at 545; *Report*, *supra*, at 201. The Register was "to be appointed by the Librarian," would "report to the Librarian," and would be "subordinate to him."

29 Cong. Rec. 1832 (1897) (Sen. Cullom); *see id.* at 1947 (1897) (Rep. Dockery). This arrangement furthered Congress's plan to step away from managing the day-to-day affairs of the Library and give the Librarian "complete and entire control over the library proper, including the copyright business." *Report*, *supra*, at 201. Indeed, the law creating the Register also permitted the Librarian to make Library-related regulations—a function previously undertaken by Congress's Joint Committee on the Library. *Id.* at 198-201.

Nowhere in this legislation did lawmakers grant the President any authority over the Register or copyright matters. In fact, the 54th Congress, which created the Register position, explicitly rejected proposals under which the President would appoint the Register, *see, e.g.*, H.R. 5976, 54th Cong. (1896), instead agreeing that "it would be eminently proper" to place that officer within the Librarian's control, S. Rep. No. 54-1573, at 133 (Librarian Ainsworth Spofford). The 54th Congress also eliminated the President's sole control over the Librarian's appointment. Whereas presidents could previously appoint the Librarian "without regard to Congress," S. Rep. No. 54-1573, at 214 (Rep. Quigg), the law creating the Register for the first time required the Senate to confirm the Librarian, Act of Feb. 19, 1897, 29 Stat. at 545; *see generally Report*, *supra*, at 200-01; *cf.* 28 Cong. Rec. 5497 (1896) (Sen. Chandler) ("[i]t was the intention of the two Houses in

creating a library that it should be absolutely within the control of the two Houses and not in the control of the Executive").

In the ensuing years, the Register continually served as an advisor to Congress on intellectual property matters. Congress has "relie[d] extensively on the Copyright Office to provide its technical expertise in the legislative process." S. Rep. No. 101-268, at 6 (1990); *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 159-60 (1985) (describing the Copyright Office's involvement in the revision of copyright laws in 1976, including by "authorizing a series of 34 studies on major issues of copyright law" and "conduct[ing] numerous meetings with representatives of the many parties that the copyright law affected").

Later revisions of the copyright laws cemented the Register's position within the Library and its role as an advisor to Congress on copyright matters. For example, a 1998 law codified the Register's "longstanding role as advisor to Congress on … copyright." H.R. Rep. No. 105-796, at 77 (1998) (Conf. Rep.); *see* Digital Millennium Copyright Act, Pub. L. No. 105-304, title IV, § 401(b), 112 Stat. 2860, 2888 (1998); 17 U.S.C. § 701(b)(1). It was this advisory role that led various lawmakers to describe the Register as "an employee of the Legislative Branch." H.R. Rep. No. 94-1476, at 174 (1976); 112 Cong. Rec. 27759 (1966) (Rep. Poff) ("I think we should be particularly proud of the Copyright Office because it is a part of the legislative branch ….").

* * *

In short, when Congress established the Copyright Office and gave the Librarian exclusive power to appoint and control the Register, it exercised its constitutional authority to create agencies and offices and prescribe how they are staffed and supervised. Seeking to bypass Congress's choices—apparently due to disagreement with advice the Register provided *to Congress* in her report on AI—Defendants make extraordinary arguments about inherent presidential authority. Neither argument holds water, as the next two Sections explain.

## II. Presidents Have No Inherent Authority to Remove the Register of Copyrights.

Defendants have argued that "Article II empowers the President to remove inferior officers … directly," at least "when there is no department head and the President lacks the power to designate an acting department head." Stay App. 19. This is wrong.

**A.** Presidents have no authority to remove officers or employees whom they do not appoint. As this Court has observed, "[a]bsent relevant legislation" "the power to remove is held by the appointing authority, and only by the appointing authority." *Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239, 247 (D.C. Cir. 1981). Here, the appointing authority is the Librarian.

The Supreme Court first made this point nearly two hundred years ago, observing that when the President does not appoint an officer, he "has certainly no

power to remove" her. *Hennen*, 38 U.S. at 259. In *Hennen*, the Court considered whether a district court judge could remove at pleasure a clerk he had appointed for no stated term. *Id.* at 257-58. The Court concluded that the judge could remove the clerk because, in the "absence of all constitutional provision, or statutory regulation," the power to remove is incident to the power to appoint. *Id.* at 259. It further observed that "[t]he same rule" applied to "all inferior officers," drawing on the "settled usage and practical construction of the Constitution and laws." *Id.* at 260. Removal of inferior officers whom the President has no power to appoint, the Court explained, is different from the removal of presidential appointees—a distinction rooted in the text of the Appointments Clause and "the chain of political accountability that was central to the Framers' design" of that provision. *Kennedy*, 606 U.S. at 794. Here, the officer who appoints the Register enjoys the power of removal, and "the President has certainly no power to remove." *Hennen*, 38 U.S. at 260.

*Hennen* echoed Founding-era conceptions of the law of officer removal, in which the removal power was linked to the appointment power. The Court there recounted what would later be called the "Decision of 1789," in which the First Congress debated whether the Constitution gave presidents inherent removal authority over certain principal officers, and if so, whether the Senate shared that authority. *See Slaughter*, 146 S. Ct. at 2295-96. During that debate, legislators

disagreed about whether a Foreign Affairs Secretary, who was to be appointed by the President and confirmed by the Senate, would be removable "by the President alone, or with the concurrence of the Senate." *Hennen*, 38 U.S. at 259. Importantly, lawmakers from both factions displayed "a full recognition of the principle that the power of removal was incident to the power of appointment." *Id.* They disagreed only because, in the case of Senate-confirmed officers, some argued that the President and the Senate *jointly* "constitut[ed] the appointing power." *Id.*

In other words, the "great question" in 1789 was whether, for a Senate-confirmed principal officer, "the removal was to be by the President alone, or with the concurrence of the Senate, both constituting the appointing power." *Id.* As for inferior officers—like the Register—whose appointment Congress vested in a department head, the Court explained that removal power depends "upon the authority of law," thus requiring "an inquiry into the meaning and intention of the statute" creating the office. *Id.* at 260. The Court then identified the default rule that applies "[i]n the absence of … statutory regulation": unless Congress provides otherwise, courts will "consider the power of removal as incident to the power of appointment." *Id.* at 259.

In the decades after the Founding, it remained widely understood that presidential removal power extended only to officers appointed by the President.

*See* 1 James Kent, *Commentaries on American Law* 289 (1826) (describing the Decision of 1789 as applying "to every other officer of government *appointed by the president and senate*" (emphasis added)); 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1531, at 390 n.1 (1st ed. 1833) (suggesting that the Decision endorsed the notion that "removal by the executive could not be abridged by the legislature; *at least, not in cases, where the power to appoint was not subject to legislative delegation*" (emphasis added)); 5 John Marshall, *The Life of George Washington* 196 (1807) (noting that the Decision concerned the manner in which "high officers" were removeable). The executive branch itself explained that "the construction adopted [in 1789] was intended to reach every officer *appointed by the President*," *The Claim of Surgeon DuBarry for Back Pay*, 4 Op. Att'y Gen. 603, 612 (1847) (emphasis added).

**B.** Early federal practice confirms that presidents have no inherent power to remove officers they do not appoint. For example, when early Congresses granted the Postmaster General the authority to appoint subordinates, *see, e.g.*, An Act for the temporary establishment of the Post-Office, ch. 16, § 1, 1 Stat. 70, 70 (1789), it was understood that he also had "sole and exclusive authority" to remove them, 3 Story, *supra*, at 387. This sole and exclusive authority excluded the President. George Washington thus believed he had no direct role in the supervision of deputy postmasters. *See* 4 *The Papers of George Washington, Presidential Series*

428 (Dorothy Twohig ed., 1993) (explaining that the laws "establishing the Post Office" gave "power to the Post[m]aster General to appoint his own Deputies, and mak[e] him accountable for their conduct," which "is an insuperable objection to my taking any part in this matter"). Indeed, Congress saw it necessary to specify the President's removal power over deputy postmasters in later legislation. *See* Act of July 2, 1836, ch. 270, § 33, 5 Stat. 80, 87-88.

Undergirding these laws was an understanding that, absent legislation to the contrary, a President's power over inferior officers is limited to acting through the presidentially appointed principal officer—and if necessary, exercising his power of removal over that person and securing a replacement who will fire the inferior or bring her in line. Thus, when President Madison disliked several of the deputies appointed by his Postmaster General, he removed the Postmaster General—not the deputies. *See* Letter from James Madison to Thomas Jefferson (Feb. 13, 1814), *reprinted by* Nat'l Archives: Founders Online, https://founders.archives.gov/documents/Jefferson/03-07-02-0121; *see also* John Quincy Adams, Diary Entry (Jan. 5, 1822), *reprinted in* 32 The John Quincy Adams Digital Diary, https://www.primarysourcecoop.org/publications/jqa/document/jqadiaries-v32-1822-01-p198--entry5 ("Mr. Granger had been removed with disgrace by President Madison for appointing Dr. Leib postmaster at Philadelphia.").

As Attorney General William Wirt explained in 1823, if a department head "should make a corrupt appointment, … the power of correction which the President holds is not to supersede such appointment by one made by himself." *The President and Accounting Offs.*, 1 Op. Att'y Gen. 624, 626 (1823). Instead, the President should "punish[]" or remove the supervising officer, appoint a successor, and "*through the medium of such successor*, … remove the deputy." *Id.* (emphasis added); *cf. Removal of Assistant Postmaster*, 17 Op. Att'y Gen. 475, 475 (1882) ("In the case of inferior officers whose appointment is by law vested in the heads of Departments, or in officers appointed by the President, he can only act indirectly by his authority over his own appointees."); *cf. The Const. Separation of Powers Between the President and Cong.*, 20 Op. O.L.C. 123, 166 (1996) ("it was determined that inferior officers appointed by a department head were not removable by the President").

**C.** The Supreme Court has reiterated *Hennen*'s removal-follows-appointment principle in cases involving all types of inferior officers. *See, e.g.*, *Burnap v. United States*, 252 U.S. 512, 514-15 (1920) (landscape architect appointed by Secretary of War); *Keim v. United States*, 177 U.S. 290, 293-94 (1900) (clerk appointed by Secretary of the Interior). And nothing in the Court's recent decision in *Slaughter* changes this longstanding principle.

Relying on the structure of the Constitution and a "regular course of practice" beginning with the Decision of 1789, the Court in *Slaughter* invalidated removal restrictions applicable to certain presidentially appointed, Senate-confirmed principal officers: the heads of independent agencies exercising "vast" regulatory powers. *Slaughter*, 146 S. Ct. at 2291-96. But *Slaughter* provides no basis for extending the President's removal power to inferior officers who are not appointed by the President.

Indeed, the Court itself described the Decision of 1789 as confirming the President's "power to remove *his own appointees*." *Id*. at 2297 (emphasis added). The Court also relied on early commentators who described the Decision as "settl[ing]" the issue of presidential removal, and those same commentators described the presidential removal power as extending only to officers appointed by the President and confirmed by the Senate. *See id.* (first citing 5 Marshall, *supra*, at 199-200; then citing 1 Kent, *supra*, at 289-290; and then citing 3 Story, *supra* § 1537, at 395). When Daniel Webster twice observed that the President's removal power was "settled," *Slaughter*, 146 S. Ct. at 2297, he was describing a power applicable to officers who were Senate-confirmed. *See* 11 Cong. Deb. 461-69 (1835) (Sen. Webster) (emphasizing that the Decision of 1789 concerned officers for whom "it is the President and the Senate … who hold the power of appointment").

Moreover, the Court in *Slaughter* relied heavily on *Myers v. United States*, its "best word" on the President's removal power, *see Slaughter*, 146 S. Ct. at 2299, and *Myers* explicitly rejected any contention that the President could remove inferior officers he does not appoint. *Myers v. United States*, 272 U.S. 52, 164 (1926). Instead, the "power of removal … remain[s] … with the President … so long as Congress does not exercise th[e] power" to vest appointment in a department head. *Id.* at 161; *id.* (recognizing that "in committing the appointment of such inferior officers to the heads of departments, [Congress] may … restrict[] the latter in the exercise of the power of removal"); *see Morrison v. Olson*, 487 U.S. 654, 689 n.27 (1988) ("*Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of 'inferior' executive officials in the head of a department."); *cf. id.* at 794 n.4 (Scalia, J., dissenting) (opining that the President need not have "plenary power to remove inferior officers" because they are "subject to the supervision of" principals).

Finally, both *Slaughter* and *Myers* focused on the need for presidential control over "those executing the laws," *see Slaughter*, 146 S. Ct. at 2291 (quoting *Myers*, 272 U.S. 164), a proposition with limited relevance to a claimed power to remove an inferior officer on account of her advice *to Congress*, *see* JA 019; JA 028-29. In *Slaughter*, the Court explicitly declined to "determine the fate of officials not before [it]," and recognized that "not all offices created by Congress

necessarily come with executive … power attached." *Slaughter*, 146 S. Ct. at 2305-06. Citing an earlier case, the Court explained that officers with "powers 'of an investigative and informative nature,'" or who "may 'be regarded as merely in aid of the legislative function of Congress,'" would generate a different conclusion regarding presidential removal. *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 137-38 (1976)); *id.* at 2302 (noting that Congress can "establish independent agencies to assist it with its functions"). Supreme Court precedent thus provides no support for defendants' power to remove the Register due to her provision of "mere[] … aid" to Congress. *Id.* at 2305 (quoting *Buckley*, 424 U.S. at 138).

**D.** Defendants have tempered the breadth of their contentions by claiming that the President must at least enjoy the ability to remove an inferior officer when "there is no department head and the President lacks the power to designate an acting department head." Stay App. 18-19. Holding otherwise, they argue, would "break[] the chain of political accountability that Article II demands." *Id.* at 19 (quotation marks omitted).

Even assuming a vacancy exists here, *but see* Appellants Br. 6, 42, the Constitution provides the process for replacing an inferior officer in the absence of a department head: the President must appoint a new department head. After all, even the Founding Era's strongest advocates of presidential control saw the advice-and-consent requirement as an important backstop against executive overreach.

During the Decision of 1789, for example, James Madison emphasized that presidents could not abuse their removal authority to install "unworthy favorite[s]" in office, because they had to "consult the Senate" and obtain confirmation before a removed officer could be replaced. 11 *Documentary History of the First Federal Congress 1789–1791*, at 897 (Charlene Bangs Bickford et al. eds., 2019) (Rep. Madison); *see also id.* at 968 (Boudinot) ("If he removes a good officer, he can not appoint his successor without the consent of the senate."); *id.* at 981-82 (Rep. Ames) (similar); 16 *id.* at 828-29 (Rep. Madison) (describing the confirmation power as a limit on the removal power); 1 Annals of Cong. 508-09 (1789) (Joseph Gales ed., 1834) (Rep. Clymer); *id.* at 500 (Rep. Hartley).

This is consistent with the Supreme Court's recognition that the Constitution contemplates that "the responsibilities of an office requiring Presidential appointment and Senate confirmation … may go unperformed if a vacancy arises" in a Senate-confirmed office. *SW Gen.*, 580 U.S. at 292. Presidents can partially ameliorate the situation by appointing acting officers if Congress has authorized it, *see infra* Section III, but they do not gain additional inherent removal powers due to the vacancy.

Moreover, the cases on which Defendants rely do not support their argument. Stay App. 19 (quoting *Free Enter. Fund v. Pub. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010), and *United States v. Arthrex, Inc.*, 594 U.S. 1, 18

(2021)). These cases do not even address—let alone endorse—presidential removal power over inferior officers whom the President does not appoint, and certainly not over *legislative* inferior officers. *Free Enterprise Fund*, for example, addressed a "novel" and "highly unusual" statute that insulated inferior officers from removal by their supervising principal officers, who in turn were insulated from presidential removal. 561 U.S. at 495, 505. This meant that, even when there were no vacancies, the inferior officers were *always* separated from presidential control by "two layers of for-cause removal" protections. *Id.* at 505. And notably, the Court's solution was not to allow presidents to fire the inferior officers, but to restore *the principal officers'* ability to fire them at will. *Id.* at 509-10 (explicitly declining to make the inferior officers "removable by the President, for good cause or at will"). The Court gave no indication that a temporary vacancy in a principal office would override the rule that when Congress vests appointment power in a department head, "it is ordinarily the department head, rather than the President, who enjoys the power of removal." *Id.* at 493.

## III. Presidents Have No Inherent Authority to Install an Acting Librarian of Congress During Vacancies.

Defendants have argued that the Take Care Clause gives presidents inherent constitutional authority to designate acting officers, *see* Appellees Opp'n Mot. Inj. 18; *see also* Defs. Opp'n Mot. Prelim. Inj. (D. Ct. Dkt. 33) 18-20, but no court has

ever endorsed that theory. And with good reason: it is at odds with constitutional text and historical practice.

**A.** The Appointments Clause "prescribes the exclusive process by which the President may appoint 'officers of the United States.'" *SW Gen., Inc.*, 580 U.S. at 311 (Thomas, J., concurring) (quoting *United States v. Germaine*, 99 U.S. 508, 510 (1879)). It thus "prohibits the appointment of principal officers without the advice and consent of the Senate." *Aviel v. Gor*, No. 25-5015, 2025 WL 1600446, at *2 (D.C. Cir. June 5, 2025) (Katsas, J., concurring).

The Recess Appointments Clause confirms that the Framers knew how to grant presidents unilateral appointment authority when they deemed it necessary—and did so only in the limited circumstance of a Senate recess. *See* U.S. Const. art. II, § 2, cl. 3. If the Take Care Clause already provided inherent authority to fill vacancies through temporary appointments, as Defendants contend, the Recess Appointments Clause would be practically irrelevant: the President could simply designate acting officers to serve indefinitely rather than contending with the "specific checks and balances" the Clause provides. *Aviel*, 2025 WL 1600446 at *2 (Katsas, J., concurring); *Holmes v. Jennison*, 39 U.S. 540, 570-71 (1840) (plurality opinion) ("[I]t is evident from the whole [Constitution], that no word was unnecessarily used, or needlessly added.").

Moreover, Defendants cannot identify a single judicial decision—at any level, in any context—endorsing the inherent authority they claim. Instead, they have relied on dicta from *Williams v. Phillips*. Appellees Opp'n Mot. Inj. 19-20 (citing *Williams v. Phillips*, 482 F.2d 669, 670 (D.C. Cir. 1973)). In *Williams*, this Court held that an acting principal officer could not serve for four-and-a-half months without any nomination being submitted to the Senate. *Id.* at 670-71. The Court posited that it "could be argued" that presidents might have "an implied power, in the absence of limiting legislation," to make a temporary appointment for a "reasonable period" before submitting a nomination, but held that four-and-a-half months exceeded that period. *Id.*; *Aviel*, 2025 WL 1600446, at *2 n.1 (Katsas, J., concurring) (interpreting *Williams* to stand for the limited "suggest[ion] that the President might possess an inherent Article II power to designate someone to temporarily exercise the powers of a vacant office in order to abate an emergency"). Even if that were true—and *amici* do not concede it is—this dicta hardly supports Defendants' broad claim of unconditional inherent presidential authority. In any event, Defendants have not made any showing of extraordinary circumstances to justify the use of such authority here.

**B.** Furthermore, Congress has always authorized presidents to make acting appointments, rather than assuming that they had any inherent power to do so. As the Court recounted in *Southwest General*, "[s]ince President Washington's first

term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant [Senate-confirmed] office without first obtaining Senate approval." *SW Gen.*, 580 U.S. at 294.

This record of congressional control over acting appointments continued through the twentieth century, despite persistent "interbranch conflict." *Id.* at 294. In the 1970s and 1980s, various executive agencies disagreed about whether they had statutory authority, "apart from the Vacancies Act," to temporarily fill vacant offices. *Id.* at 294-95. When tensions persisted despite later legislation, and acting officials routinely served beyond statutory limits, Congress perceived "a threat to the Senate's advice and consent power" and passed the FVRA. *Id.* at 295. Lawmakers underscored that such legislation was necessary because presidents lacked any "inherent appointment authority" themselves. *See* S. Rep. No. 105-250, at 5 (1998) (emphasizing that legislation was necessary because "the President lacks any inherent appointment authority for government officers").

This long history of vacancies legislation reflects the understanding that the "authority to appoint acting officials" is a power that must be "*given*" to the President by Congress—not something that presidents enjoy automatically. *SW Gen.*, 580 U.S. at 294. If the President had an inherent power to appoint acting officials, these laws—like the Recess Appointments Clause—would be superfluous.

**C.** Lacking support in text, history, or precedent, Defendants have cited opinions from the executive branch. Appellees Opp'n Mot. Inj. 18-19. Of course, these views "are not binding, nor … entitled to deference." *See Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C. Cir. 2023). But even if they were, the opinions that Defendants have cited do not substantiate their claim of broad inherent authority to appoint acting officers. Rather, until recently, the executive has endorsed such inherent authority only in response to unique and exigent circumstances—not routine vacancies.

Two early Attorneys General opined that, "in cases of need," presidents had some constitutional power to make temporary appointments, *see Const. Separation of Powers*, 20 Op. O.L.C. at 161-62, but neither of these opinions supports the current administration's broad claim of inherent presidential power. One opinion did not involve principal or Senate-confirmed officers, but rather the Secretary of War's ability to designate an "agent or commissioner" to carry out investigations required by statute. *See Exec. Power of Appointment*, 4 Op. Att'y Gen. 248, 248 (1843) (asserting without analysis that the Take Care Clause provides such authority).

The other opinion concerned only military appointments "for a particular exigency, in a distant service," endorsing a naval regulation that provided: "'On foreign stations a commander may, when absolutely necessary, give acting

appointments to fill vacancies which may be occasioned by death or other circumstances ….'" *Appointment of Acting Purser*, 6 Op. Att'y Gen. 357, 364-65 (1854); *see id.* ("In such distant service, vacancies will happen which cannot abide to be filled until the President may be informed and exercise his appointing power."). Neither opinion supports the use of unilateral, unconditional, and unbounded acting appointments, and both require exigent circumstances. *Cf. President-Temp. Recess Appointments*, 25 Op. Att'y Gen. 258, 262 (1904) (using the two earlier opinions to opine that the President has a constitutional right to make a temporary appointment to fill a vacancy that occurred "during the recess of the Senate," because it may be "impossible" to immediately nominate a successor).

Other opinions allude to past instances of appointing temporary officers without congressional authorization but describe the legality of that practice as "questionable." *Off. and Duties of Att'y Gen.*, 6 Op. Att'y Gen. 326, 352 (1854); *Designating an Acting Att'y Gen.*, 42 Op. O.L.C. 182, 198 (2018). And still other opinions have directly acknowledged that presidents lack authority to fill vacancies without statutory authorization. *Chief of Bur. of Steam Eng'g—Ret.—Appointment*, 27 Op. Att'y Gen. 337, 345 (1909) (concluding that the President could not temporarily fill a vacancy created by retirement because Congress had not included retirement among the statutory conditions authorizing temporary appointments); *Status of the Acting Dir., Off. of Mgmt. and Budget*, 1 Op. O.L.C. 287, 289 (1977)

("in the absence of … legislation vesting a temporary power of appointment in the President, the constitutional process of nomination and confirmation must be followed" (quoting *Williams v. Phillips*, 360 F. Supp. 1363, 1371 (D.D.C. 1973))).

Like these earlier opinions, the Office of Legal Counsel (OLC)'s endorsements of inherent presidential authority have involved exigent circumstances, unique statutory contexts, or officials who were not deemed to be constitutional "officers." For instance, a 1977 opinion addressed a unique situation in which an unexpected loss of quorum threatened an agency's core functions and the President submitted a nomination the same day as the acting appointment. *See Power of the President to Designate Acting Member of the Fed. Home Loan Bank Bd.*, 1 Op. O.L.C. 150, 150 (1977). Similarly, a 1978 opinion concerned a newly created department requiring immediate leadership to begin operations, in which temporary appointments were thought to facilitate congressional intent. *See Dep't of Energy—Appointment of Interim Offs.—Dep't of Energy Org. Act*, 2 Op. O.L.C. 405, 405-06 (1978).

And a 1994 opinion—possibly the first in which OLC claimed a temporary appointment power absent unique circumstances—addressed a staff director position that was not Senate-confirmed, whom OLC regarded as "not a constitutional officer" at all. Memorandum for Neil Eggleston from Walter Dellinger, OLC, *Re: Appointment of an Acting Staff Director of the United States*

*Commission on Civil Rights* 4-5 (Jan. 13, 1994); *see id.* at 4 n.5 (noting that the Staff Director was a non-officer "appointed in a manner not specified in the Appointments Clause"). Importantly, too, a federal district court rejected the OLC's inherent authority argument, observing that "[n]o court has ever recognized that the President has such inherent authority." *George v. Ishimaru*, 849 F. Supp. 68, 71-72 (D.D.C. 1994), *vacated as moot*, No. 94-5111, 1994 WL 517746 (D.C. Cir. 1994).

The March 2025 OLC opinion on which Defendants principally rely departs radically from its predecessors. Unlike prior opinions that emphasized the short-term nature of acting appointments while permanent nominations were pending, *see, e.g.*, 1 Op. O.L.C. at 150, the 2025 opinion contemplates open-ended appointments, subject only to the vague limitation that acting service may not "continue indefinitely" and should instead last "a reasonable time," *Temp. Presidential Designation of Acting Bd. Members of the Inter-Am. Found. & the U.S. Afr. Dev. Found.*, 49 Op. O.L.C. __ (Mar. 14, 2025) (slip op. at 1, 10) (quotation omitted). The executive branch had never licensed such a broad contravention of the Appointments Clause.

* * *

Allowing the President to remove the Register by firing the Librarian and refusing to nominate a successor jettisons Congress's deliberate decisions about

intellectual property matters and undermines the structural safeguards enshrined in the Appointments Clause. This Court should reverse.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Smita Ghosh
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: September 8, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 8th day of September, 2026.

/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: September 8, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod